**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| Diana Vara ~~and,~~ Amanda Wilson, <u>and Noemy Santiago</u> *on behalf of themselves and all others similarly situated,*<br><br>      Plaintiff(s),<br><br>v.<br><br>ELISABETH DEVOS, *in her official capacity as Secretary of the United States Department of Education,*<br><br>AND<br><br>THE UNITED STATES DEPARTMENT OF EDUCATION,<br><br>      Defendants. | Civil          Action          No. ~~_____~~<u>19-12175-LTS</u><br><br><u>**FIRST AMENDED**</u> **CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>~~( )~~ |

### <u>INTRODUCTION</u>

1. Approximately 7,241 students borrowed federal student loans to pay for attendance at Everest Institute, an abusive for-profit school. The chief law enforcement officer in Massachusetts and a Commonwealth court agreed—nearly four years ago—that Everest Institute violated Massachusetts law and that these individuals were entitled to full restitution of all amounts paid to the school, whether those fees were paid out of pocket, by private loans, or by federal student loans or grants. This case is about the Department of Education's enduring refusal to discharge the federal student loans for those Everest students.

2. Everest Institute had locations in Chelsea and Brighton, Massachusetts (together, Everest Massachusetts). It was operated by Corinthian Colleges, Inc., an ignominious nationwide chain that went bankrupt and shut down in 2015.

1

3. While in operation, it offered career training programs leading to certificates or associate degrees in healthcare-related fields, such as medical insurance billing and coding, medical administrative assisting, dental assisting, and massage therapy. Everest marketed its programs to individuals who were un- or underemployed, and seeking job-specific training. Many were single mothers, immigrants, and/or the first in their families to go to college.  As of June 30, 2010, 89.9 percent of Corinthian's revenue came from federal student aid and grants.

4. The Attorney General of Massachusetts (AGO) investigated and prosecuted Everest Massachusetts for consumer fraud. In 2015, she asked the Department to cancel the federal student loans of each and every student who was impacted by the consumer fraud, as the AGO's prosecution of Everest demonstrated that each student had a "borrower defense" under the Department's own regulations. In 2016, a court of the Commonwealth entered judgment in favor of the AGO, finding that Everest had violated Massachusetts law and defrauded students.

5. Without issuing a reasoned decision denying or granting this request, the Department continues to collect on the loans of former students of Everest Massachusetts, including by seizing the tax refunds and garnishing the wages of individuals specifically named by the Attorney General as qualifying for loan cancellation.

6. This Court has already ruled that the Attorney General's submission validly invoked a borrower defense on behalf of approximately 7,241 former students of Everest Massachusetts. Further, the Court held that the Secretary had an obligation to act on the application.

7. Named Plaintiffs, on behalf of themselves and all of their classmates, ask the Court to rule that the Secretary is violating the Administrative Procedure Act by failing to render a reasoned decision on the Borrower Defense that the Attorney General submitted on behalf of 7,241 students in 2015.

8. Moreover, by the Secretary's own admission before this Court, she has determined that the AGO's submission is insufficient, in and of itself or in combination with all other information available to the Department, to establish a borrower defense for any and all individuals who took out a federal student loan in connection with Everest Massachusetts.  Plaintiffs seek an order setting aside this decision as arbitrary and capricious in violation of the Administrative Procedure Act.

9. The only non-arbitrary action that Defendants may take, in light of all the evidence in front of them, is to cancel the loans of all members of the proposed class, and return any money already collected towards these invalid loans.

## JURISDICTION AND VENUE

10. This action arises under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, and the Higher Education Act and its amendments, 20 U.S.C. § 1001, *et seq*.  This Court has jurisdiction over this case as it arises under federal law.  28 U.S.C. § 1331.

11. Venue is proper in this judicial district because a substantial part of the events or omissions giving rise to the claims occurred here, 28 U.S.C. § 1391(e)(1)(B), and ~~Plaintiff~~Plaintiffs Vara ~~is a resident~~and Santiago are residents of this judicial district, *id.* § 1391(e)(1)(C).

12. This Court is authorized to grant the relief requested in this case pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 706, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the Higher Education Act, 20 U.S.C. § 1082, and Federal Rule of Civil Procedure 23.

## PARTIES

13. Plaintiff Noemy Santiago is a resident of Dorchester, Massachusetts.  She borrowed federal student loans to attend Everest Institute in Brighton, Massachusetts.  On November 23, 2015, the AGO submitted an application for loan cancellation on Ms. Santiago's behalf, specifically naming

her, to the Department of Education.  The Department has not rendered a reasoned decision on the borrower defense asserted on Ms. Santiago's behalf by the AGO.

13. 14. Plaintiff Diana Vara is a resident of Medford, Massachusetts. She borrowed federal student loans to attend Everest Institute in Chelsea, Massachusetts. On November 23, 2015, the AGO submitted an application for loan cancellation on Ms. Vara's behalf, specifically naming her, to the Department of Education. From 2017 until Ms. Vara submitted an individual Borrower Defense in May of 2019, the Department authorized the garnishment of Ms. Vara's wages to pay her Everest student loans. Since 2017, the Department has seized her tax refunds to offset her Everest student loans. The Department has not rendered a reasoned decision on the borrower defense asserted on Ms. Vara's behalf by the AGO.

14. 15. Plaintiff Amanda Wilson is a resident of Epping, New Hampshire. She borrowed federal student loans to attend Everest Institute in Chelsea, Massachusetts. On November 23, 2015, the AGO submitted an application for loan cancellation on Ms. Wilson's behalf, specifically naming her, to the Department of Education. On March 6, 2019, Ms. Wilson learned that the Department seized her tax refund for tax year 2018 to offset her Everest student loans. On April 23, 2019, Ms. Wilson received notice that the Department of Education intended to garnish her wages in order to pay her Everest student loans. The Department has not rendered a reasoned decision on the borrower defense asserted on Ms. Vara's behalf by the AGO.

15. 16. Defendant Elisabeth DeVos is the Secretary of Education (the "Secretary"), and is charged by statute with the supervision and management of all decisions and actions of the United States Department of Education.  The Secretary oversees and is responsible for federal student loan programs.  *See* 20 U.S.C. § 1070(b). Plaintiffs sue Secretary DeVos in her official capacity.

16.17. Defendant United States Department of Education (the "Department") is an "agency" of the United States, within the meaning of the APA, 5 U.S.C. § 701(b)(1).  It is responsible for overseeing and implementing rules for the federal student aid program.

**STATUTORY AND REGULATORY BACKGROUND**

*The Federal Student Loan Program*

17.18. All loans at issue in this lawsuit were issued under Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§ 1070-1099, which provides the statutory authorization for federal student loans, including the Federal Family Education Loan ("FFEL") and Direct Loan programs.

18.19. Under the FFEL program, private lenders issued student loans, which were then insured by guaranty agencies and in turn reinsured by the Department. *Id.* § 1078(b)-(c). No new loans can be made under the FFEL program, effective July 1, 2010.

19.20. Under the Direct Loan program, the federal government directly issues student loans to eligible student borrowers for use at "participating institutions of higher education" as approved by the Department.  *See* 20 U.S.C. § 1087a.

20.21. Direct loans and FFEL loans have the same terms, conditions, and benefits, under the HEA.  20 U.S.C. § 1087e(a)(1).

21.22. Both of these programs were and are an important source of financing for individuals who otherwise would not be able to afford higher education and could not meet underwriting standards of private lenders.

5

~~22.~~23. Federal student loans are presumptively non-dischargeable in bankruptcy. 11 U.S.C. § 523(a)(8).

~~23.~~24. There is no statute of limitations on the Secretary's ability to collect federal student loans. 20 U.S.C. § 1091a(a)(2).

~~24.~~25. The Department possess extensive extrajudicial collection powers, including the power to size federal tax refunds and to garnish federal student loan borrowers' wages and benefits. *See* 31 U.S.C. § 3716; 31 U.S.C. § 3720A; 31 U.S.C. § 3720D.

~~25.~~26. However, before submitting a debt to the Department of Treasury for collection through offset of federal tax refunds, the Secretary must comply with certain notice requirements for the borrower, and then certify only legally enforceable debts to the Department of Treasury. 31 U.S.C. §§ 3716, 3720A(b)(3). Pursuant to the Department's annual certification agreement with Treasury's Bureau of Fiscal Services, the Department must also certify to the Department of Treasury before collection occurs that it "has considered any and all evidence presented by the Debtor disputing the Creditor Agency's determination that would preclude collection of the Debt."

**Borrower Defense**

~~26.~~27. "Borrower defense" refers to an assertion that a borrower's federal student loan is void or unenforceable because of school misconduct.

~~27.~~28. Beginning January 1, 1994, the Department issued a Common Application/Promissory Note for all FFEL Program loans, providing that the borrower is entitled to assert, as a defense to repayment of the loan, "all claims and defenses that the borrower could assert against the school." This provision was later incorporated into the Department's FFEL regulations, 72 Fed. Reg. 61,960 (Nov. 1, 2007) (adopting 34 C.F.R. § 682.209(g)).

~~28.~~29. In 1993, Congress altered the terms and conditions of Direct Loans to allow for student loan borrowers to seek cancellation of their loans on the basis of school misconduct.  103 P.L. 66,

107 Stat. 312.  The statute directs that "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part[.]" 20 U.S.C. § 1087e(h).

29.30. Pursuant to this directive, the Secretary promulgated a regulation that permits a Direct Loan borrower to assert, as a defense to repayment, "any act or omission of the school attended by the student that would give rise to a cause of action against the school *under applicable state law*." 34 C.F.R. § 685.206(c)(1)(emphasis added).  This regulation became effective July 1, 1995, and governs all Direct Loans borrowed by Everest students in Massachusetts.

*Chapter 93A*

30.31. State law provides the standard for borrower defense for all federal student loans at issue in this lawsuit. 34 C.F.R. § 685.206(c) (eff. until Oct. 16, 2018); 34 C.F.R. § 682.209(g).

31.32. The Massachusetts Consumer Protection Act, M.G. L. c. 93A, § 2, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]"

32.33. The AGO is expressly authorized to make rules and regulations interpreting the Act. M.G.L. c.93A §2(c).

33.34. The AGO promulgated regulations, first in 1978, addressing for-profit and occupational schools.  In 2014, these regulations were updated:

> In recent years, there has been a proliferation of for-profit and occupational post-secondary educational institutions that intensively market degree and non-degree programs to students. Many of these schools accept state and federal funds in the form of student grants and loans to finance student enrollment. Certain widespread acts and practices in the for-profit and occupational school industry continue to unfairly harm consumers, frequently leaving students with few career opportunities and significant student debt. The Attorney General, therefore, has updated and amended the 1978 regulations by replacing 940 C.M.R. 3.10 with 940 C.M.R. 31.00, to address problems experienced by consumers when they seek or are enrolled

in for-profit schools or occupational programs.

940 C.M.R. 31.01.

~~34.~~35. The Attorney General's Office (AGO) has express authority to bring any actions to enforce the Act in Superior Court. M.G.L. c. 93A, § 4.

### FACTUAL BACKGROUND AND RELATED PROCEEDINGS

~~35.~~36. The Attorney General of Massachusetts (AGO) began investigating Everest Massachusetts for consumer fraud in 2011. In the course of its investigation, the AGO obtained records from Corinthian, its accreditor, its successor, lenders, and other parties; reviewed over 650 surveys from former students; conducted over 900 employment verifications; and interviewed more than 100 former Corinthian employees and students.

~~36.~~37. Through its verification process, the AGO determined that Corinthian had inflated its in-field job placement rates by falsifying jobs, counting jobs regardless of field, and counting temporary and unsustainable employment. Further, Corinthian's sales representatives routinely told prospective students in-field job placement rates were even higher than claimed by the falsified reported rates.

~~37.~~38. The AGO initiated a lawsuit in Massachusetts Superior Court in early 2014, charging Corinthian for violations of the Massachusetts Consumer Protection Act, Mass. Gen. Laws c. 93A (Chapter 93A or the Act). The lawsuit alleged that, beginning in 2009 or earlier, the school misrepresented, *inter alia*, (1) the urgency of enrollment and the need to enroll immediately in Corinthian schools, (2) Everest MA's influence and historical success in finding jobs in the students' fields of study, (3) the employment opportunities available to Everest MA graduates, (4) the earnings of Everest MA graduates, (5) the assistance of Everest MA schools provide graduates

8

in obtaining employment in their fields of study, (6) the nature, character, and quality of Everest MA programs, (7) the transferability of Everest MA credits, (8) the availability of externships in the students' fields of study, together with the training provided by and employment opportunities accompanying externships, and (9) the nature and availability of financial aid.

38.39. On November 30, 2015, the Massachusetts Attorney General submitted a borrower defense application to the Department of Education on behalf of borrowers who took out federal student loans for students who attended Everest Institutes in Massachusetts—from the time that Corinthian began to operate campuses under its Everest Institute brand in 2007, until the schools closed in 2015—requesting that the Department find all such federal loans unenforceable and immediately discharge them.

39.40. The Attorney General supported her application with 2,700 pages of investigatory findings, supporting evidence, and attestations from former Corinthian students. In the view of the state's chief law enforcement officer, students are "legally entitled to relief" because an "extensive investigation" of Corinthian's Massachusetts operations "uncovered a program built on predation and lies," amounting to "an unrelenting scheme to secure unaffordable federal loans from vulnerable students, without providing the education, services, or opportunities promised." According to the Attorney General, "Corinthian amounted to a pervasive violation of Massachusetts law." On behalf of all students who attended Everest Massachusetts, the Attorney General requested that the Department "provide a swift, wholesale, and automatic discharge" of federal student loans.

40.41. Among the attachments to the Attorney General's borrower defense application was Exhibit 4, which contained information on 7,241 Everest students, including each student's name, dates of enrollment, contact information, and program(s) attended.

9

41. 42. On the necessity of discharging the loans of these specified students without the need for further action from the individuals, the Attorney General stated:

> Given the enclosed evidence of widespread abuse, it is important that the Department of Education automatically discharge the loans of Corinthian's Massachusetts borrowers, and not require borrowers to submit individual applications. It is well beyond the resources of borrowers to investigate cohort placement rates or aggregate witness statements. Navigating defense to repayment applications and gathering associated required documentation can also present significant hurdles, particularly in the case of a closed school like Corinthian. If the Department cannot create an automatic discharge process, we urge the Department to put measures in place to assist borrowers in asserting their individual defense to repayment, as part of the debt collection process.

42. 43. On January 8, 2016, the Department responded to the Attorney General in a two-page letter, acknowledging receipt and promising careful review of the defense to repayment application and its attachments.

43. 44. The Department requested additional information about Corinthian's job placement rates and corroborating documentation of Corinthian's alleged misrepresentations in its advertising materials.

44. 45. The Department anticipated "providing a fair, transparent, and efficient process for debt relief for all students" and "working with [the Attorney General] for the benefit of Massachusetts students."

45. 46. In 2016, the Commonwealth obtained a final judgment against Corinthian in which the Massachusetts Superior Court ordered restitution in the amount of $67,333,019, an amount equal to all funds Corinthian acquired from graduates who enrolled between July 1, 2006 through June 30, 2014.

46. 47. Additional information received by the Department has only confirmed that Everest Massachusetts students were harmed and received no value from those programs. In 2017, on behalf

10

of dozens of its clients, the Project on Predatory Student Lending (Project) submitted a "Statement of Law and Common Facts in Support of Defense to Repayment Application," (Common Statement) to the Department. https://perma.cc/QG45-5A9J.

~~47.~~48. The Common Statement synthesized findings from the Project's investigation, including interviews with over 80 former students of Everest Massachusetts.

~~48.~~49. The Common Statement identified 27 distinct violations of Massachusetts law of the kind determined by the Department to be the basis for loan cancellation that infected the experiences of each and every Everest Massachusetts student.

~~49.~~50. The Common Statement also included written testimony from Dr. Russell Williams, a labor market economist. Even though Dr. Williams observed that Everest's marketing materials and in-person sales pitch caused prospective students "to focus on the twin expectations of employment and earnings," he concluded that the actual earnings Everest students received after graduation were far different from what was promised.

~~50.~~51. Dr. Williams concluded that attendance at Everest Massachusetts typically led to wages that were lower than the median earnings for a worker with only a high school education. For example, a prospective student making the median income for a high school graduate who entered one of Everest Massachusetts' five programs and subsequently began a job in the field at entry-level wages would experience a 23% *decrease* in earnings as a medical assistant, a 21 % *decrease* in earnings as a medical administrative assistant, a 14 % *decrease* in earnings as a dental assistant, a 36% *decrease* in earnings as a medical records and health information technician, and a 6 % *decrease* in earnings as a massage therapist.

~~51.~~52. On September 28, 2016, two former Everest Massachusetts students filed a lawsuit against the Secretary of Education, challenging her certification of their defaulted student loans for

collection through Treasury offset and subsequent seizure of their tax refunds. *Williams et al. v. DeVos*, Case No. 16-cv-11949 (LTS) (D. Mass.) (*Williams*).

~~52.~~53. The accounts of the two *Williams* Plaintiffs were certified for Treasury offset on or about December 9, 2015, and remained certified throughout the litigation. Neither Plaintiff submitted an objection in response to a notice of the proposed offset. Both Plaintiffs were listed in Exhibit 4 of the Attorney General's borrower defense application.

~~53.~~54. The decision to certify the Plaintiffs' debts was a final agency action as to the legal enforceability of the debts.

~~54.~~55. The Department acknowledged that, in making this determination, it did not consider any evidence from the AGO's submission or any other evidence in its possession.

~~55.~~56. Evidence in the Department's possession includes that submitted in connection with individual borrower defense applications and other discharge applications (including false certification) from former Everest Massachusetts students, that gathered in the course of the Department's enforcement and oversight activities, and that developed and shared with the Department as the result of investigations by other state and federal law enforcement agencies and private attorneys.

~~56.~~57. The AGO was granted leave by the Court to appear as *amicus curiae* in support of the Plaintiffs in *Williams*.

~~57.~~58. Ruling on cross motions for judgment, on October 24, 2018, this Court found "that Attorney General Healey's DTR submission was sufficient to require the Secretary to determine the validity of the plaintiffs' borrower defense. It rejects the Secretary's assertion that Attorney General Healey needed a signed statement (or its equivalent) from each individual borrower before the DTR could invoke borrower defense proceedings on each identified student's behalf."

Administrative exhaustion, if any were required, "therefore was met by Attorney General Healey's DTR submission[.]"

58. 59. The Court observed that "detrimental reliance is not required to succeed on a claim under Chapter 93A," and that "no language in the borrower defense regulation or any related regulation requires detrimental reliance in order for a borrower to state a claim sufficient for administrative consideration."

59. 60. In conclusion, the Court ruled:

> [T]he DTR invoked a borrower defense proceeding on behalf of the people listed on Exhibit 4[…]; that such a request was within Attorney General Healey's authority to make; that such a request was not precluded by federal regulations, even in the absence of an attachment of a personal request emanating from each individual borrower; and that certification, without consideration of Attorney General Healey's DTR submission, was arbitrary and capricious.

60. 61. The Court vacated the certification of Plaintiffs' debts for collection through Treasury offset, declared that the Attorney General's DTR required the Secretary to render a decision on the merits of Plaintiffs' borrower defenses, remanded the matter to the Secretary for a redetermination of her certification decision within sixty days, and retained jurisdiction in the event of an appeal from or challenge to the resulting administrative decision.

61. 62. Although the Department has never issued a reasoned decision addressing the merits of the AGO's submission and the volumes of evidence demonstrating widespread violation of Massachusetts law, as the Court observed in *Williams*, the decision to certify for offset the debt of any individual identified in the AGO's submission "necessarily rejected any borrower defense the submission presented[.]"

62. 63. At a post-Order status conference, in-house counsel for the Department of Education represented to the Court that, absent the submission of additional information submitted

individually from the *Williams* Plaintiffs, the Department of Education would deny their borrower defense.

~~63.~~64. The Department of Education did not issue a decision on the merits of the borrower defenses, and instead settled the claims of the two *Williams* Plaintiffs.

~~64.~~65. Counsel for the Department informed the AGO that it did not interpret the *Williams* Order "as requiring the Department of Education to take any action with respect to any individuals other than the two named Plaintiffs" in that lawsuit.

~~65.~~66. In response, the AGO filed a motion to compel compliance with the Court's October 2018 Order pursuant to Federal Rule of Civil Procedure 71 or, in the alternative, to intervene pursuant to Rule 24. On August 8, 2019, the Court denied the AGO's motion, noting that the proper venue for resolving the Defendants' ongoing legal duties in the wake of the *Williams* decision and subsequent settlement was a new lawsuit, which would likely be related to *Williams* and "would then proceed expeditiously."

## FACTS CONCERNING PLAINTIFFS

### *Noemy Santiago*

67. Noemy Santiago is a resident of Dorchester, Massachusetts. She enrolled in the dental assistant program at Everest Brighton in August 2007.

68. Ms. Santiago learned about the Everest program through a commercial on television. The television commercial mentioned that students got jobs and received job placement assistance.

69.  After viewing the commercial, Ms. Santiago called Everest and set up a meeting. She met with an Everest representative who promised her guaranteed externships and job placement. The Everest representative told her that students often got hired from their externships.

70. Ms. Santiago enrolled the same day that she met with the Everest representative and began attending classes the following week.

14

71. While Ms. Santiago was enrolled, Everest did not help her secure an externship and she had to arrange for one herself. At the externship site, Ms. Santiago was told that she lacked the necessary skills required for the externship and she had to be retrained.

72. Ms. Santiago completed her program in June 2008. Despite its representations, Everest offered no assistance to Ms. Santiago in finding a job in her field.

73. When Ms. Santiago sought employment in the dental assistant field, employers did not believe that she was qualified, even though she had completed Everest's program.  When she was asked to demonstrate her skills to prospective employers, the employers told her that she lacked the skills to be a dental assistant.

74. Ms. Santiago was eventually able to find employment in the field through a personal connection. However, she was ultimately unable to retain the position.

75. Ms. Santiago borrowed federal and private loans to attend Everest.  She borrowed a total of $7500 in federal loans to attend Everest Brighton.

76. Ms. Santiago is currently unemployed.

77. Ms. Santiago has four children, three of whom live with her.

78. On November 23, 2015 the AGO filed a borrower defense application to the Department of Education on Ms. Santiago's behalf, specifically naming Ms. Santiago.

79. The AGO's submission on behalf of Ms. Santiago is the only pending borrower defense application she has with the Department.

80. The current principal owed on Ms. Santiago's loans is approximately $12,800, and outstanding interest is approximately $1000. She is not able to make payments on her loans.

*Diana Vara*

66. 81.  Diana Vara is a resident of Medford, Massachusetts. She enrolled in the medical assistant program at Everest Chelsea in December 2013.

67 82. Ms. Vara completed her coursework but never received her degree because the school shut down before her graduation ceremony. In the period leading up the school's closure, teachers were leaving the program and the school was operating without many of the basic necessities of the program.

68 83. When Ms. Vara was speaking with admissions counselors before enrolling in Everest, they promised her that she would get a job when she graduated. They also showed her pictures of Everest alumni working for employers like Beth Israel Deaconess Medical Center.

69 84. Everest did not assist Ms. Vara in getting an externship. She arranged one for herself, through her cousin, who worked at a podiatrist office. The work that Ms. Vara did in her externship was secretarial, and not medical assisting.

70 85. Ms. Vara currently works as a medical secretary at Harvard Vanguard, where she has worked for three years. Everest did not assist her in any way in obtaining this job.

71 86. Ms. Vara borrowed federal and private loans to attend Everest. Her private loans were discharged pursuant to a settlement with the CFPB.

72 87. Ms. Vara thought that her federal loans were or would be similarly erased, but this has not been the case.

73 88. Ms. Vara has three daughters, between the ages of 22 and 25.

74 89. She is currently unable to put any money towards her retirement. She lives with her mother, whom she assists.

75 90. Ms. Vara was originally drawn to Everest Massachusetts because of her desire to serve people in a helping profession. She still wishes to serve in a helping profession, perhaps as an occupational therapist. However, based on her experience with Everest Massachusetts and the Department of Education, she cannot and will not go back to school for any more training.

76.91. Since 2017, Ms. Vara's wages have been garnished in service of her defaulted federal student loans.  The Department has taken about $300 per month from her paycheck. Her federal tax refund has also been seized to pay for her defaulted federal student loans.

77.92. On May 7, 2019, the AGO assisted Ms. Vara in submitting a supplemental individual borrower defense to the Department of Education. In the borrower defense application, Ms. Vara requested that her federal loans be put into forbearance and for collections to stop on any loans in default while her loan discharge applications are reviewed. Around July of this year, Ms. Vara's wage garnishment stopped and she was only reimbursed for the wages that were garnished following the submission of her individual borrower defense.

93. As of January 13, 2020, the National Student Loan Data System—the federal database with information about federal student loans—indicates that the balance on Ms. Vara's loans is $0.  On information and belief, the Department has not issued, and Ms. Vara has not received, any written decision on the merits of her borrower defense application(s) or an explanation for the change in her loan balance.

*Amanda Wilson*

80.94. Amanda Wilson is a resident of Epping, New Hampshire. She completed the Medical Assisting program at Everest Chelsea in 2009.

81.95. She learned about Everest Massachusetts while she was attending community college to become a nurse. Television advertisements mentioned that students got jobs after going to Everest, and the training was very hands on.

82.96. She called Everest and had an in-person visit at the school within a week.

83. 97. Representatives of Everest showed her statistics of the hiring rate for people that had finished the program, which was just under 100 percent for medical assisting. The representatives told her that most students get hired at their externship site, and the ones that were not were helped by staff and were guaranteed to find a job somewhere else.  They also told her that an Everest certificate would be transferable to another school for an advanced degree.

84. 98. She decided not to enroll that day, wanting to take some time to think about it. An Everest representative called her twice a day after her visit, asking whether she had made up her mind and telling her that the deadline for enrollment was fast approaching.

85. 99. Ms. Wilson decided to enroll, and began classes two weeks later.

86. 100. At North Shore Community College, Ms. Wilson qualified for state grants. But at Everest, she could only borrow loans. She was told by Everest financial aid workers that she would need to take out two loans of $3500 each. Sometime after she enrolled, she realized that she had four loans ranging from $2000 to $4000, for more money than she originally thought she was borrowing. She was also told that her monthly payment would be only $50 per month, but it ended up being substantially more than that.

87. 101. Her classes were disrupted by the continual addition of newly enrolled students even in the middle of ongoing classes.

88. 102. After graduation, Ms. Wilson asked for job placement assistance from Career Services multiple times. They offered to review her resume, but did not provide her with any listings or leads on positions in her field. She also learned that her Everest diploma did not transfer to other schools.

89. 103. Since graduating from Everest, Ms. Wilson has never obtained paid work in her field of study. Many potential employers told her that her Everest certificate alone, without job experience, was not enough. She worked at a veterinary clinic, doing janitorial work, and now

works at a medical manufacturing company. She cannot afford to pay her loans because of her limited income. She defaulted on her loans in 2018.

90.104. Her defaulted student loan debt has negatively impacted her credit. When Ms. Wilson applied for an auto loan, she was only able to obtain one with a cosigner, and on subprime terms. She cannot return to school because of her defaulted loans.

91.105. Ms. Wilson submitted an individual defense to repayment based on the illegal conduct of Everest Massachusetts on or around November 2016. She submitted this defense to repayment application on her own, without the assistance of counsel, and without an awareness that the AGO had submitted an application on her behalf.

92.106. On March 6, 2019, Ms. Wilson received a notice from the U.S. Department of Treasury's Bureau of Fiscal Service, notifying her that her tax refund of $3,101 had been seized and applied to her defaulted federal student loans.

93.107. On April 23, 2019, Ms. Wilson received a notice that the U.S. Department of Education will garnish her wages to pay for her defaulted federal student loans.  The notice lists the outstanding balance on her federal student loans as in excess of $8,500. The notice included a "request for hearing" form, listing several bases for objecting to the proposed garnishment.  Objection # 10 states, "I believe that this debt is not an enforceable debt in the amount stated for the reason explained in the attached letter. (Attach a letter explaining any reason other than those listed above for your objection to collection of this debt amount by garnishment of your salary. ENCLOSE: any supporting records.)" The notice advised Ms. Wilson that she had 30 calendar days from the date of the notice to submit an objection to the garnishment.

94.108. On May 24, 2019, the Project on Predatory Student Lending (the Project) filed a second supplemental borrower defense application on Ms. Wilson's behalf, including the Combined

Statement. The application was sent both to the Borrower Defense Unit and the Department's Administrative Wage Garnishment Hearings Branch.

95. 109. Ms. Wilson received a refund check for the amount of money offset from her tax return in July of 2019.

110. As of January 13, 2020, the National Student Loan Data System—the federal database with information about federal student loans—indicates that the balance on Ms. Wilson's loans is $0. On information and belief, the Department has not issued, and Ms. Wilson has not received, any written decision on the merits of her borrower defense application(s) or an explanation for the change in her loan balance.

*Members of the Proposed Class*

96. 111. Named Plaintiffs Noemy Santiago, Diana Vara, and Amanda Wilson seek to represent a class of all individuals who borrowed a federal student loan to pay the cost of attendance for the 7,241 students identified in Exhibit 4 to the AGO's borrower defense submission who have not yet had their federal student loans completely cancelled and/or have not yet received a refund of sums already collected.

97. 112. All of the approximately 7,241 individuals named in the AGO's application borrowed federal student loans, or had a parent borrower a federal Parent PLUS loan, to pay for their attendance at Everest Massachusetts.

98. 113. All of the 7,241 students were subject to illegal conduct in violation of Massachusetts law in one or more forms.

99. 114. As a matter of Massachusetts law, each Everest Massachusetts student is entitled to restitution sufficient to put them back into the position they were in before they attended Everest.

100.115. A court of the Commonwealth calculated the damages for Everest Massachusetts' violations of state law as equal to and surpassing the amount of money each class member borrowed in federal student loans.

101.116. As described above, the Defendants are in possession of a substantial amount of evidence in addition to that submitted by the Attorney General demonstrating that each Everest Massachusetts student (and any parent who borrowed a Parent PLUS loan so that their child could attend Everest) has a complete defense to the repayment of their federal student loan or loans.

102.117. Overall, only a fraction of the individuals identified by the Attorney General as eligible for complete loan cancellation—the exact number of which is known to the Defendants— have received cancellation of their federal student loans.

103.118. Only a fraction of these individuals—the exact number of which is known to the Defendants—have had returned to them money collected on their federal student loans, including money seized through Treasury offset or wage garnishment.

104.119. A substantial number of these individuals—the exact number of which is known to the Defendants—have defaulted on their federal student loans and therefore face an ongoing threat of involuntary collection through Treasury offset or wage garnishment.

105.120. Since November 30, 2015, the Defendants have collected a substantial amount of money—the exact amount of which is known to the Defendants—through involuntary collection mechanisms from members of the proposed class. The Department has not placed Ms. Santiago's loans into forbearance, as it should as a result of a pending borrower defense application.

## CLASS ACTION ALLEGATIONS

106.121. The proposed class satisfies the requirements of Rule 23(a) of the Federal Rule of Civil Procedure.

a.  The class is so numerous that joinder of all members is impracticable because, on
    information and belief, the class consists of thousands of individuals.

b.  There are questions of law and fact common to the class, including without
    limitation, whether the Defendants have constructively denied the AGO's
    application on behalf of class members; whether doing so without rendering a
    reasoned decision on the merits of the application is arbitrary and capricious; and
    whether the evidence supports a finding that all members of the class have
    established a complete defense against the repayment of their federal student loans.

c.  The claims of Named Plaintiffs are typical of the claims of the proposed class. Ms.
    Santiago, Ms. Vara and Ms. Wilson, like all members of the proposed class, have
    been determined by a court of the Commonwealth to be owed full restitution by
    Everest Massachusetts, in compensation for that entity's widespread consumer
    fraud. Both Ms. Santiago, Ms. Vara, and Ms. Wilson are specifically identified in
    Exhibit 4 to the AGO's submission, as are the majority of the members of the
    proposed class. When it seized Ms. Vara and Ms. Wilson's taxes and/or wages, the
    Department necessarily rejected the AGO's submission as sufficient to establish a
    borrower defense for them or for any member of the class.

d.  The Named Plaintiffs are adequate representatives of the class because their
    interests do not conflict with the interests of the Class they seek to represent, they
    have retained counsel who are competent and experienced in APA and class action
    litigation, and because they intend to prosecute this action vigorously.

e.  Named Plaintiffs are represented by attorneys from the Project on Predatory
    Student Lending of the Legal Services Center of Harvard Law School (the

22

"Project").  The Project has represented and/or advised numerous former for-profit students regarding the borrower defense process, including the Plaintiffs in *Williams*, and has represented classes of students against the Department of Education.  They have knowledge of and familiarity with the relevant law and regulations concerning federal student loans and borrower defense.

~~107.~~122.  A class action is superior to other available means for the fair and efficient adjudication of the claims of Named Plaintiffs and the class.  Each member has been damaged by reason of the Department's refusal to adjudicate any borrower defense claims.

~~108.~~123.  The proposed class is ascertainable and identifiable.  The Attorney General provided information identifying the majority of the class members—the 7,241 students—in the proposed class in Exhibit 4 of her defense to repayment submission. Information known to the Department establishes which individuals borrowed a Parent PLUS loan to pay for an individual listed in Exhibit 4 to attend Everest. Additionally, information known to the Department establishes which individuals have outstanding loan balances, and which have made voluntary or involuntary payments on their loans that have not been refunded to them.

~~109.~~124.  A class is appropriate under Federal Rule of Civil Procedure 23(b)(2) because the Defendants' action in constructively denying the loan cancellation application submitted by the AGO on behalf of the class, without rendering a reasoned decision, applies generally to the class, such that final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole.

**Formatted:** Indent: Left:  0"

23

## CAUSES OF ACTION

### COUNT 1

*Unlawful Agency Action – APA § 706(2)*

110.125. The foregoing allegations are incorporated as if fully set forth herein.

111.126. Defendants have violated the APA, 5 U.S.C. § 706(2), by rejecting the AGO's submission as establishing a borrower defense for each and every federal student loan associated with each individual listed in Exhibit 4, without ever issuing a reasoned determination on the merits of the application.

112.127. Pursuant to the APA, a court "shall [] hold unlawful and set aside agency action" that is "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

113.128. "Agency action" is "the whole or part of an agency rule, order, … or the denial thereof, or failure to act," 5 U.S.C. § 551(13).

114.129. The AGO's submission validly invoked a borrower defense on behalf of each person who borrowed federal student loans to pay for the attendance of each individual listed in Exhibit 4.

115.130. A borrower defense is an objection to the legal enforceability of the underlying debt.

116.131. The Department has represented to the Court that it lacks sufficient evidence to grant the AGO's application and cancel the loans of each and every individual listed in Exhibit 4, in conformity with this determination.

117.132. Each and every time the Defendant issued a wage garnishment order and certified a debt as legally enforceable for purposes of Treasury offset since November 25, 2015, it acted in conformity with this determination.

~~118.~~133. The Department has also determined that it will not issue a reasoned decision on the merits of the AGO's application.

~~119.~~134. These determinations are final agency action subject to judicial review.

~~120.~~135. This final agency action is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and was made without observance of procedure required by law.

~~121.~~136. The Court should find unlawful and set aside the Department's final agency action rejecting the borrower defense application of the AGO on behalf of every individual listed on Exhibit 4, without ever rendering a reasoned decision on its merits.


## COUNT 2

### *Declaration of Non-Enforceability pursuant to the Declaratory Judgment Act*

~~122.~~137. The foregoing allegations are incorporated as if fully set forth herein.

~~123.~~138. Plaintiffs seek a declaration, pursuant to the Declaratory Judgment Act, that they have successfully established a defense to the repayment of all federal student loans associated with Everest Massachusetts.

~~124.~~139. The Secretary is empowered to bring civil lawsuits in federal court against any individual who has defaulted on his or her student loan.

~~125.~~140. In such a lawsuit, the individual borrower, as defendant, could raise a borrower defense to the Department's claim, based on school misconduct.

~~126.~~141. This Court may exercise jurisdiction over the affirmative defense to putative collection actions raised by the AGO in her borrower defense submission, and reiterated by the Plaintiff Class in this action.

~~127.~~142. The Court should do so, and issue a declaration that each and every borrower listed in Exhibit 4 has established a complete defense to the repayment of their federal student loans.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in their favor and grant the following relief:

A.  Certify the class as defined in paragraph 94 pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.  Declare that the Department's rejection of the AGO's submission is arbitrary and capricious and thus vacated or, in the alternative, declare that the Defendants' failure to issue a decision on the merits of the AGO's submission is unlawful;

C.  Compel the Department to issue a decision on the merits of the AGO's submission as to the loans borrowed in connection with each and every individual listed in Exhibit 4, taking into account the AGO's evidence, the Common Statement, and all other evidence in the Department's possession within 60 days of the Court's Order;

D.  Declare that every certification of legal enforceability and every wage garnishment order issued by the Department, since November 26, 2015, against any individual listed on Exhibit 4 is unlawful;

E.  Order the Department to return any money collected through Treasury offset and wage garnishment from any individual listed on Exhibit 4 since November 26, 2015;

F.  Declare that the individuals listed in Exhibit 4 have established a defense to the repayment of their federal student loans;

G.  Retain jurisdiction to ensure that the Department complies with the law as declared by the court and to review any decision on the merits of the AGO's application;

H.  Award reasonable costs and attorneys' fees as authorized by law; and

I.   Grant such further relief as may be just and proper.

Dated: January 13, 2020

Respectfully submitted,

/s/ Toby Merrill
Toby R. Merrill
Eileen Connor
Kyra A. Taylor* (*pro hac vice*)
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

*Attorneys for Plaintiffs*
*Application*

27

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon counsel for ~~admission forthcoming~~ all parties of record through the ECF system on January 13, 2020.

**Formatted:** Different first page header

**Formatted:** Font: Not Italic, English (United States)

_/s/ Toby Merrill_

Toby R. Merrill