## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DARNELL E. WILLIAMS and YESSENIA M. TAVERAS, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 16-11949-LTS |
| ELISABETH P. DEVOS, in her official capacity as Secretary of the United States Department of Education, | |
| *Defendant*. | |

## SEALED DOCUMENT:

## EXHIBIT A TO PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD AND ORDER LIMITED DISCOVERY (DOC. NO. 47)

# EXHIBIT A

I.    INTRODUCTION AND EXECUTIVE SUMMARY

The Massachusetts Attorney General's Office ("AGO") seeks the immediate discharge of federal Stafford, Parent PLUS, and Consolidation loans taken in connection with Corinthian Colleges, Inc.'s ("Corinthian's") Massachusetts Everest Institute campuses under the William D. Ford Federal Direct Loan ("Direct") and Federal Family Education Loan ("FFEL") programs.  As part of its request, the AGO seeks full refunds to borrowers of amounts paid on the loans and the reversal of negative credit reporting. The following sections make clear that Corinthian engaged in a pattern of unfair and deceptive conduct in violation of Massachusetts consumer protection laws, specifically M.G.L. c. 93A ("Chapter 93A" or "the Massachusetts Consumer Protection Act") and 940 C.M.R. 3.10 and 940 C.M.R. 3.16.  Corinthian's illegal conduct provides students a defense to repayment against their federal student loans.

Between 2007 and the closures of its Massachusetts campuses in 2014 and 2015, Corinthian offered Medical Assistant, Medical Administrative Assistant, Medical Insurance Billing and Coding, Dental Assistant, and Massage Therapy diploma programs at its Brighton and/or Chelsea, Massachusetts Everest Institute campuses (together, "Everest MA" and individually, "Everest-Brighton" and "Everest-Chelsea").  Corinthian advertised its Everest MA locations as career schools and boasted high in-field placement rates, often in excess of 70%, on its website and in marketing materials.

As compared to many local public and non-profit alternatives, Corinthian's tuition was expensive.  In 2014, Everest MA charged over $16,000 for a Medical Assistant program, while similar programs cost between $4,000 and $6,000 at local community colleges.  Despite this high cost, credits from Everest MA were essentially non-transferable and could not be used towards an associate's or bachelor's degree.

Corinthian marketed its programs to individuals who were often unable to afford them.  Most of Everest MA's students were in precarious economic circumstances, including many women, students of color, and single parents.  The vast majority of students who attended Everest MA received funding in the form of federal grants and loans authorized under Title IV of the Higher Education Act of 1965 ("Title IV").  Title IV funding constituted the majority of Corinthian's revenue.  For example, for the year

1

ending June 30, 2010, Title IV funding amounted to 89.9% of Corinthian's national revenues.[1]

In 2011, the AGO initiated an investigation of Corinthian after receiving consumer complaints. In the course of this review, the AGO obtained records from Corinthian, its accreditor, its successor, lenders, and other parties; reviewed over 650 surveys from former students; conducted over 900 employment verifications; and interviewed more than 100 former Everest MA employees and students. During the investigation, the AGO received communications from over 770 Everest MA students concerning their experiences at the schools, demonstrating widespread and systemic illegal behavior. Based on this evidence, the AGO found that Corinthian engaged in a pattern of unfair and deceptive conduct in violation of Massachusetts consumer protection laws. On April 3, 2014, the AGO filed a lawsuit against Corinthian in Suffolk Superior Court alleging violations of state consumer protection laws ("Complaint"). A copy of the Complaint is attached at Exhibit 1. The litigation is currently ongoing; it was stayed from May 4, 2015 until October 14, 2015 due to Corinthian's bankruptcy filing.

A key component of the AGO's investigation involved audits of the in-field job-placement rates that Corinthian published for its Everest MA locations. The AGO audited these claimed placement rates for certain cohorts by verifying the underlying individual job placements with the alleged employers. Through this process, the AGO determined that Corinthian had inflated its in-field job placement rates by falsifying jobs, counting jobs regardless of field, and counting temporary and unsustainable employment. Compounding this deception, student reports indicate that Corinthian's sales representatives (promoted by Corinthian as "Career Training Specialists") routinely cited in-field job placement rates that exceeded even the falsified written rates.

In addition to citing misleading in-field placement rates, Corinthian often rushed and pressured students into uninformed and ill-advised enrollment decisions. In some cases, Corinthian even encouraged students to register for courses despite the fact that the students lacked the English language skills necessary to participate. Corinthian's sales representatives promised students a high-quality hands-on educational experience with

---

[1] Much of the remainder of Corinthian's reported revenues came from a private loan program created by Corinthian.

professional instructors and small classes; placement in relevant externships; and assistance with job placement, resume writing, and interviewing. But once students had signed enrollment contracts and promissory notes, evidence shows that Corinthian failed to provide the promised education or career services upon which the students were relying. Many students featured in the attached exhibits report a dangerous, inadequate, and inappropriate learning environment. There are consistent student reports of cheating, on-campus violence, and drug use, as well as apathetic teachers and unresponsive administrators.

This evidence, compiled in the course of the AGO's investigation, shows that Corinthian engaged in patterns and practices of unfair and deceptive conduct in violation of Massachusetts law, providing Everest MA students with defenses to repayment of their student loans, pursuant to 20 U.S.C. § 1087e(h), 34 C.F.R. § 685.206(c)(1), 34 C.F.R. § 30.24, 34 C.F.R. § 682.410(b)(5)(ii)(C), and 34 C.F.R. § 682.410(b)(5)(vi)(I).

Corinthian's illegal conduct induced students to enroll, and caused students to suffer significant financial harm. Indeed, the need for broad and swift loan discharge for all affected borrowers is clear. Overwhelming numbers of former Everest MA students struggle to pay their federal student loans, in addition to onerous private loans. Many other former students are simply unable to pay the enormous debts incurred. These students are in various stages of delinquency and default, making them vulnerable to collection, or they are trapped in forbearance, where their loan balances continue to balloon through interest capitalization. Very few students have been able to use and maintain income-based repayment plans. In fact, due to forbearance, deferment, default, collection fees, and interest capitalization, many Everest MA borrowers now owe significantly more on their loans than when they left school. Collection of these debts is likely to continue for years and have long-term negative effects on the lives of borrowers and their families. Educational loans are typically non-dischargeable in bankruptcy and collection efforts can result in wage garnishment and tax refund interception, which hits low-income households particularly hard. Federal loan default fees can be as high 18.5%, and some borrowers default multiple times. Over the years of collection, financially

distressed Corinthian borrowers could easily be forced to pay many times the amounts they originally borrowed.[2]

The AGO's submission describes Corinthian's unlawful and harmful conduct with particular clarity regarding the students who attended Corinthian's Everest-Brighton Medical Assistant programs between 2011 and 2012 and its Dental Assistant program between 2013 and 2014. Moreover, this submission includes other facts and information gathered in the course of the AGO's investigation which support findings that Corinthian's unlawful practices were systemic, affecting cohorts and programs throughout the time the company operated Everest MA campuses in Massachusetts.

In addition, attached at Exhibit 3 are applications by Massachusetts Corinthian students who are proffering individualized defenses to repayment. With a few exceptions, these students attended Everest-Brighton's Medical Assistant programs between 2011 and 2012. The AGO requests that the Department of Education review these individual proffers, as supplemented by this submission, and promptly discharge[3] the applicants' federal student loans.[4] Based on the information contained in this submission, the AGO also requests that the Department provide a swift, wholesale, and automatic discharge (including providing refunds on loan payments previously made and removal of any negative credit report entries) for each of Corinthian's Everest MA students, including the 7,200 students shown on Exhibit 4.[5]

---

[2] The AGO has heard from borrowers who were harmed long ago by similar for-profit school abuses, who have already repaid many times what they borrowed, and are still being pursued in collections. *See* Exhibit 2, *December 7, 2011 Letter from AGO to the Department of Education* and www.nytimes.com/2013/07/29/nyregion/promised-better-life-by-beauty-schools-graduates-have-little-training-and-lasting-debt.html.

[3] While we are pleased that the Department has already chosen to allow Corinthian borrowers to opt out of collection activity, the offered forbearance is interest accruing (though non-capitalizing). Time is therefore of the essence to borrowers.

[4] Per the enclosed release forms, please copy the AGO on all future correspondence with the borrower concerning the discharge application.

[5] Given the enclosed evidence of widespread abuse, it is important that the Department of Education automatically discharge the loans of Corinthian's Massachusetts borrowers, and not require borrowers to submit individual applications. It is well beyond the resources of borrowers to investigate cohort placement rates or aggregate witness statements. Navigating defense to repayment applications and gathering associated required documentation can also present significant hurdles, particularly in the case of a closed school like Corinthian. If the Department cannot create an automatic discharge process, we urge the Department to put measures in place to assist borrowers in asserting their individual defense to repayment, as part of the debt collection process.

The AGO's overview of the relevant Massachusetts law, its investigation, and its findings of how Corinthian violated Massachusetts law are set forth in the sections below. These sections identify a variety of unfair or deceptive practices and include both a narrative and the AGO's findings as well as references to supporting data, statements, and testimony.

II.   MASSACHUSETTS CONSUMER PROTECTION LAWS, M.G.L. c. 93A, 940 C.M.R. 3.10
      AND 940 C.M.R. 3.16

The Massachusetts Consumer Protection Act prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." M.G.L. c. 93A, § 2(a). Chapter 93A is an expansive statute, designed to make business practices unlawful beyond those already barred by common law. *Kattar v. Demoulas*, 433 Mass. 1, 12 (2000) (*quoting Commonwealth v. DeCotis*, 366 Mass. 234, 244 n.8 (1974) (noting that Chapter 93A "mak[es] conduct unlawful which was not unlawful under the common law or any prior statute")). *See also Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 693 (1975) (holding that Chapter 93A "creates new substantive rights and provides new procedural devices for the enforcement of those rights"). The statute does not cabin what constitutes "unfair or deceptive acts or practices," recognizing that "[t]here is no limit to human inventiveness in this field." *Kattar*, 433 Mass. at 13 (internal citation omitted). *Cf. Purity Supreme, Inc. v. Attorney Gen.*, 380 Mass. 762, 771 (1980) (explaining that "[t]he purpose of an open-ended legislative use of the words 'unfair' and 'deceptive' was to allow for the regulation of future, as-yet-undevised, business practices").

Standards for unfairness and deception under the Massachusetts Consumer Protection Act are created through ever-evolving case law, which takes into account "those unexpressed standards of fair dealing which the conscience of the community may progressively develop," *DeCotis*, 366 Mass. at 242, and by regulatory prescriptions promulgated by the AGO. *See* M.G.L. c. 93A, § 2(c) ("The attorney general may make rules and regulations interpreting the provisions of subsection 2(a) of this chapter."); *Purity Supreme*, 380 Mass. at 775 ("[T]he Legislature has . . . delegated to the Attorney General the power to promulgate rules and regulations defining with specificity acts and practices which violate G.L. c. 93A, § 2(a).").

5

Massachusetts courts have found that an act is "unfair" if it is "(1) within the penumbra of a common law, statutory, or other established concept of unfairness; [or] (2) immoral, unethical, oppressive, or unscrupulous." *Gossels v. Fleet Nat'l Bank*, 453 Mass. 366, 373 (2009) (internal quotation marks and citation omitted). Unfair acts include practices as varied as breach of an implied warranty of merchantability, *Mallet v. ATF-Davidson Co., Inc.*, 407 Mass. 185 (1990), to building code violations, *Klairmont v. Gainsboro Restaurant, Inc.*, 465 Mass. 165 (2013). Practices that are unconscionable are also considered unfair. *See DeCotis*, 366 Mass. at 242–43 (finding landowners' collection of resale charges on mobile home owners an unfair act where landlord rendered no services, and discussing by analogy "that provision of the Uniform Commercial Code which permits a court to refuse to enforce a contract or a contract provision which is unconscionable").

Courts have construed unfairness broadly. *See Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 503 (1979) ("It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field.") (*quoting* H.R. Conf. Rep. No. 1142, 63rd Cong., 2d Sess. (1914)). Violations of federal consumer protection laws are unfair practices under Massachusetts law. *See, e.g., McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*, 775 F.3d 109, 122 (1st Cir. 2014) (*citing Slaney*, 366 Mass. at 694 n.8); 940 C.M.R. 3.16(4) (regulation holding that an act or practice is a violation of Chapter 93A if it violates the Federal Trade Commission Act, 15 U.S.C §§ 41–58 (the "FTC Act"), the Federal Consumer Credit Protection Act, or other Federal consumer protection statutes within the purview of M.G.L. c. 93A, § 2). Moreover, the Supreme Judicial Court of Massachusetts has stated that Chapter 93A extends unfairness beyond the limitations of those statutes. Thus, for instance, violations of the FTC Act are necessarily violations of Massachusetts state law, but Massachusetts has also gone beyond those limits and barred conduct that is not prohibited by the federal government. *See, e.g., American Shooting Sports Council, Inc. v. Attorney Gen.*, 429 Mass. 871, 883 (1999) (noting that Chapter 93A can bar sales of various firearms as an unfair practice based on their features even though not barred by federal law); *Purity Supreme*, 380 Mass. at 780 (explaining that "[s]tates are not forbidden . . . from adopting rules more

restrictive than those of the FTC" while upholding a more restrictive regulation promulgated by the AGO).

The Chapter 93A unfairness doctrine is also expansive in other ways. Transactions may be unfair even if consumers enter into them willingly and with full information and knowledge. *See DeCotis*, 366 Mass. at 243 ("The willingness of [the relevant consumers] to pay [certain] fees, and even to contract knowingly to pay those fees, does not make the collection of such a fee fair."); *American Shooting Sports Council* 429 Mass. at 877 (1999) (where "risks or dangers inherent in [a] product, or latent performance inadequacies, cannot be detected by the average user or cannot be avoided by adequate disclosures or warnings," the product's sale is unfair) (internal citation omitted). Chapter 93A protects even the gullible and the desperate from unfair acts or practices. *See Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993) (stating that the Federal Debt Collections Act[6] "protects all consumers, the gullible as well as the shrewd" and "[t]his standard is consistent with the norms that courts have traditionally applied in consumer-protection law"). The court went on to note that the related FTC Act was "not made for the protection of experts, but for the public—that vast multitude which includes the ignorant, the unthinking and the credulous." *Id.* at 1319 (internal quotation marks and citation omitted). The United States Supreme Court, while interpreting the FTC Act, wrote that laws "are made to protect the trusting as well as the suspicious," and this is particularly the case within the realm of consumer protection laws. *F.T.C. v. Standard Educ. Soc'y,* 302 U.S. 112, 116 (1937).

Deception under the Consumer Protection Act is likewise broadly construed. *See Aspinall v. Philip Morris Cos., Inc.*, 442 Mass. 381, 394 (2004) ("In determining whether an act or practice is deceptive, regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which [the act or practice] might reasonably be expected to have upon the general public.") (internal quotation marks and citations omitted). Massachusetts courts have found violations of the Consumer Protection Act under the deception prong for a wide variety of business tactics. Indeed, a "practice is 'deceptive' if it could reasonably be found to have caused a person to act

---

[6] As noted in the previous paragraph, violations of federal consumer protection statutes within the purview of M.G.L. c. 93A, § 2 are violations of Chapter 93A. *See* 940 C.M.R. 3.16(4).

differently from the way he otherwise would have acted." *Lowell Gas Co. v. Attorney Gen.*, 377 Mass. 37, 51 (1979). Even if a business merely omits material information when marketing or selling a product, this omission violates Chapter 93A. *See Schwartz v. Rose*, 418 Mass. 41, 43 (1994). *See also Commonwealth v. AmCan Enters., Inc.*, 5 Mass.L.Rptr. 53, *3 (1996) ("[A] solicitation package is deceptive if it contains material . . . omissions which are likely to mislead the recipients."), *aff'd*, 47 Mass. App. Ct. 330 (1999). Any failure to provide information that would be relevant to a purchaser is a violation of the Consumer Protection Act. *Grossman v. Waltham Chem. Co.*, 14 Mass. App. Ct. 932, 933 (1982) ("[F]ailure to disclose any fact, the disclosure of which may have influenced a person not to enter into a transaction, is a violation of c. 93A."). *See also Slaney*, 366 Mass. at 700–04 (failure to disclose defective engine at time of sale a violation of Consumer Protection Act).

In order to prove a violation of Chapter 93A, the Commonwealth is not required to show a business intended or even knew that its acts or practices were unfair or deceptive. *See Drakopoulos v. U.S. Bank Nat'l. Ass'n*, 465 Mass. 775, 786 n.15 ("A successful G.L. c. 93A action based on deceptive acts or practices does not require proof . . . that the defendant intended to deceive . . . or even knowledge on the part of the defendant that the representation was false." (internal citation omitted)). Indeed, "[n]either intent to engage in an unlawful act nor knowledge of its unlawfulness is required in order to establish liability" under Chapter 93A. *Equitable Life Assur. Soc. of the U.S. v. Porter-Englehart*, 867 F.2d 79, 89 (1st Cir. 1989) (*quoting Linthicum v. Archambault*, 379 Mass. 381, 388 n.12 (1979) (internal citation omitted)).

The AGO may bring claims under Chapter 93A on behalf of all similarly situated persons. In *DeCotis*, the Massachusetts Supreme Judicial Court noted that class actions allow for relief for similarly situated individuals and determined there was no reason to limit actions brought by the AGO to specific named individuals. 366 Mass. at 245–46. The court stated that "[t]he very purpose of the Attorney General's involvement is to provide an efficient, inexpensive, prompt and broad solution to the alleged wrong" and gave relief to all the tenants of the defendants, even those not specifically listed in the complaint. *Id.* at 245. Chapter 93A is designed to provide broad relief for all wronged

parties and so proof of widespread deceptive marketing is sufficient to allow relief for all purchasers.

Beyond these judicially established precepts, unfairness and deception are further delineated by AGO regulations. The legislature gave the AGO the authority to set standards for unfairness and deception and provided that these promulgated standards would have the force and effect of law. *See* M.G.L. c. 93A, § 2(c) ("The attorney general may make rules and regulations interpreting the provisions of subsection 2(a) of this chapter."); *Purity Supreme*, 380 Mass. at 775 ("[T]he Legislature has . . . delegated to the Attorney General the power to promulgate rules and regulations defining with specificity acts and practices which violate G.L. c. 93A, § 2(a)."). Thus, the AGO may determine what conduct violates the law and deem that conduct to be unfair in violation of Chapter 93A. For instance, the AGO has issued regulations barring a "claim or representation . . . concerning a product[7] which directly, or by implication . . . has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect." 940 C.M.R. 3.05(1). Other regulations have delineated unlawful behavior in other ways. *See, e.g.,* 940 C.M.R. 3.16(1) (act or practice violates Chapter 93A if "[i]t is oppressive or unconscionable in any respect"); 940 CMR 3.16(2) ("fail[ure] to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction" is a violation Chapter 93A).

Both by case law and by AGO regulations, various practices relevant to for-profit schools are prohibited under Massachusetts law. Most pertinently, any type of misleading marketing will violate the statute. Such marketing, if it either omits material information or actively misleads potential students, is a violation of Chapter 93A. *See Aspinall*, 442 Mass. at 402 (holding that "the deceptive advertising, as alleged by the plaintiffs in this case, if proved, effected a per se injury on consumers" who purchased the relevant product); *AmCan Enters., Inc.*, 5 Mass.L.Rptr. at *3 ("[A] solicitation package is deceptive if it contains material . . . omissions which are likely to mislead the recipients."), *aff'd*, 47 Mass. App. Ct. 330 (1999); 940 C.M.R. 3.05(1) (failure to disclose information that has the "capacity or tendency or effect of deceiving" consumers in a

---

[7] "Product" is defined to include "goods, whether tangible or intangible, real, personal, or mixed, services, or franchise or distribution systems of any nature whatsoever." 940 C.M.R. 3.01.

material way supports a finding that a defendant engaged in deceptive conduct). Various types of high-pressure sales tactics are also violations of Chapter 93A. As noted above, violations of the FTC Act are violations of Chapter 93A by definition under 940 C.M.R. 3.16(4). In numerous instances, high-pressure sales tactics have been found to violate the FTC Act. *See, e.g., Arthur Murray Studio, Inc. v. F.T.C.,* 458 F.2d 622, 625–26 (5th Cir. 1972) (unfair to use "cajolery" or other unrelenting sales pressure aimed at enticing elderly women to enter contracts for extended series of dance lessons costing thousands of dollars); *In re Nat'l Housewares, Inc.,* 90 F.T.C. 512, 572 (1977) (consumers "are entitled to protection from high-pressure tactics when they do attend a sales presentation because these tactics interfere with their right to make an intelligent purchasing decision"); *Am. Fin. Servs. Ass'n v. F.T.C.,* 767 F.2d 957, 979 (D.C. Cir. 1985) (referring to article authored by member of Federal Trade Commission that identifies high-pressure sales tactics as unfair).

Furthermore, the AGO issued regulations that make certain conduct by for-profit schools in the Commonwealth a *per se* violation of Chapter 93A.[8] The regulation, 940 C.M.R. 3.10, prohibits, in pertinent part:

> (1) False Advertising. The making or causing, or permitting to be made or published, any false or deceptive statement or representation or any statement or representation which has the tendency or capacity to mislead or deceive students, prospective students or the public, by way of advertising or otherwise concerning . . . business, technological, career, or social skills schools, their activities in attempting to enroll students, or concerning the character, nature, quality, value, or scope of any course of instruction or educational service offered, its influence in obtaining employment for its students, or in any other material respect, is an unfair and deceptive trade practice.

> (2) False Representation as to Earnings. The making of false or deceptive statements or representations or any statement or representation which has the tendency or capacity to mislead or deceive students, prospective students, or the public regarding actual or probable earnings or opportunities in any vocation or field of activity is an unfair and deceptive trade practice.

---

[8] 940 C.M.R. 3.10: Private Home Study, Business, Technological Social Skills and Career Schools, was repealed and replaced by 940 C.M.R. 31.00: For-Profit and Occupational Schools, on June 30, 2014. 940 C.M.R. 31.00 further defines what constitutes unfair or deceptive conduct by for-profit schools under Chapter 93A, but is not discussed herein because the AGO's allegations against Corinthian are for conduct that occurred prior to June 30, 2014.

(3) It is unfair and deceptive practice in the sale or offering for sale of consumer services for a school or person subject to this regulation to represent or imply in advertising or otherwise that persons employed in a particular position earn a stated salary or income or that persons completing the training course will earn the stated salary or income or "up to" the stated salary or income unless:

    (a) The salary or income is equal to or less than the average salary of persons employed less than five years in the indicated position in the Commonwealth, and the advertisement or representation states the basis for calculation of the average salary or income; or the advertisement or representation states the basis for calculation of the salary stated and also discloses the average salary or income of persons employed less than five years in the indicated position in the Commonwealth; and

    (b) The advertisement or representation states clearly and conspicuously any limitations, conditions, or other requirements such as union membership or service of an apprenticeship, which must be met before the stated salary or income can be earned; and

    (c) The advertisement or representation states clearly and conspicuously that no guarantee is made that a person who purchases the advertised services will earn the stated salary or income, unless the guarantee is actually offered by the seller.

The words "EARN $...." or "EARN UP TO $...." or words of similar import or meaning constitute a representation that a person who attends the training course will earn the stated salary or income within the meaning of this Regulation.

(4) Misrepresentation of Opportunity. The making of false, untrue, or deceptive statements or representations or any statement or representation which has the tendency or capacity to mislead or deceive students, prospective students, or the public regarding any opportunities in any vocation or field of activity as a result of the completion of any given course of instruction or educational service is an unfair and deceptive trade practice.

(5) False Representations as to Student Employment or a School's Connection with or Approval by the United States Government or Commonwealth. The making of false or deceptive statements or representations or any statement or representation which has the tendency or capacity to mislead or deceive students, prospective students, or the public as to services to be rendered in connection with the securing or attempting to secure employment for students . . . is an unfair and deceptive trade practice.

(6) Limited Time Offers. Representing an offer to be limited as to time or otherwise when such is not the fact, with the tendency or capacity to mislead or deceive students, prospective students, or the public is an unfair trade practice.

(7) Misrepresenting Offers as "Special." Representing an offer as "special" when it is in fact the school's regular offer, is an unfair and deceptive trade practice.

...

(16) Deceptive Language in General. The use of language in any form which has the tendency or capacity to mislead or deceive students, prospective students, or the public is an unfair and deceptive trade practice.

(17) Unqualified Students. Inducing the enrollment or retention of a student for any course of instruction or training for a job or position for which the school knows or has reason to know the student is unfit by reason of educational or permanent physical disqualification, or other material disqualification is an unfair and deceptive trade practice.[9]

940 C.M.R. 3.16 is also relevant to for-profit schools. Section 3.16 provides:

Without limiting the scope of any other rule, regulation or statute, an act or practice is a violation of M.G.L. c.93A, § 2 if:

(1) It is oppressive or otherwise unconscionable in any respect; or

(2) Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction; or

(3) It fails to comply with the existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection; or

(4) It violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes within the purview of M.G.L. c.93A, § 2.

The AGO's investigation of Corinthian found that the company routinely and systemically violated M.G.L. c. 93A, 940 C.M.R. 3.10, and 940 C.M.R. 3.16 at its

---

[9] 940 C.M.R. 3.10.

Massachusetts campuses.  These violations of state law provide a defense to repayment against federal student loans.

III.    AGO'S INVESTIGATION, LAWSUIT, AND RELATED ACTIVITIES

As part of its investigation, pursuant to M.G.L. c. 93A, § 6 the AGO served Civil Investigative Demands ("CIDs") on Everest-Brighton and Everest-Chelsea and obtained, among other materials, records related to Corinthian's Everest MA programs, marketing, enrollment processes, and placement verification policies, plus samples of student program, placement, and financial aid data.  The AGO cannot provide materials produced pursuant to CID without a court filing or the waiver of the producing party.  M.G.L. c. 93A, § 6(6).  Many parts of those productions, however, are cited in the Complaint, which is attached at Exhibit 1.  The AGO also served a CID on the accreditor for Corinthian's Everest MA campuses and obtained data underlying Corinthian's claimed job placement rates.  The accreditor, Accrediting Commission of Career Schools and Colleges ("ACCSC"), has provided a waiver enabling the AGO to share these data with the Department of Education.  The relevant portion of that data is attached at Exhibit 5.  For the cohorts of students who started in the eight- and nine-month Everest-Brighton Medical Assistant programs from 2008 through 2009,[10] the AGO, prior to filing its Complaint, undertook significant effort to verify with employers the placement data that Corinthian submitted to its accreditor and achieved a survey response rate of approximately 95 percent.  Those survey responses are attached at Exhibit 6.  The AGO's analysis of those responses and comparison to the accreditor's data, are attached at Appendix A.  Extensive verification of additional cohorts has been ongoing prior to and since the filing of the Complaint, and is discussed in Section IV.A, below.

During the course of its review, the AGO also contacted many former Everest MA students who attended various programs at both Everest-Brighton and Everest-Chelsea from 2008 through 2014.  The AGO reviewed over 650 survey responses from these students.  Survey responses and documents produced by former Everest MA students are attached at Exhibit 7, and pertain to students who attended Everest MA

---

[10] The placement data from this cohort were published to the Everest-Brighton webpage between July 1, 2011 and June 30, 2012.

programs at various points between 2008 and 2014. The AGO also obtained affidavits of 26 Everest MA students, copies of which are attached at Exhibit 8. Additionally, the AGO held an event to assist Everest MA students in completing defense to repayment affidavits ("DTR Applications"), which are attached at Exhibit 3. Attached at Exhibit 9, is a sample of over 100 consumer complaints submitted by Corinthian students to the AGO.

As part of its investigation, the AGO also obtained affidavits from 12 former employees of Everest MA, who collectively worked at the school between at least 2009 and 2014. Former employee affidavits are attached at Exhibit 10.

This submission, its exhibits, and appendices are provided pursuant to the common interest agreement between the AGO and Department of Education, dated August 5, 2015.

IV.    AGO's FINDINGS ON CORINTHIAN'S VIOLATIONS OF MASSACHUSETTS LAW

A. <u>Corinthian Misled and Deceived Students About In-Field Job Placement Rates</u>

Between at least 2009 and the time it ceased operating in Massachusetts, Corinthian unfairly and deceptively misrepresented Everest MA's historic in-field job placement rates in its written and oral communications. These misrepresentations induced students to enroll in Everest MA programs and incur substantial federal (and also sometimes private) student loan debt.

Corinthian promoted its schools as vocational training grounds that would position students for well-paid careers in growing industries. Job placement was a core selling point for Corinthian, which trumpeted its purported historic success in placing Everest MA graduates into jobs within their fields of study. Corinthian's representations concerning job placement fostered strong expectations amongst enrollees that they would obtain in-field employment.

At various times from 2009 through 2014, the Everest MA websites stated:

- "Many of our career programs can be completed in nine months, which means you could be working in your new career in less than a year." Exhibit 11.

- "You're here for career training and to get on with your life. It's a decision that deserves respect." Exhibit 11.

- "We're here to learn about you and answer your questions. Our purpose is to help you with your training and career goals, and get you on the fast-track to a real career." Exhibit 12.

In its marketing pamphlets, Corinthian told prospective students that they could "[j]oin the more than 200,000 Everest graduates who have successfully started their careers and transformed their lives." Exhibit 13. An advertisement Corinthian mailed to Massachusetts consumers stated:

> "IMPORTANT NEWS FOR TOUGH TIMES: You're Approved For A NO-OBLIGATION 15-MINUTE ONE-ON-ONE ASSESSMENT With A Career Training Specialist. CALL [phone number] So We Can Match Your Interests With A Career Training Program That Gets Your Life Headed In The Direction You Want!" (Emphasis in original.) Exhibit 14.[11]

During enrollment phone calls and in-person meetings, Everest MA sales representatives strongly implied that Corinthian would help its graduates secure careers in their fields of study. For example, in a recorded enrollment call, a Corinthian sales representative stated:

> "Are you familiar with the differences between a job and a career? . . . [W]ith a career you get all kinds of benefits. You know, the medical ones which include health, dental, vision, and you also get paid sick time, paid vacation time, and you get retirement benefits depending on your employer. You get subsidized bus passes or other kinds of club membership benefits, all that sort of thing. And also you are more satisfied with your work. So essentially that is what we do here at the Everest Institute. We work with people. We provide training in three different fields in order to help them launch a career, not just have jobs. We are very good at what we do as an institution; we have a very good job placement rate. Based on what I just told you, would you be interested in launching a career that would provide you with all the benefits I mentioned?" Exhibit 1, *Complaint at ¶ 67, citing recorded enrollment call dated January 16, 2013, 10:53 AM, Everest-Brighton.*

Corinthian often compared mere "jobs" to the high quality "careers" Everest MA graduates would allegedly obtain. For example, in other recorded phone calls, Everest MA sales staff stated: "Welcome to Everest, the place where we can help you start your journey to a rewarding career. . . . Our primary focus is training people for high-demand

---

[11] In fact, the "Career Training Specialist" was simply a sales representative. As a Corinthian manual stated: "this is a sales position and the new hire must understand that from the beginning." Exhibit 1, *Complaint at ¶ 34.*

careers in the medical field." Exhibit 1, *Complaint at ¶ 62, citing recorded enrollment call dated January 31, 2013, 11:09 AM, Everest-Brighton.*

Everest's website described each of its programs as preparing students for jobs in their fields of study:

- "The objective of the Medical Assistant program is to provide graduates with the skills and knowledge that will enable them to qualify for entry-level positions as Medical Assistants. . . . Since Medical Assistant diploma students are educated in both administrative and clinical procedures, they are capable of filling a variety of entry-level positions, including:
    - o Clinical or Administrative Assistant
    - o Medical Receptionist
    - o Medical Insurance Biller
    - o Medical Office Assistant
    - o Medical Records Clerk
    - o Medical Transcription
    - o Medical Office Management
    - o Medical Assistant
    - o Clinical Assistant
    - o Outpatient Surgery Assistant
    - o Optometric Assistant". Exhibit 15.

- "[As a dental assistant student] you will be trained in valuable clinical, radiographic and administrative procedures, leading to career opportunities with dental offices, dental supply manufacturers, hospital dental departments, and dental insurance companies. Additional entry-level positions include dental assistants, front office receptionists, dental insurance clerks, dental supply salespeople and administrative assistants." Exhibit 16.

- "Medical billing and its related occupations are expected to grow much faster than average in the health care industry. Give yourself an advantage as more and more insurance companies, medical offices and clinics look to hire well-schooled and experienced professionals." Exhibit 17.

Between at least 2009 and the time it stopped enrolling Massachusetts students in 2014, Corinthian consistently represented that its graduates were likely to obtain employment in their fields of study, and supported these claims with what appeared to be hard numbers. Corinthian publicly reported "historical placement rates" of Everest MA graduates obtaining jobs within their fields of study and provided these placement rates directly to prospective students and its accreditor. The school regularly cited placement rates in oral and written marketing efforts and knew that its placement rates were crucial

to its continued marketing success. In its annual statements to investors in at least 2009, 2010, 2011, and 2012 Corinthian stated that "[g]raduate placement outcomes are critical to our colleges' reputations and their ability to successfully recruit new students." Exhibit 18.

Corinthian reported in-field job placement rates on its Everest MA campus webpages from at least 2011 through 2014. Each year, Corinthian posted the in-field placement rates that it had reported to its accreditor, ACCSC, in its Annual Report the previous year. For example, in July 2010, Corinthian reported to ACCSC in-field placement rates for cohorts that had attended Everest MA programs in 2008-2009. These rates were then published to Everest MA's websites from July 1, 2011 through June 30, 2012. Exhibit 5, at AGO-MA00205–10, *Corinthian Annual Report to ACCSC* and Exhibit 19, *Corinthian's website placement rate disclosures*. Everest MA staff also provided prospective students hard copies of these in-field placement rates. *See, e.g.,* Exhibit 20.

The annual rates Corinthian provided to its accreditor for its Massachusetts programs (and then published to its website the following year) were typically between 60 and 90 percent. For the Medical Assistant program (historically the largest program offered at both Massachusetts campuses), the reported rates were between 61 and 83 percent as seen in the table below. Exhibit 5.

| | | | | Program Length | |
|---|---|---|---|---|---|
| **On Website** | **Sent to Accreditor** | **Student Start Date** | **Campus** | **8 Months** | **9 Months** |
| | July 2009 | 2007-2008 | Brighton | 63% | 70% |
| | | | Chelsea | 77% | |
| July 2011-June 2012 | July 2010 | 2008-2009 | Brighton | 71% | 72% |
| | | | Chelsea | 76% | |
| July 2012-June 2013 | July 2011 | 2009-2010 | Brighton | 63% | 67% |
| | | | Chelsea | 61% | |
| July 2013-Feb. 2014 | July 2012 | 2010-2011 | Brighton | 63%[12] | 67% |
| | | | Chelsea | 61%[13] | |
| Feb. 2014-Present | July 2013 | 2012-2013 | Chelsea | 83% | |

Table title (spanning across top): **Everest MA Medical Assistant In-Field Placement Rates Reported on Website and to Accreditor**

Corinthian verbally provided in-field placement rates to prospective students that were often even higher than the rates Corinthian reported on its website and to its accreditor. Recruiters for Everest MA told students that programs had in-field placement rates ranging from 70 to 100 percent, and students frequently report being guaranteed a job. Examples of these representations include the following:

- "I went to the Everest campus to see what they offered. . . . They said, you are guaranteed employment after finishing the program." Exhibit 8, at AGO-MA01910, *Affidavit of* ▮▮▮▮▮▮▮▮, *2012-2013 Everest-Brighton Medical Assistant student.*

- "The Everest representative told me that the program had a 100 percent job placement rate and that anybody placed in an externship is then offered a job at that site." Exhibit 8, at AGO-MA01891, *Affidavit of* ▮▮▮▮▮▮▮▮, *2011-2012 Everest-Brighton Medical Assistant student.*

---

[12] Corinthian reported 63% on its website, but 61% to its accreditor.
[13] Corinthian reported 61% on its website, but 66% to its accreditor.

- "I was told that 85% of the students that graduated would be hired after completing the course." Exhibit 7, at AGO-MA01359, *Survey Response of* ███████, *2008-2009 Everest-Brighton Medical Assistant student.*

- "I told [enrollment representative ████] ██ I did not want to sign the loan unless I was guaranteed a job, because I know that I would not be able to pay it back. ███ told me the school placed 99% of the students and they could guarantee a job after I finished my externship. ███ told me I would be making between $18.00 to $20.00 an hour after completing the program. No worries about the loan. She told me career services would place me in a job, and that she makes sure everyone she enrolls gets placed." Exhibit 8, at AGO-MA01875–76, *Statement of* ████████████, *2008-2009 Everest-Chelsea Medical Assistant student.*

- "When I went down there they were just telling me what I wanted to hear. They said things like, they could take care of everything, we would get certified and they help us along the process. They tell us that we are guaranteed a job and that the school has a high rate of hires." Exhibit 8, at AGO-MA01902, *Affidavit of* ████████████, *2009-2010 Everest-Chelsea Medical Assistant student.*

- "They told me that there are so many dental offices to place me in, and that I would be guaranteed a job at a dental office." Exhibit 8, at AGO-MA01918, *Affidavit of* ████████████, *2013-2014 Everest-Brighton Dental Assistant student.*

The attached Appendix B identifies approximately two hundred other students who reported being told a specific high placement rate or being promised or guaranteed a job.

Recorded enrollment phone calls between Everest MA's recruiters and prospective Massachusetts students show similar placement representations:

- "As an institution we've been very successful at what we do. We have a roughly 70% placement rate, which means 7 out of 10 of our graduates, roughly, obtain employment within the field that they trained for. When you went to Wheelock [College], do you know what their job placement rate was?" Exhibit 1, *Complaint at ¶ 70, citing recorded enrollment phone call dated January 31, 2013, 11:09 AM, Everest-Brighton.*

- "As an institution, let me tell you, we have a very good job placement rate. Institutionally 7 out of 10 of our graduates get employment in the field they are trained for. . . . You know it can't be 100 percent . . . because not everybody comes to class and do[es] what they're supposed to. Not everybody gets the skills, not everybody is as passionate in the job. . . . The way we structure it, we're all about employment. . . . We know you're not coming here just for kicks, just to learn medical administrative assisting for kicks. You're coming here to get a job, right? . . . We train people for careers that are in demand by local employers." Exhibit 1,

*Complaint at ¶ 70, citing recorded enrollment call dated January 7, 2013,
5:07 PM, Everest-Brighton.*

Corinthian made in-field placement statistics the centerpiece of its Massachusetts
recruitment efforts. However, these representations, from the oral promises to the written
placement statistics, were false and misleading.

As part of its investigation, the AGO audited data underlying the written
advertised in-field job placement rates for sample Everest MA programs and cohorts.
These data, which were provided to Corinthian's accreditor, included the specific student
names, alleged job titles, and alleged employers. After conducting employment
verifications with the referenced employers for sample cohorts, the AGO concluded that
the in-field placement rates Corinthian advertised for the sample cohorts included
falsified, temporary, and out-of-field jobs, and that Corinthian had generally utilized an
unfair and deceptive methodology in calculating its placement rates.

For example, Corinthian published in-field placement rates for the Everest-
Brighton students who started in its eight-month Medical Assistant program between
April 2008 and March 2009 and nine-month program between March 2008 and February
2009, showing purported in-field placement rates of 71% and 72%, respectively.
Supporting data, provided to the AGO as part of the investigation but also reported to
Corinthian's accreditor, contained each student's employment status, and where
applicable, the student's job title and employer's name.[14] Exhibit 5, *2010 Corinthian
Annual Report to ACCSC and employment data for these cohorts.*

The AGO contacted the listed employers to verify whether the student had been
employed as reported by Corinthian. A summary of the results of the AGO's verification
process is attached at Appendix A, and the underlying employer surveys are attached as
Exhibit 6.[15] After reaching an employment survey verification rate of response of
approximately 95%, the AGO examined and classified the results. The verified data did
not support Corinthian's purported in-field placement rates that it had published. The

---

[14] At the time, a sample of students was reviewed at Corinthian's request in order to reduce the burden
of the investigation.

[15] For a small number of students, when the reported employer did not respond to our request
following multiple written and telephonic requests, the AGO used first Corinthian's own employment
verification forms, and then, in the absence of a verification form, the student's own response to determine
employment status. These forms and surveys are attached as Exhibits 21 and 22, respectively.

school falsified the results using a variety of tactics, including counting students as placed when they were: (1) not employed at all, (2) employed in a job outside their field of study, and (3) merely completing externships or had short-term, unsustainable jobs.

The spreadsheets attached at Appendix A show the results of the AGO's employment confirmations. The classification categories are as follows:

| | Definition |
|---|---|
| **Placed in Field** | The placement is verified as reported by Corinthian. |
| **Falsified Job** | The employer had no record of the student ever being employed. |
| **Improperly Classified Job as In-Field** | The student worked for the employer but in a capacity outside the field of study. |
| **Externship & Unsustainable Job** | The student worked for the employer, but in a temporary, unsustainable capacity, or as an extern or intern only. |

In determining whether a placement should be counted as "improperly classified as in-field", the AGO relied on information about the medical assistant market, along with Corinthian's own published policies for counting jobs as in-field or not in-field, and statements by Corinthian executives regarding how placement was calculated.[16]

For the sampled Medical Assistant cohort the AGO found that Corinthian falsified and misclassified placements in the following manner:

---

[16] Corinthian's Chief Executive Officer, Jack Massimino, has stated that certain job titles reported as placements should not be counted for this purpose: "And so if you're a medical assistant, for example, with us and you get a job at a doctor's or the hospital, those count. If you get a job as an aide in a nursing home, that does not count even though you're making $10 to $12 an hour. So we're very tight on our definitions around what is and what isn't included in our placements. . . ." Jack D. Massimino, Chairman of the Board and Chief Executive Officer Corinthian Colleges CEO Presents at Credit Suisse 15th Annual Global Services Conference (Transcript), March 11, 2013. Exhibit 23.

| Corinthian's Falsification Techniques Used in Brighton Medical Assistant Sample | |
|---|---|
| Falsified Job | 5% |
| Improperly Categorized Job as In-Field (includes unsustainable temporary out-of-field jobs) | 40% |
| Externship and Unsustainable Temporary Jobs | 18% |
| Subtotal | 63%[17] |

Based on the verifications and classifications referenced above, the AGO concluded that the actual placement rates were 27% for the eight-month cohort and 23 percent for the nine-month cohort, rather than the 71% and 72%, respectively, claimed by Corinthian. Prospective students enrolling between at least July 2011 and June 2012 would have seen these false placement rates.

| | 8-Month | 9-Month |
|---|---|---|
| Everest MA Placement Representations on Website | 71% | 72% |
| Actual Placement Rate | 27% | 23% |

Verifications of placements for additional programs/cohorts indicate that falsification and misrepresentation of in-field placement rates were systemic at Everest's Massachusetts locations. For example, between 2013 and 2014, Corinthian represented on its website that 72 percent of graduates who attended its eight-month Dental Assistant program in Brighton were placed in dental assistant jobs.[18] The AGO contacted all employers identified by Corinthian in the supporting data and found that this placement rate was significantly inflated. Using the methodology discussed above, the actual rate for in-field placement was 43.2%, not 72%.[19] Appendix A and Exhibits 5 and 24.

Corinthian was aware that its numbers were deceptive.[20] The company

---

[17] There were 10 non-responses within this cohort. These students were removed from the AGO calculation and thus were not counted as either placed or not placed.

[18] For this cohort, the published rate of 72 percent was inconsistent with the rate of 83 percent Corinthian reported to the accreditor. Both rates were inflated.

[19] We are continuing to receive employer responses and this rate may change.

[20] While this shows the egregiousness of Corinthian's conduct, this knowledge is not necessary to show that Corinthian violated state law. As noted in Section II, above, the Massachusetts Consumer

aggressively put almost any possible job placement into its statistics. Despite contrary statements by Corinthian's Chief Executive Officer (*see* footnote 16, above), Corinthian counted nursing home and home health aides as placements from its Brighton campus's Medical Assistant program.[21] It also counted jobs that were extremely short-term. One former employee, a Career Services Representative at Everest-Brighton from ████████ ██████████████, stated "[f]or the purposes of job placement rate calculation, Everest Institute counted its graduates as employed in their fields of study even if they reported that they have been working in jobs that would not last more than two days." Exhibit 10, at AGO-MA02199, *Affidavit of* ████████, *Everest-Brighton Career Services Representative,* ████████.

Corinthian's efforts to inflate its placement rates included maneuvers indistinguishable from outright lies. For example, in 2010 Everest MA held its own two-day health fair and counted the participation of 15–25 students at this event as "placements" into jobs in the field. According to former Everest-Brighton Director of Education ████████████:

> "In the spring following the health fair, Everest Brighton was considered by ACCSC to have met its placement requirement and was no longer 'on reporting' with ACCSC.[22] In order to reach the ACCSC required level of placement, it is my understanding that the 25 students hired for the health fair were counted for placement purposes. I had no prior knowledge that the health fair event would be used for the sole purpose to get the school off reporting. . . . I believe that Corinthian knew about the health fair when it occurred." Exhibit 10, at AGO-MA02183, *Statement of* ████████ ████████ *Everest-Brighton Director of Education,* *("Everest-Brighton Director of Education* ████████ *Statement")*.

Even with its placement rate falsifications, Everest MA failed to meet its accreditor's standard for placement and retention between 2008 and 2011. Exhibit 25, *ACCSC Letters to Corinthian.* This additional information would have been relevant to students considering investing in career training at Everest.

---

Protection Act does not require scienter or actual knowledge for violations. Companies violate the statute if they "knew or should have known." M.G.L. c. 93A, §§ 2, 4.

[21] A list of out-of-field positions improperly categorized by Corinthian as in-field is attached as Appendix C.

[22] Even with its misleading placement calculations, Corinthian was repeatedly in danger of failing the basic placement criteria of its accreditor. This issue is discussed further in this section of our submission.

Through affirmative deception, unfairness, and omission, Corinthian misled prospective students regarding its in-field placement rates for its programs. Corinthian's actions violated Massachusetts consumer protection laws, and harmed the students who enrolled in Corinthian's Massachusetts schools.

B. <u>Corinthian Misrepresented the Availability of Career Services</u>

Between at least 2009 and the time it stopped enrolling students in 2014, Corinthian misrepresented that Everest MA would help students find employment within their fields of study. In describing its objectives, Corinthian stated: "The institution is dedicated to assisting graduates in securing career-related employment." Exhibit 26, at AGO-MA02576, *2010-2011 Everest MA Catalog*. Among the commitments included in its mission statement, Corinthian purported to be dedicated to "[t]he provision of career development support services to students and alumni." *Id.* At various times between 2009 and 2014, Corinthian's Everest Institute website stated:

> "We help our graduates find jobs after graduation. At Everest, training you for a career doesn't stop at graduation. Each campus has a Career Placement Office staffed with dedicated Career Placement Representatives who can assist you with everything from interviewing skills to improving your resume." Exhibit 11.

Corinthian made similar representations in promotional documents and oral statements. A pamphlet mailed to prospective Everest MA students listed four reasons to call the school for more information, including: "Job finding assistance upon graduation. Our placement experts help you find a job in your new career through a vast network of employer relationships." Exhibit 27. A mailing sent to prospective students stated that "most [students] find their first new job with the help of our Career Services Department." Exhibit 28. A student reported "I was told that I would get a good pay[ing] job and that they would help me find a job in my field until someone hired me." Exhibit 7, at AGO-MA01010, *Survey Response of* ███████████, *2009-2010 Everest-Chelsea Medical Assistant student*.

Students were also provided with pamphlets describing resources Corinthian claimed to provide, such as one titled "Career Services/Helping You Succeed" given during the enrollment process to a 2012-2013 Everest-Brighton Medical Assistant

student.  This pamphlet, attached at Exhibit 29, on a page captioned "Your Career. Our Commitment." stated the following:

> "Everest Institute has helped thousands of students train for a new career—and build a better life.  We are dedicated to helping you succeed.  This means that in addition to providing you with career education and training, we're also committed to helping you find a job that's right for you.  Our Career Services team offers many services to help you find a job that launches you in your new career."

It continued on:

> "Everest Career Services has a network of employers to help students find jobs.
> . . .
> "Everest Institute has developed solid relationships with employers, both in our local communities and nationwide.  These employers know that they can count on our graduates to be knowledgeable and professional.  Speak with a Career Services Representative today and we'll help you start building your new career." *Id.*

Another pamphlet provided to students promised that job placement assistance would extend beyond a student's time at Everest MA: "You can get ongoing help from Career Services anytime after you graduate—for life[.]" Exhibit 13.

The promise of life-long job placement services was an effective lure.  Many prospective students, by their own accounts, decided to enroll after hearing marketing representations about career services from Everest MA recruiters.  *See, e.g.*, Exhibit 8, at AGO-MA01888, *Affidavit of* ████████████, *2009-2011 Everest-Chelsea Medical Assistant student* ("They told me they would help me find a permanent medical assistant job.  That was the whole reason for me signing up.  They said, 'You're going to get a job; we're going to place you.'"); Exhibit 7, at AGO-MA00707, *Survey Response of* ████████████, *2012-2013 Everest-Brighton Dental Assistant student* ("The main reason I enrolled was the job placement/help they were offering after graduation.").  *See also* Appendix D, identifying student reports of enrollment due to Corinthian's promise of job placement assistance.

In fact, the AGO investigation found that Corinthian provided little or no help to its Everest MA students and graduates who were looking for jobs.  Numerous enrollees, after being induced to attend Everest MA, found themselves without employment and without any help from Everest MA's much-touted Career Services departments.  Former

student ▮▮▮▮▮ stated that "I spent several months try[ing] to find a job with no luck. I made several attempts to getting ahold of my 'career' Rep to help me. All I ever got was a voicemail box. When I did get someone I was told to use Craigslist." Exhibit 7, at AGO-MA01590, *Survey Response of* ▮▮▮▮▮, *2012-2013 Everest-Chelsea Medical Assistant student*. Other students had similar experiences:

- "I tried numerous times contacting Everest Institute about job placement and interviews but wasn't successful. Everest had a waiting list of 2-3 weeks for students who needed help with job placement, interviews or building your resume and if you were lucky enough to touch bas[e] with them they either had 'ran out' of job placements or were too busy to see you." Exhibit 7, at AGO-MA00633, *Survey Response of* ▮▮▮▮▮ ▮▮▮▮, *2010 Everest-Chelsea Medical Assistant student*.

- "At the time of enrollment, Everest made several promises that made me want to sign up including, that 'they will always help me find a job after graduation.'. . . Upon my graduation in 2012, Everest did very little to assist me in obtaining a full time position. I was given a list of staffing agencies and sent to job fairs that had nothing to do with my field." Exhibit 7, AGO-MA00913, *Survey Response of* ▮▮▮▮▮, *2011 Everest-Chelsea Medical Billing and Coding student*.

- "When I was approaching graduation and I didn't have a job, the career representative only gave me public job listings from places like Monster.com. I never got a job in field. I now work as assistant manager at ▮▮▮▮▮." Exhibit 3, at AGO-MA00168, *DTR Application of* ▮▮▮▮, *2011-2012 Everest-Brighton Medical Assistant student*.

- "I was looking for a permanent full time job for over a year after I graduated. I called Everest several times and even went into the school and no one would help or get back to me." Exhibit 7, at AGO-MA00707, *Survey Response of* ▮▮▮▮▮, *2012-2013 Everest-Brighton Dental Assistant student*.

- "After graduation I went back for help with my resume and interview skills, I can honestly say I got zero help with both. I was always told to come back at a later time and twice the woman wasn't at work. So I stopped going back. I eventually found a temp job out of Boston. When that work ended I contacted Everest to see if they knew of any other temp/permanent jobs but never received a call back. I have not had a job related to Medical Billing since then." Exhibit 7, at AGO-MA01218–19, *Survey Response of* ▮▮▮▮▮, *2008 Everest-Chelsea Medical Insurance Billing and Coding student*.

During the AGO's investigation, approximately 280 students raised issues concerning career services, including 240 students who reported that they did not receive

the job placement assistance that Corinthian promised its students. *See* Appendix D. ███████████, who worked in the admissions office of the Everest-Chelsea campus in 2010, described the lack of career services from his perspective as a former employee: "[S]tudents were supposed to get career services. But I know from forwarding calls that the people in career services did not answer students' calls or provide services to former students. Their voicemails were always full." Exhibit 10, at AGO-MA02201, *Affidavit of* ██████████████, *Everest-Chelsea Admissions Receptionist,* ████ *("Everest-Chelsea Admissions Receptionist* ██████ *Affidavit")*.

Even students who did find jobs emphasized that they did so without any assistance from the school. For example, █████████████ noted that "I graduated in July 2010 and found a medical assistant job with no help from Career Services. I was hired because of the job I had in the medical field prior to enrolling in the Everest Medical Assistant program." Exhibit 8, at AGO-MA01915, *Statement of* ████████ ████████, *2009-2010 Everest-Chelsea Medical Assistant student*. Other students had similar experiences:

- "We were told that we were guaranteed job placement assistance as long as we finished the program. But that did not happen. I got [a] job as a part-time medical assistant on my own from looking at websites." Exhibit 3, at AGO-MA0107–08, *DTR Application of* █████████████, *2012 Everest-Brighton Medical Assistant student*.

- "I had limited if any help from Everest finding employment. . . . Everest definitely under delivers on their promise of finding employment for their students. Their efforts ended with a bulletin board of job listings wherein the vast amount of students far exceeds the amount of job listings they provided. They did not give the individual help that they advertised nor did they help students prepare for the interviewing process. I accepted a part time (2 days) position in which I am currently still employed. I obtained the position without any help from Everest." Exhibit 7, AGO-MA01786, *Survey Response of* ████████████, *2010-2011 Everest-Brighton Dental Assistant student*.

- "I [found] a small job after a few months of being out of school. I found it myself and Everest took credit when they did nothing for me." Exhibit 8, AGO-MA01903, *Affidavit of* ████████████, *2009-2010 Everest-Chelsea Medical Assistant student*.

- "When I called to see if they could help me they said all they could [do to help] is send my school resume out. I found the job on my own." Exhibit

7, at AGO-MA01321, *Survey Response of* ███████████, *2008 Everest-Brighton Medical Assistant student.*

The attached materials include approximately 280 examples of Corinthian's unfair and deceptive behavior relating to career services at Everest MA. See Appendix D. These materials, which contain statements from students from a variety of programs at both campuses ranging from 2009 through 2014, show that Everest MA simply did not provide the career services assistance they routinely marketed to students. Corinthian misled potential students regarding job placement services in violation of Massachusetts law.

### C. Corinthian Engaged in High Pressure Sales Tactics

Between 2009 or earlier and the time it stopped enrolling students, Corinthian used high pressure sales tactics when marketing the school to prospective students. The school contacted potential recruits via a barrage of harassing telephone calls, often calling individual student prospects several times a day. As one Everest recruiter aptly described it, "Everest Institute engaged in pressure sales tactics to enroll students." The recruiter added that "admissions representatives were instructed to call each new lead three times a day for a period of around four to seven days," even if the students requested that they not be contacted. Exhibit 10, at AGO-MA02195, *Affidavit of* ██████████████, *Everest-Chelsea Admissions Representative,* ███████. Another Everest recruiter reported that she "was instructed to make between 100 and 300 phone calls per day to prospective students, often dialing the same number several times." Exhibit 10, at AGO-MA02190, *Affidavit of* ██████████ *Everest-Brighton Admissions Representative/Director of GED Programs,* ███████ *("Everest-Brighton Admission Representative* ██████*Affidavit")*. A third former Everest employee described a quota system:

> "From my personal observation, the admissions officers functioned as sales people. There was a quota system and the sales people had to enroll students or they would get fired. Since the sales people were judged on how many students they enrolled, there was constant competition for the prospective students' calls. . . . There was a constant need to enroll more people. . . . The entire point of admissions was to get students to sign up and sign on for a loan, since my understanding is that a certain amount of that money was guaranteed to the institution regardless of whether the student finished the program or was placed in a job. From my perspective,

the goal was to bring people in the door and get them to sign up. After that, the level of hand holding and service providing fell off." Exhibit 10, at AGO-MA02200–01, *Everest-Chelsea Admissions Receptionist* ████████ *Affidavit*.

Students reported numerous issues with harassing phone calls:

- "[The admission representative] called me every day at any time during the day or night to tell me that car[eer] will change my life. Guess what? It didn't! I'm working [i]n my city grocery store." Exhibit 7, at AGO-MA01556, *Survey Response of* ██████████, *2009-2010 Everest-Chelsea Medical Assistant student.*

- "They called about 10 times a day. Even after telling them I would call them back." Exhibit 7, at AGO-MA00593, *Survey Response of* ██████ ████ *2009-2010 Everest-Chelsea Medical Administrative Assistant student.*

- "Overwhelming amounts of phone calls to get you to join." Exhibit 7, at AGO-MA00881, *Survey Response of* ████████████, *2009-2010 Everest-Chelsea Medical Administrative Assistant student.*

- "[The admissions representatives] haunted me every day, 3x times per day." Exhibit 7, at AGO-MA00970, *Survey Response of* ██████████, *2009-2012 Everest-Chelsea Medical Assistant student.*

- "Enrollment was very pushy, almost not given a choice with phone calls daily till you're signed." Exhibit 7, at AGO-MA01687, *Survey Response of* █████████, *2009-2010 Everest-Chelsea Medical Assistant student.*

- "Calls every single day. Very annoying." Exhibit 7, at AGO-MA01571, *Survey Response of* ██████████, *2009 Everest-Chelsea Medical Assistant student.*

- Another prospective student received numerous calls from an Everest-Brighton lead generator. She answered one call in order to ask them to discontinue the calls: "I only answered the phone because I've been getting calls from this, that number like ten times a day for like two or three weeks now. . . . It's just annoying and I figured I would answer it this one time and I'm not interested in going to school right now. . . . I just wanted to address it today because it's been happening way too much and it's been like a pain." Exhibit 1, *Complaint at ¶ 35, citing recorded enrollment call dated January 7, 2013, 2:35 PM, Everest-Brighton.*

Part of Corinthian's recruitment strategy was to ensure that prospective students visited Everest MA schools, where maximum pressure could be applied to induce them to enroll. An Everest recruiter noted that she "was instructed to call each prospective student continuously until he or she agreed to come to the campus for an in-person interview." Exhibit 10, at AGO-MA02197, *Affidavit of* ██████████, *Everest-*

*Brighton Admissions Representative,* ▓▓ *("Everest-Brighton Admissions
Representative* ▓▓▓ *Affidavit").* Prospective students who requested even basic
information over the phone (for example, program start dates or financial aid eligibility
requirements) were told that Corinthian required them to come to the campus to receive
the information. A Corinthian admissions representative told one prospective student
inquiring about financial aid, "I wouldn't be able to send you anything like that. . . . [A]s
far as information goes, you'd have to come in for that." Exhibit 1, *Complaint at ¶ 36,
citing recorded enrollment call dated February 6, 2013, 2:33 PM, Everest-Brighton.*

When students visited an Everest MA campus, recruiters attempted to ensure that
students did not have time to intelligently weigh their options and consider whether
Everest's high-cost program was the right choice for the student's educational needs.
Everest staff worked to ensure students enrolled while still on the premises, and kept up
the recruitment pressure during the student's visit so the student would not have the time
to contemplate changing her mind. Exhibit 10, at AGO-MA02197, *Everest-Brighton
Admissions Representative* ▓▓▓▓ *Affidavit.* Everest student ▓▓▓▓▓
described being pressured to "enroll right away" when she visited. Exhibit 8, at AGO-
MA01875, *Statement of* ▓▓▓▓, *2008-2009 Everest-Chelsea Medical Assistant
student.* Another student stated that "I was forced to enroll! . . . I was so overwhelmed,
n[aïve], and vulnerable." Exhibit 7, at AGO-MA0657, *Survey Response of* ▓▓▓▓
▓▓▓, ▓▓▓▓▓ *Everest-Chelsea Medical Assistant student.* The attached materials
include more than 180 examples of students reporting high-pressure sales tactics. *See*
Appendix E.

Corinthian's focus was on increasing its numbers of enrollees. As former
Everest-Brighton Campus President, ▓▓▓▓▓▓ noted to the AGO that ▓▓▓
▓▓▓'s recruitment philosophy as Director of Admissions was "asses in classes"; she
attempted to maximize the school's enrollment, without concern for whether the enrollees
were adequately prepared for the program. Exhibit 10, at AGO-MA02202, *Attestation of*
▓▓▓▓▓ *regarding Statement of* ▓▓▓▓▓, *Everest-Brighton President,*
▓▓▓▓. Another Corinthian employee described a "push from management and
regional leadership to get students in regardless of their situation and whether they could
benefit from the education at that time." Exhibit 10, at AGO-MA02187, *Affidavit of*

████████, *Everest-Brighton Student Finance Planner,* ████████ *("Everest-Brighton Student Finance Planner* ███ *Affidavit").*

Everest supplemented its high pressure tactics with misleading information. Potential students were told that they needed to enroll immediately in Everest MA schools because limited space was available. A mass mailing sent to prospective students stated: "LIMITED SPACE AVAILABLE" and asked the recipient to "[p]lease call within 7 days. Even if you are not sure, call so we can reserve a 'Pending' spot for you." It further stated: "So call us today at [phone number] and take the first step to your new, rewarding career. But hurry. Make sure you're one of the people in [Massachusetts] who gets a spot in career training." Exhibit 28, *Everest sales flyer.* Everest recruiters also misled students individually, using various versions of the "limited space availability" tactic:

- "The recruiter made it seem like it was extremely urgent to sign up right away. They stated that there was an 'open spot' and that classes fill up very quickly." Exhibit 8, at AGO-MA01908, *Affidavit of* ████████, *2008-2009 Everest-Brighton Medical Assistant student.*

- "When I told them that I wanted to think it over and would call the next week, they said they could not guarantee I would have a spot or any of the financial aid. I wanted a better life so I enrolled that day, because I felt the pressure to do so at the time." Exhibit 8, at AGO-MA01918, *Affidavit of* ████████, *2013-2014 Everest-Brighton Dental Assistant student.*

- "I was told if I didn't sign up right away I wouldn't be able to later." Exhibit 3, at AGO-MA00125, *DTR Application of* ████████, *2011 Everest-Chelsea Medical Assistant student.*

- "They sent me emails stating that there was 'limited space available' at the school and made false statements to me." Exhibit 8, at AGO-MA01879, *Affidavit of* ████████, *2012-2013 Everest-Chelsea Medical Administrative Assistant student.*

- "They said space was limited, but it wasn't true. There was a new student each week." Exhibit 3, at AGO-MA00123, *DTR Application of* ████████, *2011-2012 Everest-Brighton Medical Assistant student.*

- "I found out about Everest when they called me twice a day during the week and more than that on the weekend telling me to enroll and told me to enroll right away before enrollment filled." Exhibit 3, at AGO-MA00184, *DTR Application of* ████████, *2011-2012 Everest-Brighton Medical Assistant student.*

In reality, Everest did not turn Massachusetts students away because of limited available space. Recruitment efforts were instead designed to enroll as many students as possible and new class cohorts started at least once, and sometimes twice, per month. *See* Exhibit 10, at AGO-MA02197, *Everest-Brighton Admissions Representative* ▆▆▆▆▆ *Affidavit.* Student ▆▆▆▆▆ said that "[i]t seems like anyone can attend Everest even if they do not do well on the basic entrance exam. In my opinion Everest is fueled by money so therefore they would not want to throw out any student because each student brings in money." Exhibit 8, at AGO-MA01908, *Affidavit of* ▆▆▆▆▆, *2008-2009 Everest-Brighton Medical Assistant student.*

Corinthian engaged in aggressive unfair marketing tactics, harassing Massachusetts students and pressuring them to enroll while creating a false urgency to the enrollment process, all in violation of Massachusetts law.

D. Corinthian Misrepresented the Quality and Type of Education and Instruction

Between 2009 or earlier and the closure of its Massachusetts campuses, Corinthian misrepresented to prospective students that it provided high-quality, hands-on, career-ready vocational training. Corinthian's Everest MA catalog represented that the school maintained its "long-standing reputation for innovation and high-quality private education." Exhibit 26, at AGO-MA02576, *2010-2011 Everest MA Catalog.* Corinthian provided prospective students with promotional materials stating "[o]ur programs are specially designed to provide hands-on training in real-world work environments, so our students are ready to enter the workforce with the skills they need to succeed." Exhibit 30, *"The Right Choice for Your Career. And Your Life." Corinthian Colleges, Inc. Brochure dated 2010.* This brochure claimed that Corinthian offered, among other things, "[s]mall work teams where you can ask questions and work with instructors who will show you what you need to get the job done." *Id.* Since at least 2009, Corinthian emphasized the hands-on training provided at its Everest Institute campuses, stating for example: "The training you'll receive is hands-on, using the techniques and tools of professionals in your chosen field." Exhibit 31. The Everest Institute website (www.everest.edu), at various times between 2009 and 2014, also promised hands-on training and qualified instructors:

- "We give you practical hands-on career training. We think it's important to practice what you're learning. That's why we incorporate hands-on training into all our programs. You'll learn better and quicker by doing the work than you will just sitting in a lecture room." Exhibit 11.

- "We have instructors with real-world experience. We don't just hire any instructor. We recruit qualified professionals with industry-specific expertise. So you get the benefit of real-world knowledge and gain the kind of practical insights that can't be learned from a textbook." Exhibit 11.

The Everest-Brighton and Everest-Chelsea webpages made similar representations:

- "The instructors at the Chelsea campus bring a wealth of personal experience, which results in innovative classroom projects and inspirational classroom discussions." Exhibit 32.

- "The instructors at the Brighton campus are professionals who can give you practical advice in each area of study—all based on the real-world experience they bring to the classroom. They understand what it takes to make the subject matter come alive through inspirational classroom discussions and creative classroom projects. Small work teams allow the instructors to work with you one-on-one when needed." Exhibit 33.

In actuality, students were not provided with high-quality, hands-on, career-ready instruction. Although Corinthian billed Everest MA as specializing in career-training programs, the curriculum was often lacking and did not prepare students for in-field jobs. As a former instructor at the Everest-Chelsea campus noted:

> "The curriculum and way I was supposed to teach was as if I was teaching grade-school students. It was really sub-par for teaching someone how to be an effective massage therapist. If the students actually got a job, they would not know what to do with the education we were supposed to provide. I tried to enhance the experience for the students and suggested a clinic where people would come in from the outside for massages, but no one ever listened to me and we never did the clinic." Exhibit 10, at AGO-MA02194, *Affidavit of* ████████████, *Everest-Chelsea Massage Therapy Instructor,* ██████ *("Everest-Chelsea Massage Therapy Instructor* ██████ *Affidavit").*

Contrary to Corinthian's representations, the training at Everest MA was largely self-taught instruction from workbooks. Students often reported that teachers failed to provide hands-on training and gave inadequate instruction. According to students, many teachers did not review work or appropriately answer questions. For example, students reported:

- "[P]rior to enrolling the admissions person told me that there was individual instruction but this was not true; we learned off of textbooks." Exhibit 3, at AGO-MA00168–69, *DTR Application of* ▉▉▉▉▉▉, *2011-2012 Everest-Brighton Medical Assistant student.*

- "There were times I would ask one of my teachers for assistance with Excel, and she would tell me that she did not know how to help. Also, she would always be sending text messages to her boyfriend during class. When new students would come to class, the teacher would tell the students who had been there for a while to teach the new students because she had too many other things to do." Exhibit 8, at AGO-MA01879, *Affidavit of* ▉▉▉▉▉▉, *2012-2013 Everest-Chelsea Medical Administrative Assistant student.*

- "I was told the teachers would be available for tutoring [and] extra and they were never there." Exhibit 7, at AGO-MA01040, *Survey Response of* ▉▉▉▉▉▉, *2009 Everest-Brighton Medical Assistant student.*

- "A student showed me my books, and a student was told to show me how to take vitals." Exhibit 8, at AGO-MA01876, *Statement of* ▉▉▉ ▉▉▉▉, *2008-2009 Everest-Chelsea Medical Assistant student.*

- "I didn't feel that Everest helped in any way except putting me in financial debt. I basically taught myself, the teachers don't pay attention with helping you. Too many. You can't teach a large group of about 30 the correct training. I feel that the course I was taught was outdated, the only thing I did get out of the class that helped in my career was the medical terminology. Other than that I have since used nothing. I would never recommend anyone to go to that school and be in debt. It was a waste of time and money." Exhibit 7, at AGO-MA00870–71, *Survey Response of* ▉▉▉▉▉▉, *2009 Everest-Chelsea Medical Assistant student.*

- "As soon as they got the money from the loan company everything changed and I was stuck. They changed teachers on me multiple times, constant fights between other students. I felt like I was in high school but w/ debt now. . . . The teachers didn't really teach, they hung out w/ the students instead." Exhibit 7, at AGO-MA01081–82, *Survey Response of* ▉▉▉▉▉▉, *2009-2010 Everest-Chelsea Medical Assistant student.*

- "There were no lectures, no one really teaching us at all. Were given spelling homework which we never went over, as well as book homework. I did more typing lessons than learning the craft." Exhibit 7, at AGO-MA01186, *Survey Response of* ▉▉▉▉▉▉, *2009-2010 Everest-Chelsea Medical Administrative Assistant student.*

The AGO's investigation found that the content of Everest MA classes did not provide students with the skills to adequately prepare them for in-field careers. Numerous students reported a stark difference between the way the courses were

portrayed in marketing and the actual education provided by Everest MA, resulting in a lack of proper training for future employment. For example, students stated:

- "[T]he things I was taught there was not needed on the job I got and I had to be retaught by my job…" Exhibit 7, at AGO-MA00661, *Survey Response of* ███████████, *2008 Everest-Brighton Medical Assistant student.*

- "I did not get enough training all the equipment were outdated there were too many student in the class, and . . . when I went to my externship I didn't know what to do." Exhibit 7, at AGO-MA00927, *Survey Response of* ████████, *2013-2014 Everest-Brighton Dental Assistant student.*

- "Everest representatives, recruiters, or employees promised hands-on training and will prepare me for my externship. This was not true, and the skills I learned from Everest weren't the same as what was required of me at my externship." Exhibit 3, at AGO-MA00162, *DTR Application of* ██████████, *2013 Everest-Brighton Medical Assistant student.*

The courses simply failed to provide the promised hands-on experience. Again and again students reported their disappointment with the instruction they were provided:

- "[F]or a period of time of three to four months, classes consisted of a lecturer just reading from the textbook." Exhibit 8, at AGO-MA01919, *Affidavit of* ██████████, *2013-2014 Everest-Brighton Dental Assistant student.*

- "This was basically a hangout place for people. . . . It was like sitting in high school. The education that was provided to us was not up to par as the enrollment staff led me to believe." Exhibit 8, at AGO-MA01887, *Affidavit of* ██████████, *2009-2011 Everest-Chelsea Medical Assistant student.*

- "[T]he education was terrible. I spent most of my time staring at the wall. We had to be in class every day for 4 hours but only had about a 20 min lecture then we looked in the book and sat around to talk (even the teachers) the rest of the time." Exhibit 7, at AGO-MA00869, *Survey Response of* ██████████████, *2010-2011 Medical Insurance Billing and Coding student.*

- "[The school] promised it would be a hands-on program in which I would learn valuable skills. . . . Rather than being hands-on, in the classroom we sat at computers and for the most part worked by ourselves." Exhibit 3, at AGO-MA00146, *DTR Application of* ██████████, *2012-2013 Everest-Brighton Medical Administrative Assistant student.*

- "[I] felt lied to . . . . [Everest] [d]id not have the hands on training . . . ." Exhibit 7, at AGO-MA00723, *Survey Response of* █████████, *2012-2013 Everest-Chelsea Medical Assistant student.*

- "The school's equipment never worked, so you didn't or don't get that full hands on experience that they promise." Exhibit 7, at AGO-MA00924, *Survey Response of* ██████████, *2011-2012 Everest-Brighton Medical Assistant student.*

- "I thought I was gonna have more hands on than what I had." Exhibit 7, at AGO-MA00677, *Survey Response of* ██████████, *2009-2011 Everest-Brighton, Medical Assistant student.*

These reported student experiences regarding quality of education are only a small fraction of the 140 examples uncovered during the AGO's investigation. *See* Appendix F. These materials, which apply to a variety of programs at both campuses ranging from 2009 through 2014, show that Corinthian's practice on this issue was widespread. *See id.* Corinthian's representations regarding the quality of education did not match the education the school actually provided. The misleading representations violated Massachusetts law, and provide a defense to repayment against the students' federal student loans.

E. Corinthian Misrepresented the Qualifications of Instructors

Between 2009 or earlier and the time it stopped enrolling Massachusetts students, Corinthian misrepresented the qualifications of the instructors at its Everest MA schools. During this period, on its website and in printed materials, Corinthian promised highly-qualified instructors with "real-world," "industry-specific expertise," along with dynamic classroom environments and personalized attention. *See, e.g.*, Exhibits 11, 31–33. It likewise provided students with promotional material claiming that its programs offer, among other things, "[e]xperienced instructors who offer insight and provide real-world experience, making learning interesting." Exhibit 30, *"The Right Choice For Your Career. And Your Life.," 2010 Corinthian Colleges, Inc. Flyer.* The school's catalog claimed: "[t]he institution is committed to quality in teaching and excellence in education and shall seek qualified faculty who will create a facilitative environment that fosters excitement in the classroom and stimulates eagerness for learning." Exhibit 26, at AGO-MA02576, *2010-2011 Everest MA Catalog.* Accordingly, students expected well-trained instructors with experience in the field and one-on-one assistance with class work, if needed. But, in many cases, Everest's instructors were not qualified to deliver the hands-on, experience-based training students anticipated upon enrollment.

Numerous students, after being persuaded to attend Everest MA, in part by such representations, found their instructors to be unqualified, uninformed, and unconcerned with teaching the skills needed to succeed in the medical assisting, medical administrative assisting, medical insurance billing and coding, and dental assisting fields. For example:

- "They said that all the instructors were certified teachers but when I started the program I found out they weren't. Many instructors were from temp agencies and some never taught in a classroom before." Exhibit 3, at AGO-MA0190–91, *DTR Application of* ███████████, *2011-2012 Everest-Brighton Medical Assistant student.*

- "This school is a free for all. My teacher wouldn't know any answers to my questions during lecture. Half way through the course, our director had to start lecturing to us while she sat and texted. . . ." Exhibit 7, at AGO-MA00658, *Survey Response of* ███████████, *2009-2010 Everest-Chelsea Medical Assistant student.*

- "The instructor was a previous student from Everest Institute. She never work[ed] in the medical field. When she graduated she got the job as an instructor. A typical day consisted of discussing a lecture assignment: we would answer among ourselves . . . the instructor just sitting there in her chair doing nothing." Exhibit 7, at AGO-MA01296, *Survey Response of* ███████████, *2009 Everest-Chelsea Medical Administrative Assistant student.*

In many cases, students report that they taught each other rather than relying on their instructors. For example, ███████████, an Everest-Chelsea student in 2011 noted: "[m]y teacher was never in the class...When she was in class, she was on Facebook. She was not an experienced teacher. I would say 95% of the time we were left to teach ourselves the course materials. . . . The students did everything on our own, we helped each other learn." Exhibit 8, at AGO-MA01896, *Affidavit of* ███████████, *2011 Everest-Chelsea Medical Insurance Billing and Coding student.* Similarly, ███████████, an Everest-Chelsea student in 2013, reported that "we had computer class with a teacher who openly admitted to not having any computer training" and that "there was no direction and absolute free-for-all, the teachers did not come in the room half the time let alone teach. . . ." Exhibit 7, at AGO-MA01238, *Survey Response of* ███████████, *2012-2013 Everest-Chelsea Medical Assistant student.*

A former Everest MA employee even reported that her colleague was not qualified or knowledgeable enough to teach the subject matter. ███████████, a

former instructor in the Everest-Brighton Dental Assisting program, stated: "There was one teacher at the Brighton campus who did not know much. Students would come in for class that was supposed to last four hours, and they would stay for just two hours instead." Exhibit 10, at AGO-MA02188, *Affidavit of* ████████████, *Everest-Brighton Dental Assistant Instructor,* ████████ *("Everest-Brighton Dental Assistant Instructor* ██ *Affidavit").*

The attached materials include over 30 examples of Corinthian's unfair and deceptive behavior relating to the qualifications of its instructors and the overall quality of education for students attending its Massachusetts programs. These attachments contain statements from students from a variety of programs at both Everest MA campuses during the time Corinthian operated in Massachusetts and show that Corinthian's practice of employing unqualified instructors was pervasive and in direct conflict with the school's representations. *See* Appendix G. Corinthian's representations regarding the qualifications and experience of its instructors were misleading, unfair, and deceptive in violation of Massachusetts law.

F. Corinthian Misrepresented the Learning Environment and Failed to Provide a Safe Learning Environment

Between 2009 or earlier and the time it stopped admitting students, Corinthian misrepresented the quality of the learning environment fostered at its Everest MA schools. During this period, the Everest MA catalog stated, "[t]he Institute maintains professional-level standards for conduct and behavior for all students." Exhibit 26, at AGO-MA02588, *Everest MA 2010-11 Everest MA Catalog.* Corinthian advertised that the school was centered on its "inspirational classroom discussions," Exhibits 32 and 33, and claimed to prohibit, among other things, possession of alcohol and drugs, harassment or intimidation of others, "any disruptive or obstructive actions," including the use of cell phones in class, and cheating, plagiarism, or other forms of academic dishonesty. Exhibit 26, at AGO-MA02589, *2010-11 Everest MA Catalog.*

The AGO's investigation found these representations about the learning environment to be false. Surveys and affidavits from students and former employees reveal an environment that was unprofessional at best and unsafe at worst. These sources routinely described the school environment as "a free-for-all," "immature," "chaos," "a

zoo," "unprofessional," "neglectful," "inappropriate," "drama," and "distracting." More than 95 students provided written complaints to the AGO regarding the quality of Everest MA's learning environment. *See* Appendix H. Contrary to Corinthian's representations to prospective students, the school lacked a professional environment conducive to learning. Students described instructors who behaved more like social acquaintances than teachers: texting and visiting Facebook during class, exhibiting a disturbing penchant for absenteeism, and getting into fights with other teachers.

- "[M]y teacher was very disrespectful and rude. Her mom came into the building and twice they fist fought. Exhibit 7, at AGO-MA00643, *Survey Response of* ██████████, *2010 Everest-Chelsea Medical Assistant student.*

- There was an event where two teachers were arguing. Almost got into a fight. They were swearing . . . ." Exhibit 7, at AGO-MA01559, *Survey Response of* ██████████, *2009-2010 Everest-Chelsea Medical Assistant student.*

- "[T]he teachers would fist fight with students during class time and I did not feel safe." Exhibit 7, at AGO-MA00970, *Survey Response of* ████ ██████, *2009-2010 Everest-Chelsea Medical Assistant student.*

- "The teachers didn't really teach, they hung out with the students instead." Exhibit 8, at AGO-MA01903, *Affidavit of* ██████████, *2009-2010 Everest-Chelsea Medical Assistant student.*

- "Many instructors were very unprofessional and unethical; they became friends with and met other students after school hours and during lunch breaks to socialize." Exhibit 8, at AGO-MA01915, *Statement of* ██████ ██████, *2009-2010 Everest-Chelsea Medical Assistant student.*

- "My instructor did not teach us. This was basically a hang-out place for people . . . . The externship coordinator was a bully to all the students." Exhibit 8, at AGO-MA01887, *Affidavit of* ██████████, *2009-2011 Everest-Chelsea Medical Assistant student.*

- "[My teacher] was always acting in an inappropriate manner. . . . And all she spoke about was clubs, drinking, and wet t-shirt contest[s]." Exhibit 7, at AGO-MA00904, *Survey Response of* ██████████, *2009-2010 Everest-Chelsea Medical Assistant student.*

- "My teacher was never in the class. She was always outside in the parking lot smoking and socializing. When she was in the class, she was on Facebook." Exhibit 8, at AGO-MA01896, *Affidavit of* ██████ ██████, *2011 Everest-Chelsea Medical Insurance Billing and Coding student.*

- "Teachers were always late or not there." Exhibit 7, at AGO-MA00607, Survey Response of ████████████, *2012-2013 Everest-Chelsea Medical Assistant student.*

- "My instructor was always leaving early" Exhibit 7, at AGO-MA00664, *Survey Response of* ████████████*, 2011-2012 Everest-Brighton Medical Administrative Assistant student.*

- "My teacher…had a fist fight with her mother in the hallway!" Exhibit 7, at AGO-MA00658, *Survey Response of* ████████████*, 2009-2010 Everest-Chelsea Medical Assistant student.*

- "There were also days when the instructor was out and no one covered." Exhibit 7, at AGO-MA00816, *Survey Response of* ████████████*, 2009 Everest-Brighton Medical Assistant student.*

Favoritism was also reportedly rampant at Everest: "If I didn't pick up my instructor every day for class then her personal feelings would be taken out on my grades." Exhibit 7, at AGO-MA01268, *Survey Response of* ████████████*, 2009-2010 Everest-Chelsea Medical Assistant student.* A number of other students reported similar experiences. *See, e.g.*, Exhibit 7, *Survey Responses of* ████████████, *2010-2012 Everest-Brighton Medical Administrative Assistant student* (AGO-MA01056); ████████████*, 2009-2010 Everest-Brighton Medical Assistant student (*at AGO-MA01095); and ████████████*, 2010-2011 Everest-Brighton Medical Assistant student* (at AGO-MA01069).

The Everest environment also suffered from inappropriate student behavior and a lack of discipline. Student reports indicate that the school faced serious problems of drug use and violence. ████████████ reported that "[g]irls would fight in the classroom during class which resulted in a night time security guard. They were not able to teach because of the constant fist fighting." Exhibit 7, at AGO-MA00772, *Survey Response of* ████████████*, 2012-2013 Everest-Chelsea Medical Assistant student.* Similarly, another student described "constant" fights between other students. Exhibit 7, at AGO-MA01081, *Survey Response of* ████████████*, 2009-2010 Everest-Chelsea Medical Assistant student.* Multiple students described an environment that made learning nearly impossible:

- "The academic environment at Everest was very bad. There were students who took drugs during the day on campus, there were fights between students on campus, and we often did not have teachers in the classrooms.

Exhibit 8, at AGO-MA01879, *Affidavit of* ███████, *2012-2013 Everest-Chelsea Medical Administrative Assistant student.*

- "There were fights and disrespectful students." Exhibit 7, at AGO-MA01716, *Survey Response of* ███████, *2010-2011 Everest-Brighton Medical Assistant student.*

- "The students were consistently disrespectful, argumentative, and generally disruptive in class and it seemed like the teachers had no way of controlling the students." Exhibit 8, at AGO-MA01908, *Affidavit of* ███████, *2008-2009 Everest-Brighton Medical Assistant student.*

- "I went to the school in September and was appalled to see students yelling and fighting in the classroom." Exhibit 8, at AGO-MA01876, *Statement of* ███████, *2008-2009 Everest-Chelsea Medical Assistant student.*

- "A lot of the students were on drugs." Exhibit 8, at AGO-MA01917, *Affidavit of* ███████, *2013-2014 Everest-Chelsea Medical Assistant student.*

- "I witnessed drug deals, fights, cheating, and lying throughout the halls, classrooms, and offices." Exhibit 7, at AGO-MA00659, *Survey Response of* ███████, *2009-2010 Everest-Chelsea Medical Assistant student.*

- "There were many drug addicts...constant fights, and students stealing needles from the lab." Exhibit 7, at AGO-MA01846–47, *Survey Response of* ███████, *2008 Everest-Chelsea Medical Assistant student.*

Even when alerted to issues of violence or bullying, Corinthian did not act to stop it. One student wrote that "I was bullied badly. Teachers knew what was going on and did nothing." Exhibit 7, at AGO-MA00607, *Survey Response of* ███████, *2012-2013 Everest-Chelsea Medical Assistant student.* ███████, a student with a learning disability, was not given the support she needed: "I was made fun of and no one wanted to work with me at all. [I was] being bullied by other students and told by my teacher that I was being over emotional." Exhibit 7, at AGO-MA01848, *Survey Response of* ███████, *2008-2009 Everest-Chelsea and Everest-Brighton Medical Assistant student.* ███████ stated that "I did not always feel safe at the school. I got threatened by one of the other students in my class and the director did not remove her from the class." Exhibit 7, at AGO-MA01463, *Survey Response of* ███████, *2010-2011 Everest-Brighton Medical Assistant student.* Another student described an even more disturbing situation:

41

"[Everest] did not take sexual harassment claims seriously. A student in my class . . . was oddly obsessed with me and would threaten me and follow me home. When I told the school and showed them text messages . . . they told me just to ignore him. Come to find out he was arrested previously for holding 2 women at gunpoint and attempting to force them into his car." Exhibit 7, at AGO-MA01252, *Survey Response of* ███, *2011-2012 Everest-Brighton Dental Assistant student*.

Corinthian employees similarly observed issues with drugs and violence at the school. One former instructor described the following:

"In my class, there was a young lady who we suspected of being on drugs. She would always pass out in class. I brought it to the Director of Education, but nothing was done. . . . There was another student in my class who always came to school smelling of marijuana. On one occasion, he left his backpack in my classroom. Inside his backpack, there was a glass jar with multiple bags of marijuana. I brought this to the attention of the Director of Education, who brought it to the attention of the campus President. They told me that they were not going to do anything about it. . . . I frequently saw fights at the school. There was also swearing and foul language used in the classroom. Students were disrespectful to teachers, and used inappropriate language." Exhibit 10, at AGO-MA02188–89, *Everest-Brighton Dental Assistant Instructor* ███ *Affidavit*.

Finally, widespread cheating pervaded Everest's learning environment. Multiple students confirmed that teachers would provide the answers to students before tests. *See, e.g.*, Exhibit 7, *Survey Responses of* ███, *2010-2011 Everest-Chelsea Medical Assistant student* ("I had a teacher who would give us the answers to tests in advance") (AGO-MA01488) and ███, *2011 Everest-Chelsea Medical Assistant student* ("We were given 'study guides' with answers to the tests") (AGO-MA01728), and Exhibit 8, at AGO-MA01908, *Affidavit of* ███, *2008-2009 Everest-Brighton Medical Assistant student* ("When it came time for testing, the exact answers were provided before we received the exam. We essentially just had to memorize what went into the blanks on the exam, instead of being taught and encouraged to actually study and learn."). ███ reported, "I nearly got into two altercations because I would not share my test answers." Exhibit 7, at AGO-MA01672, *Survey Response of* ███, *2011-2012 Everest-Brighton Medical Assistant student*. Another student reported that "[s]tudents also cheated, but nothing was ever done about it." Exhibit 8, at AGO-MA01879, *Affidavit of* ███, *2012-2013 Everest-Chelsea*

*Medical Administrative Assistant student.* Such an environment is not what students were led to expect from the expensive career training school.

Corinthian's misrepresentations regarding the quality of the learning environment and its failure to provide a safe learning environment at its Everest MA schools were unfair and deceptive practices in violation of Massachusetts law.

G.  Corinthian Misrepresented the Salaries of Graduates

Between at least 2009 and the time it stopped enrolling Massachusetts students, Corinthian regularly overstated potential starting salary rates for graduates in order to entice prospective students to enroll. As part of its marketing efforts, Corinthian regularly told prospective students that graduates of Everest MA schools earned wages as high as amounts between $16 and $25 per hour. For example, students reported the following representations:

- "[The Everest employee] told me I would be making between $18.00 to $20.00 an hour after completing the program. No worries about the loan." Exhibit 8, at AGO-MA01876, *Statement of* ▮▮▮▮▮▮▮, *2008-2009 Everest-Chelsea Medical Assistant student.*

- I was told that I was going to get a job after school was over and I would be making $18.00 [an hour] or more." Exhibit 9, at AGO-MA02153, *Complaint to AGO from* ▮▮▮▮▮▮▮, *2008-2009 Everest-Brighton Medical Administrative Assistant student.*

- "I feel like they promised that they would find me a great paying job, at $22/hour for example, in my field of study." Exhibit 8, at AGO-MA01918, *Affidavit of* ▮▮▮▮▮▮▮, *2013-2014 Everest-Brighton Dental Assistant student.*

Many other students reported being told that they would earn "great money" or be better able to support their children after completion of an Everest MA program:

- "I was told [during the enrollment process] what great money you could make in Medical Billing and Coding." Exhibit 7, at AGO-MA00939, *Survey Response of* ▮▮▮▮▮▮▮, *2009-2010 Everest-Chelsea Medical Insurance Billing and Coding student.*

- "I was told I chose a good field and could 'make lots of money.'" Exhibit 7, at AGO-MA00988, *Survey Response of* ▮▮▮▮▮▮▮, *2011-2012 Everest-Chelsea Massage Therapy student.*

- "[I was told that] it would get me well on my way to making more money to care for my children." Exhibit 7, at AGO-MA01831, *Survey Response of* ▮▮▮▮▮▮, *2012-2013 Everest-Brighton Medical Assistant student.*
- "I was told that I could gain career skills to make more money in a short amount of time." Exhibit 7, at AGO-MA01349, *Survey Response of* ▮▮▮▮▮▮▮▮▮, *2009 Everest-Brighton Medical Administrative Assistant student.*

Based on reports from students and publicly available data regarding average salaries and wages, however, the figures Corinthian cited in its marketing were misleading. The average starting salary in Massachusetts for vocational medical positions is considerably lower than what Corinthian represented its Everest MA graduates could expect upon completion of their programs. According to data collected by the state's Executive Office of Labor and Workforce Development, in 2012, the average hourly wage for an entry-level medical assistant was $13.94.[23] By 2014, it had risen an additional 13 cents.[24] The same data indicated that in 2014 the entry-level hourly wage in Massachusetts was $12.72 for massage therapists, $14.33 for medical records and health information technicians, and $15.07 for dental assistants.[25] Furthermore, Corinthian collected employment verification sheets from some of its students and employers for its accreditor. Verification sheets covering certain students from the Everest-Brighton 2012 cohort show a median hourly wage of $13.52 for graduates of the Medical Assisting Program who obtained jobs and $13.00 for graduates of the Dental Assisting Program who obtained jobs. Exhibit 21. Corinthian was thus aware that its graduates often earned low wages, significantly less than the rates represented by the schools. *Id.*

Numerous students' reports make clear that Corinthian often misrepresented the earning potential of Everest MA's graduates. Graduates who were fortunate enough to find a job after graduation often reported a considerable discrepancy between the wages Corinthian stated they would earn and the wages they were actually able to earn. Examples include:

---

[23] Exhibit 1, *Complaint at* ¶ 84.
[24] http://lmi2.detma.org/lmi/lmi_oes_a.asp (searching "Massachusetts" and "medical assistant").
[25] *Id.* (searching "Massachusetts" and "massage therapist," "medical records and health information technician" and "dental assistant," respectively).

- "[W]hen they were giving me a tour of the campus, they told me that when I graduate, I would make $20 to $25 per hour and that they would help me find a job. They also said that by ten years after graduation I would be making $104,000 per year. The amount of money they told me that I would make after graduation is what attracted me to the school and caused me to enroll. It was a lie." Exhibit 8, at AGO-MA01879, *Affidavit of* ████████, *2012-2013 Everest-Chelsea Medical Administrative Assistant student.*

- "[An Everest MA recruiter] also said the salaries of graduates of the Medical Assistant program start at $17.00 or $18.00 per hour. I was even given a graph that further defined [her] statements of expected salaries of Medical Assistant graduates. I was fine with earning a little less than my office job because [she] stressed the hourly pay was a starting point that would increase over time. . . . I graduated in July 2010 and found a medical assistant job with no help from Career Services. I was hired because of the job I had in the medical field prior to enrolling in the Everest Medical Assistant program. . . . My starting salary was $15.00 per hour, $2.00 per hour lower than the salary [the recruiter] described and $6.00 per hour lower than my previous job's salary. . . . [I] currently earn just $15.50 per hour, still less than what I earned before enrolling at Everest." Exhibit 8, at AGO-MA01915, *Statement of* ████████, *2009-2010 Everest-Chelsea Medical Assistant student.*

- "I was told that I was going to be making around $17 – $18 per hour. I only make $14 [per hour]. . . . It took me forever to get in contact with my [Everest MA] case agent. She never picked up her phone. I had to leave countless messages for her and in the end I wound up placing myself. She just gave me the paperwork to do it." Exhibit 7, at AGO-MA01838, *Survey Response of* ████████, *2009-2010 Everest-Brighton Medical Assistant student.*

- "I was told by Everest [that the] pay rate was $21.00 – $22.00 [per hour]. I am now only making $14.50 [per hour] after 2 years!!!" Exhibit 7, at AGO-MA01471, *Survey Response of* ████████, *2009-2010 Everest-Chelsea Medical Administrative Assistant student.*

- "[I am] not happy at all. Never got a job. They help[ed] me find one at a pharmacy getting pay [of] 8.50 an hour. When I was supposed to get pay [of] $16 an hour with a Medical Assistant job. Till this day I'm still paying [off] my loan. [The Everest MA program] was useless." Exhibit 7, at AGO-MA01628, *Survey Response of* ████████, *2009 Everest-Chelsea Medical Assistant student.*

- "Everest representatives told me that I would receive $18-25 per hour starting upon graduation. This is untrue. After my internship, I was hired per diem temporarily, making $14 per hour." Exhibit 3, at AGO-MA00089, *DTR Application of* ████████, *2011-2012 Everest-Brighton Medical Assistant student.*

- "Everest representatives . . . told me that I would be making $18-$20 per hour upon graduation. This was not true—when I tried to apply for jobs, I was told the average wage is $12-$14." Exhibit 3, at AGO-MA00095–96, *DTR Application of* ███████████, *2011-2012 Everest-Brighton Medical Assistant student.*

- "I was told that I would get paid around $18-19 per hour, but out in the field the jobs offered only $12-13 per hour because I was not certified and did not have 2-3 years of experience that most positions required." Exhibit 3, at AGO-MA00098, *DTR Application of* ███████████, *2012 Everest-Brighton Medical Assistant student.*

Similarly, a former Everest-Brighton Admissions Representative stated:

> "I gave campus tours to prospective students. During the tour, we had the prospective students stop at Career Services. The Career Services representatives usually told prospective students about graduates with good jobs, such as a manager in a medical office earning $23 per hour. The Career Services representatives did not mention graduates making only minimum wage, or graduates who did not find a job at all." Exhibit 10, at AGO-MA02190, *Everest-Brighton Admission Representative* ███ *Affidavit.*

The AGO investigation identified over 50 former students who reported misleading practices relating to graduate salaries and potential earning capacity. Appendix I. These reports, spanning a variety of cohorts at both Everest MA campuses, demonstrate the systemic nature of these misrepresentations. Corinthian's statements about the earning potential of its graduates were misleading and deceptive in violation of Massachusetts law.

## H. Corinthian Misrepresented the Transferability of Credits

Between 2009 or earlier and the time of its closure, Corinthian misrepresented to prospective students and the public the transferability of credits earned at its Everest MA schools. During this period, Corinthian's recruiters told prospective Massachusetts students that credits from Everest MA would transfer to any accredited school. *See* Appendix J, identifying survey responses from students who were told that their Everest MA credits would be transferable. The AGO's investigation found, however, that Corinthian had no basis for these statements. A review of Massachusetts educational alternatives, including community colleges, shows that Everest MA credits were not generally accepted by other viable schools. Fitchburg State University, for example, stated that "Fitchburg State University does not accept credits in transfer from Everest

46

Institute and we have not accepted transfer credits in the past. This institution does not carry the regional accreditation that we require." Exhibit 34, at AGO-MA02641, *Letter from* ███████, *Registrar, Fitchburg State University.* Roxbury Community College likewise will not accept Everest MA credits: "Unfortunately, we do not accept credits from the Everest Institute. However, you are more than welcomed to enroll at Roxbury Community College. If you have credits from another college we can attempt to transfer them. If not, you must take a placement test." Exhibit 34, at AGO-MA02644, *letter from Registrar Staff, Roxbury Community College.*

Numerous students, after being induced to enroll, discovered through direct experience that Everest MA's credits were not transferable:

- "I tried to transfer to another school, but the other school told me they wouldn't accept any of my 26 credits. When I went to the Everest to ask about transferring, they told me if I signed up for two more years and paid more money, then my credits would transfer. I was never able to transfer out of Everest." Exhibit 8, at AGO-MA01905, *Affidavit of* ███████ ███████, *2009 Everest-Chelsea Medical Assistant student.*

- "I was told by the financial advisor that they were an 'accredited school' and that I would be able to transfer my credits to other accredited schools. That was false." Exhibit 7, at AGO-MA01684, *Survey Response of* ███ ███████., *2012-2013 Everest-Chelsea Dental Assistant student.*

- "I just wish I knew they did not transfer credits. I would of never joined." Exhibit 7, at AGO-MA01796, *Survey Response of* ███████, *2013 Everest-Chelsea Medical Assistant student.*

- "I was told I would be able to transfer my credits and there would be job placement." Exhibit 7, at AGO-MA01355, *Survey Response of* ███████ ███ *2010-2011 Everest-Brighton Medical Assistant student.*

The attached materials include over 50 examples of students unable to transfer credits. *See* Appendix J. These materials—which contain statements from students enrolled between 2009 and 2014 in a variety of programs at both Everest MA campuses—show that Corinthian's misrepresentations on this issue were widespread.

Everest MA recruiters not only made generalized false statements about credit transferability as part of an overall package of misrepresentations about the school, they also blatantly lied to students who specifically elicited information about credit transfers. Such students stated that their ultimate goal was continuing their education beyond an Everest diploma, thus making the ability to transfer credits one of their primary concerns.

- "I was also pulled into their school under the understanding that my credits would transfer to other colleges to continue my education and dream to become a labor and delivery nurse. Again I was let down and furious when I went to look into nursing programs and found that not only are my credits non-transferable but the accreditation that they are so worried about keeping is barely accepted anywhere!" Exhibit 7, at AGO-MA01735, *Survey Response of* ▓▓▓▓▓▓▓, *2013-2014 Everest-Chelsea Medical Assistant student.*

- "My goal was getting a fast education due to my pregnancy. Then continue my stud[ie]s in college, with the credit [from] Everest. But come to find out Everest Program won't count in school which they had told me they did and I'm very upset with Everest for false info." Exhibit 7, at AGO-MA01521, *Survey Response of* ▓▓▓▓▓▓▓, *2009 Everest-Chelsea Medical Administrative Assistant student.*

- "I was told how great the program was and I would be able to transfer my credits to [a] 2 or 4 year program, [but later the nursing] program did not accept my credits from Everest, or as credit towards prerequisites courses." Exhibit 7, at AGO-MA01262–63, *Survey Response of* ▓▓▓▓▓▓▓ ▓▓▓▓▓, *2010 Everest-Brighton Medical Assistant student.*

Corinthian's representations regarding the transferability of credits were misleading, unfair, and deceptive in violation of Massachusetts law.

I.   Corinthian Misrepresented Student Externships

Between 2009 or earlier and the time it stopped enrolling Massachusetts students, Corinthian represented to prospective students and the public that an externship was an invaluable component of an Everest MA education. According to Corinthian, the externship enabled students to practice skills in the students' fields of study. For example, Corinthian's Everest MA catalog stated that "[t]he [Medical Assistant program] externship provides the student an opportunity to apply principles and practices learned in the program and utilize entry-level medical assisting skills in working with patients." Exhibit 26, at AGO-MA02610, *2010-11 Everest MA Catalog. See also id.* at AGO-MA02603 *(Dental Assisting program),* at AGO-MA02607 *(Medical Administrative Assistant program), and* at AGO-MA02613 *(Medical Insurance Billing and Coding program).* The catalog further stated that "[s]erving in an externship at an approved facility gives externs an opportunity to work with the principles and practices learned in the classroom." *Id.* at AGO-MA02613.

48

Certain Everest MA programs, including the Medical Assistant, Dental Assistant, Medical Administrative Assistant, and Medical Insurance Billing and Coding programs, required students to complete an externship prior to graduation. Corinthian policy dictated that a student who was unable to complete the externship was not allowed to finish the program and graduate:

> "[u]pon successful completion of all classroom requirements, students are expected to begin the externship portion of their program. The required number of externship clock/credit hours must be successfully completed within three months from the date students begin their externship. Students must complete at least 15 clock hours per week . . . at an approved externship site. . . . Students who will not complete their externship training within the required three-month completion time will also be dropped from the program by the Institute." *Id.* at AGO-MA02587.

Although Corinthian touted the externship experience as an important part of a student's career training, the AGO's investigation found that many externships provided little or no training or practical experience in the students' fields of study, and that others were entirely unrelated to the students' programs, as the following students noted:

- "I told [externship coordinator █████████] I was disappointed in my externship because I did not get much experience as a medical assistant. She got really upset and shouted 'you're lucky you got what you got.'" Exhibit 8, at AGO-MA01877, *Statement of* █████████, *2008-2009 Everest-Chelsea Medical Assistant student.*

- "We had to finish externships before graduating. I had an externship near the end of my program, but I left because I wasn't doing anything related to my classes. The externship coordinator was a bully to all the students. She placed me at an externship where they made me enter one patient's information on a computer for eight hours a day. I did not use the skills from my classes." Exhibit 8, at AGO-MA01887, *Affidavit of* █████████, *2008-2009 Everest-Chelsea Medical Assistant student.*

- "Everest placed me at █████████ for my required externship. When I showed up to this hospital on the first day of my externship, no one was there to meet me and they had no record of my placement. After calling Everest's externship coordinator repeatedly for days, I finally got in contact with the coordinator who said she forgot to cancel my assignment, and that she would reassign me the next day. Again I could not get in contact with anyone at Everest for days. . . . If you do not begin your assigned externship 'within the system' within two weeks of the start date, Everest assumes you are not showing up and drops you from the program. Because of this policy, Career Services then called me to inform

they were dropping me, and after explaining my situation, I was placed the next day in what was supposed to be a 'temporary' externship, at ███████. It was not a medical setting. Even after many phone calls to the office, they never changed my placement site. I never was able to apply the skills I was supposed to be learning as a medical assistant at this externship." Exhibit 8, at AGO-MA01899, *Affidavit of* ███████, *2009-2010 Everest-Brighton Medical Assistant student.*

- "I finished the program. I was hoping I can find a job but they send me to a physical therapy for [externship] that was a big mistake in my resume. [B]ecause any place I go to apply they said you did your [externship] in a not better place. They find me a home health aide job. [T]hat crazy, I can do a HHA or CNA training for free and less time. I tried staffing agency they said the same thing. My [externship] was in not good place. After looking here and there I went to JVS for CNA training and I started work. I do just a part time." Exhibit 7, at AGO-MA00785–86, *Survey Response of* ███████████, *2009-2010 Everest-Chelsea Medical Assistant student.*

- "I was . . . promised an externship in a medical office, and I was placed in a chiropractic office, which has not helped me secure employment in a hospital or doctor's office. I have been told this experience is not counted by medical offices that I have applied to work for." Exhibit 3, at AGO-MA00114 *DTR Application of* ███████, *2011-2012 Everest-Brighton Medical Assistant student.*

Not only did Corinthian fail to provide externships with the promised skill-content, the school also often failed to provide any externship at all. While Corinthian represented to prospective Everest MA students that it would provide them with these required programs as part of the curriculum, in many cases the school did not do so. The school often required students to find their own externships, with no help whatsoever, or provided externships that did not last the required time periods:

- "After the class requirements of the program were completed, Everest placed me at an adult daycare facility for my externship along with many other students. On my first day I was sent home early and told I was no longer needed because Everest had sent too many students. Career Services asked that I try and set up an externship myself." Exhibit 8, at AGO-MA01915, *Statement of* ███████████, *2009-2010 Everest-Chelsea Medical Assistant student.*

- "Everest's admissions people promised me that I would be placed in an externship, which was a requirement for the program. They offered me an externship once. However, after one day at the externship site I was told that they could only have me work one day a week because there was not enough work to support me full time. The next day I was dropped from the

externship and the Brighton campus closed on the same week. Everest told me to contact the Chelsea campus for an externship placement, but they had none available. I kept calling the Chelsea campus and leaving them messages for a month, but no one got back to me. Therefore, I was unable to finish the program and get a certificate." Exhibit 8, at AGO-MA01918–19, *Affidavit of* ███████████, *2013-2014 Everest-Brighton Dental Assistant student.*

- "I found my externship on my own because the school was not helpful and I wanted to have something to start right away, not have to wait until they placed me somewhere that wouldn't work out for me. I had heard not so great things about placements for previous students, the location was either very far from where they lived or it was just a spot for externships with no hope to be hired." Exhibit 7, at AGO-MA01256, *Survey Response of* ███████████, *2009-2010 Everest-Chelsea Medical Assistant student.*

- "Even though I was at the top of my class I had an emergency situation my last month after classes had ended which cost me an internship at ████. Then when I got the flu my coordinator kicked me out of Everest and did not let me continue with my internship. . . . When I returned to Everest to see if I could finish my program they told me that the only way they would accept me is if I found my own internship because they would no longer assist me. I was basically informed that I still had to pay the loans even though they would not allow me to continue receiving an education." Exhibit 7, at AGO-MA01478–80, *Survey Response of* ████, *2009 Everest-Chelsea Medical Assistant student.*

The attached materials include over 85 examples of Corinthian's unfair and deceptive behavior relating to student externships as described above. *See* Appendix K. The statements in these documents show that Corinthian's practice of misleading students about the nature and content of externships spanned a variety of programs at both campuses and between at least 2009 and 2014. The school's unfair acts relating to this issue were long term and widespread.

Since at least 2009, Corinthian's written and verbal representations concerning externships were false and were made for the purpose of, and had the effect of, inducing consumers to enroll in Everest MA schools. These illegal marketing efforts violated Massachusetts law.

## J. Corinthian Misled Students about their Ability to Benefit from its Programs

In seeking to enroll as many students as possible, Corinthian recruited students with criminal backgrounds, students who did not speak or understand English, and

students who lacked high school diplomas or GEDs and who did not satisfy the federal law requirements for the Ability to Benefit ("ATB"). Corinthian deceptively told a number of these students that such issues would not hinder their education or efforts to obtain employment in their fields of study. In fact, reports indicate that the students Corinthian improperly admitted did not benefit from the educational programs and/or could not secure employment in their fields of study.

Former employees at the Everest MA campuses described Corinthian's policies of enrolling as many students as possible, regardless of their ability to complete or benefit from its programs:

- "I observed that it was Everest's policy to enroll anyone, without considering their ability to benefit from its programs. For example, I met with an older woman who visited the campus repeatedly and was very interested in enrolling. I was told that she was under psychiatric counseling, and she seemed unstable. I believed she could not benefit from attending Everest. I tried to discourage her from enrolling, and suggested that her psychiatric counselor give me a call to discuss her interest in Everest. A vice president from the corporate office was listening in on our conversation, and he later reprimanded me for discouraging the woman from enrolling. I resigned from my position at Everest shortly after this event because I felt morally conflicted. I heard from another employee in the admissions department that the woman enrolled at Everest shortly after my resignation." Exhibit 10, at AGO-MA02197–98, *Everest-Brighton Admissions Representative* ▮▮▮ *Affidavit.*

- "As time progressed, there was much more of a push from management and regional leadership to get students in regardless of their situation and whether they could benefit from the education at that time." Exhibit 10, at AGO-MA02187, *Everest-Brighton Student Finance Planner* ▮▮▮ *Affidavit.*

- "The school admitted students who would not have a chance of succeeding in the real world. It was just something to get them in to get the [tuition] money." Exhibit 10, at AGO-MA02194, *Everest-Chelsea Massage Therapy Instructor* ▮▮▮ *Affidavit.*

At various times beginning in 2009 or earlier, Corinthian recruited and enrolled in Everest MA programs students who had criminal records. Corinthian knew, however, that hospitals and other medical facilities would not hire students with criminal backgrounds. Corinthian's former Director of Education for Everest-Brighton concisely described the problem:

"[T]he school was admitting students who had criminal records within Massachusetts' Criminal Offender Record Information (CORI) system. This was a particular concern because I know from my experience in the medical field that hospitals and other medical employers will not hire someone who cannot pass a CORI check. I did not think it was appropriate for Everest Brighton to admit students with CORI records because their records would make it impossible for these students to benefit from the Everest Brighton program." Exhibit 10, at AGO-MA02182, *Everest-Brighton Director of Education* ▉▉▉▉▉▉ *Statement.*

One such student disclosed his criminal record to Everest-Chelsea prior to enrolling, and was actively told that it would not present employment problems, when this was not the case:

"I really wanted to work in a hospital, which I told [Everest-Chelsea]. I asked them at that first meeting if my criminal background, which includes three operating under the influence charges and an assault and battery charge, would affect enrollment or my chances of getting a job. They promised me the charges were not a problem, and as long as I wasn't a sex offender or abusive to the elderly, 'it would be okay.'. . . They told me I would have no problems at all getting a job at a hospital, even with my background. I have never been able to get a job in that field because of my background." Exhibit 8, at AGO-MA01904, *Affidavit of* ▉▉▉▉▉▉ ▉▉▉▉▉▉*, 2009 Everest-Chelsea Medical Assistant student.*

Another student had a similar experience. She informed Corinthian's employees that she had been convicted of a felony in 2006 and had no high school diploma, but Corinthian told her it would be no problem and admitted her. The student now has student debt but has not been able to find employment in her field of study. Exhibit 7, at AGO-MA00772, *Survey Response of* ▉▉▉▉▉▉*, 2012-2013 Everest-Chelsea Medical Assistant student.* Another Everest student summed up Corinthian's admissions policy in stark terms: "Anyone can get enroll[ed] in three days without checking your background. Many students go high to class. People who [have] been in prison and still doing many bad things on the streets had gone to Everest." Exhibit 7, at AGO-MA01559, *Survey Response of* ▉▉▉▉▉▉*, 2009-2010 Everest-Chelsea Medical Assistant student.*

At various times beginning in 2009 or earlier, Corinthian also routinely recruited and enrolled students who did not speak or understand English well, if at all, and could not read or understand enrollment and course materials. This practice was particularly

harmful because Everest MA did not offer language courses to assist non-English speaking students. *See* Exhibit 10, at AGO-MA02182, *Everest-Brighton Director of Education* ███████████ *Statement* ("A number of these students were foreign, and many of them had difficulty with English, but Everest Brighton did not provide English as a Second Language (ESL) support for these students."). The problems were clear to Corinthian employees:

- "Some students were enrolled even though they did not understand English well. There were instances when the front office greeted students in Spanish, an admissions representative conducted interviews in Spanish, and a financial advisor spoke to students and their parents in Spanish, but the classes were not taught in Spanish. Everything in the program was in English." Exhibit 10, at AGO-MA02190, *Everest-Brighton Admission Representative* ████ *Affidavit.*

- "The students were given a basic literacy or competency test. I recall many times students coming in who did not speak English at all and maybe had relatives come in who would translate for them. Somehow, they would pass the literacy test." Exhibit 10, at AGO-MA02201, *Everest-Chelsea Admissions Receptionist* ██████ *Affidavit.*

- "Students were enrolled even if they had language barriers that made it extremely difficult to benefit from the programs. Finance Planners in my department prepared financial aid packages for students who spoke very little English and did not understand the contents of the documents they were signing. The students were enrolled anyway." Exhibit 10, at AGO-MA02192, *Affidavit of* ██████████████, *Everest-Brighton Director of Student Finance,* ███████

These statements by Corinthian's Massachusetts employees are consistent with students' reports to the AGO. For example, at enrollment, an Everest-Brighton student was required to sign documents in English she could not read and was told she would get the help needed to finish the program:

"Although I didn't understand the content of most of the forms, I was asked to sign. As I was eager to attend the class, finish the course and get job, I signed. . . . At the orientation for admission and thereafter, I was told I will get the needed help to finish the program. I was also told the school will assist me with job placement after graduation. It was with this understanding that I got a loan payable to the school. But the school after receiving all the money from the Department of Education and other sources, it seems, mission accomplished for them. They were not interested to give me the assistance I needed, they didn't have the professional ethics to do their job." Exhibit 9, at AGO-MA02055,

*Complaint to AGO from* ███████████, *2010-2011 Everest-Brighton Medical Assistant student, through a translator.*

After attending Everest-Brighton for a month, employees told the student she was doing well, but after four months she was expelled from the school. *Id.* Both the student and her translator tried to find out why she was dismissed, but were given no additional information. *Id.* at AGO-MA02055–56.

Even when students asked Corinthian recruiters whether it was advisable to enroll in an Everest MA program given their lack of English language skills, the employees gave them false assurances. For example, ███████████████████ was pressured to enroll even though she told the Corinthian recruiter about her limited English.

> "I am making this statement through a translator because I am still learning English. I found out about Everest when they called me twice a day during the week and more than that on the weekend telling me to enroll and told me to enroll right away before enrollment filled. I told them I was learning English and asked if that would be a problem and they said it would not be a problem. They said they would give me an oral and a written test of my English skills. They told me that I needed a 70 and gave me a 70. They told me I did 'perfect,' but I know that I did not because I could not write in many of the answers in English. I said that I thought I should apply in a year after I learned more English, but they told me that I did not need to do that. All of my classes were taught in English and there were no ELS." Exhibit 3, at AGO-MA0184–85, *DTR Application of* ███████████████, *2011-2012 Everest-Brighton Medical Assistant student.*

In short, Corinthian routinely recruited and enrolled students who spoke and understood little or no English and who could not understand the content of the financial aid documents that they signed, let alone the course materials. When these students raised concerns, they were falsely assured that their lack of proficiency in English would not be a problem.

Beginning in 2009 or earlier, Corinthian also improperly enrolled students without high school diplomas (or GEDs) who did not meet the ATB standards under federal law. The Everest MA's 2010–2011 school catalog explained the ATB requirement for federal financial aid:

> "Students who do not have a high school diploma or its recognized equivalent may still be admitted into certain diploma programs at the school, as long as they are past the age of compulsory school attendance in

Massachusetts. However, before the school can accept a prospective student who is seeking federal financial aid and who does not have a high school diploma or its recognized equivalent, federal law requires the school to determine whether the student has the ability to benefit (ATB) from training at the institution. Federal law requires that the school make the ability to benefit determination on the basis of the applicant's score on an ATB exam. The school will admit under the Ability to Benefit policy applicants who provide an official score report that meets of [sic] exceeds the passing scores as specified in the federal register on the CPAT, COMPASS, or Wonderlic." Exhibit 26, at AGO-MA02578, *2010–11 Everest MA Catalog.*

Nationwide, about 25% of Corinthian students in 2009 were ATB students who did not have high school diplomas. In 2010, the number was about 15%. Exhibit 1, *Complaint at* ¶ 104. According to a former employee, students who enrolled without a high school diploma or GED had a very high dropout rate. Exhibit 10, at AGO-MA02191, *Everest-Brighton Admission Representative* ▮▮▮▮ *Affidavit* ("[T]he student drop-out rate was very high, particularly among students who enrolled without a high school diploma or GED.").

Corinthian did not provide the support promised to students who enrolled lacking a high diploma or GED. For example, before ▮▮▮▮▮▮▮▮▮▮▮ enrolled at Everest MA in July 2010, Corinthian promised him assistance in obtaining his GED, but that assistance was withdrawn two months after he enrolled: "I was promised completion of my G.E.D. as well as my Medical Assistance Program[.] ▮▮▮ months into my program, the G.E.D. [program] was [d]iscontinued." Exhibit 7, at AGO-MA01161, *Survey Response of* ▮▮▮▮▮▮▮▮▮▮, *2010-2011 Everest-Brighton Medical Assistant student.* Another student similarly reported that she did not receive the help from Corinthian in obtaining the GED she was promised. Exhibit 7, at AGO-MA01546, *Survey Response of* ▮▮▮▮▮▮▮▮▮, *2010-2011 Everest-Chelsea Medical Assistant student.*

Corinthian's own former Director of Education at Everest-Brighton, who holds a Ph.D and has experience in hospital administration and other medical fields, stated unequivocally that, without a high school diploma, GED, or equivalent, students in the medical assistant program were not employable: "For students in Everest's Medical Assistant Program, having a GED or high school diploma is critical because hospitals and other medical employers in Massachusetts will not hire a person without either a GED or

high school diploma." Exhibit 10, at AGO-MA02182, *Everest-Brighton Director of Education* ▮▮▮▮▮▮ *Statement.*

Students who did not have a high school diploma or GED were supposed to take a so-called Ability to Benefit test, but if a student failed the test, Corinthian would let the student retake the test with a proctor who would give her the answers. A former Admissions Representative at Everest-Brighton from ▮▮▮▮▮▮▮▮▮▮▮▮ described the practice as follows:

> "Students who did not have a high school diploma or GED had to pass an Ability to Benefit test to be admitted to the Everest Institute. Often, if a student failed the test, the student was rescheduled to take the test again on a day when a particular proctor who would give the students the answers was scheduled to work." Exhibit 10, at AGO-MA02190–91, *Everest-Brighton Admission Representative* ▮▮▮▮ *Affidavit.*

Alternatively, Corinthian sometimes simply fabricated the student's credentials to obviate the need for a passing test score. Students described institutional cheating to ensure that students could enroll:

- "When I started at Everest in Chelsea I did not have a GED [and] took the test but failed, they put on my resume that I graduated from Rox[bury] Comm. College and told me If they don't ask don't tell. Exhibit 7, at AGO-MA01484, *Student Survey Response of* ▮▮▮▮▮▮▮, *2012-2013 Everest-Chelsea Medical Assistant student.*

- "They were aware I did not have a diploma or GED, but told me I could attend and get a job. I took a placement test to attend the school, and the answers were already circled for you. Exhibit 3, at AGO-MA0198-D, *DTR Application of* ▮▮▮▮▮▮▮, *2012 Everest-Brighton Medical Assistant student.*

- "When I enrolled, I was 45 years old and had never turned on a computer until going to Everest. I don't have a high school diploma or GED. At the first meeting I failed the entrance test, but took a second one right away, and the admissions representative offered me the answers on the second test until I passed." Exhibit 8, at AGO-MA01904, *Affidavit of* ▮▮▮▮ ▮▮▮▮▮, *2009 Everest-Chelsea Medical Assistant student.*

- "[W]hen I went to take the test to get in [] the teacher was walking around giving everyone the answers. Exhibit 9, at AGO-MA02153, *Complaint to AGO from* ▮▮▮▮▮▮, *2008-2009 Everest-Brighton Medical Administrative Assistant student.*

Not only did such enrollment violate the Department of Education's ATB regulations, it also unfairly induced students to start on a path that was doomed to failure.

Everest MA's recruitment and/or enrollment of students who it knew could not benefit from their education or obtain employment in their fields of study was an unfair or deceptive act or practice. The materials attached at Appendix L contain approximately 30 examples of Corinthian's practices in this area.

V.  CONCLUSION

For the reasons set forth above, the AGO seeks the immediate discharge of federal Stafford, Parent PLUS, and Consolidation loans taken in connection with Corinthian's Massachusetts Everest Institute campuses under the Direct and FFEL programs, full refunds of amounts paid, and reversal of any negative credit reporting. Corinthian engaged in a pattern of unfair and deceptive conduct in violation of Massachusetts consumer protection laws. Corinthian misrepresented in-field job placement rates, the quality and type of instruction, the qualifications of instructors, the learning environment, the salaries of graduates, its career services, the transferability of its credits, and the nature and availability of externships. Corinthian also engaged in high pressure sales tactics, and misled students about their ability to benefit from its Massachusetts programs. Full discharge of the relevant federal student loans is the only way to remedy the harm the affected students have suffered.

VI.  APPENDICES

| Appendix Number | Section (first reference) | Description |
|---|---|---|
| A. | III | AGO placement analysis spreadsheet and calculation exhibits |
| B. | IV.A | Appendix of *Placement* related surveys, student and employee affidavits, DTR applications, and complaints. |
| C. | IV.A | List of jobs improperly classified as in field |
| D. | IV.B | Appendix of *Career Services* related surveys, student and employee affidavits, DTR applications, and complaints. |
| E. | IV.C | Appendix of *High Pressure Sales* related surveys, student and employee affidavits, DTR applications, and complaints. |
| F. | IV.D | Appendix of *Quality and Type of Education and Instruction* related surveys, student and employee affidavits, DTR applications, and complaints. |
| G. | IV.E | Appendix of *Qualifications of Instructors* related surveys, student and employee affidavits, DTR applications, and complaints. |
| H. | IV.F | Appendix of *Learning Environment* related surveys, student and employee affidavits, DTR applications, and complaints. |
| I. | IV.G | Appendix of *Salaries* related surveys, student and employee affidavits, DTR applications, and complaints. |
| J. | IV.H | Appendix of *Transferability of Credits* related surveys, student and employee affidavits, DTR applications, and complaints. |
| K. | IV.I | Appendix of *Externships* related surveys, student and employee affidavits, DTR applications, and complaints. |
| L. | IV.J | Appendix of *ATB* related surveys, student and employee affidavits, DTR applications, and complaints. |

VII. EXHIBITS

| Exhibit Number | Description |
|---|---|
| 1. | Litigation complaint |
| 2. | December 7, 2011 Letter from AGO to ED (Dale Kilgore) |
| 3. | DTR applications, full set |
| 4. | Directory data for Everest MA students |
| 5. | Excerpts from ACCSC Annual Reports and Outcomes Reports |
| 6. | Survey Responses from Medical Assistant cohort employers; Snow attestation re: telephone responses |
| 7. | Student survey responses |
| 8. | Student affidavits |
| 9. | Complaints made to AGO |
| 10. | Former employee affidavits; Salera attestation |
| 11. | Website: Why Everest |
| 12. | Website: Getting In |
| 13. | Marketing pamphlet |
| 14. | Marketing pamphlet "Tough Times" |
| 15. | Website: Medical Assistant Training Program and Classes in Brighton, MA |
| 16. | Website: Dental Assistant Training Program and Classes in Brighton, MA |
| 17. | Website: Medical Insurance Billing and Coding Training Course in Chelsea, MA |
| 18. | Corinthian SEC filings |
| 19. | 2011 Brighton website placement rate disclosure |
| 20. | 2011 Brighton website placement rate disclosure, as provided to Everest MA student |
| 21. | Employment verification forms (as submitted to ACCSC by Corinthian) |
| 22. | Student survey responses used in AGO placement analysis |
| 23. | Massimino statement |
| 24. | Survey Responses from Dental Assistant cohort employers; Snow attestation re: telephone responses |
| 25. | ACCSC letters to Corinthian re: Outcomes Reports |
| 26. | 2010-2011 Everest MA Catalog |
| 27. | Mailing: Office of Admissions |
| 28. | Mailing: Limited space available |
| 29. | Brochure: Career Services |
| 30. | Brochure: "The Right Choice for Your Career. And Your Life." |
| 31. | Website: Chelsea Campus Q&A |
| 32. | Website: Colleges, Schools in Boston Area - Everest Institute Chelsea, MA 02150 |
| 33. | Website: Colleges, Schools Boston Area - Everest Institute Brighton, MA 02135 |
| 34. | Letters regarding transfer of credits |