To: Under Secretary Ted Mitchell
From: Borrower Defense Unit
Date: January 4, 2017
Re: Recommendation for Full Borrower Defense Relief for Borrowers Who Attended American Career Institute's Massachusetts Campuses

## I. Introduction

The American Career Institute, Inc. (ACI) was a for-profit school that operated five campuses in Massachusetts beginning in late 2009 and ending with the school's closure on January 9, 2013.[1] During this time, ACI enrolled almost 4,500 students in Massachusetts.[2]

On November 21, 2013, the Massachusetts Attorney General's Office (MA AGO) filed a complaint against ACI and its principals alleging that the school engaged in "a range of deceptive schemes to meet accreditation requirements."[3] Over the course of the investigation and discovery that followed, the MA AGO obtained hundreds of thousands of pages of records, issued over 100 subpoenas, and interviewed and/or deposed more than 350 witnesses. On June 1, 2016, the MA AGO entered into a Consent Judgment[4] with ACI and its corporate and individual owners. The Consent Judgment included numerous admissions that ACI made a series of false and misleading representations to prospective students and engaged in other misconduct. The admissions cover a variety of misconduct actionable under Massachusetts state law, including misrepresenting job placement rates, wrongfully representing that certain employers had previously hired ACI graduates, and failing to inform students that a substantial number of ACI instructors were not authorized to teach by the Massachusetts Division of Professional Licensure. As described in more detail below, the evidence provided by the MA AGO confirms these admissions.

On July 26, the MA AGO sent an application to the Department requesting that all Massachusetts borrowers who attended ACI receive a full discharge of their federal loans under the borrower defense regulation without individual application. Because of the far-reaching scope of ACI's admitted misconduct, and the substantial evidence supporting these admissions, the Borrower Defense Unit recommends providing full borrower defense relief to all borrowers who attended ACI's Massachusetts campuses.

## II. ACI's Misconduct

### A. Falsification of Job Placement Rates

---

[1] ACI also had three campuses in Maryland. Because the evidence provided to the Department does not pertain to these campuses, the recommendation in this memo concerns only ACI's campuses in Massachusetts.

[2] *See* Commonwealth's Cover Letter for ACI Group Discharge Application at 2 (July 26, 2016) (asking the Department to discharge loans for "all 4,458 students who attended ACI").

[3] Press Release, Massachusetts Attorney General's Office, American Career Institute Sued for Falsifying Student Documents, Failing to Provide Service (Nov. 21, 2013), *available at* http://www.mass.gov/ago/news-and-updates/press-releases/2013/2013-11-21-aci-complaint-regs.html.

[4] We recognize that admissions in consent judgments may have limited probative value. Notwithstanding, the Borrower Defense Unit has independently reviewed Consent Judgment admissions where relied upon, along with any accompanying analysis performed by the MA AGO, and verified any factual findings detailed throughout this memo.

Both the corporate and the individual defendants admitted in the Consent Judgment that ACI "made false or misleading representations to students and prospective students regarding the School's completion and placement percentages."[5] As described below, the defendants specifically admitted to misrepresenting placement rates that ACI provided to fifteen cohorts of students who enrolled between June 2011 and December 2012,[6] and admitted to specific methods of falsifying those rates.[7] The MA AGO conducted an extensive investigation through which it recalculated the placement rates for the fifteen cohorts and nine additional cohorts. The Borrower Defense Unit reviewed these investigative materials, including deposition testimony, interview notes, and subpoenaed records, and confirmed the MA AGO's conclusions.

ACI inflated its job placement rates in two ways. First, ACI staff under-reported the number of students who graduated by removing students who did not receive job placements. The MA AGO found many instances where ACI had reported more graduates to the Massachusetts Division of Professional Licensure than it reported to its accreditor. Indeed, ACI admitted in the Consent Judgment that "[t]he School improperly and inaccurately increased numerous Cohort placement percentages by excluding from the data some of the Students who were graduates but who had not obtained employment."[8] By under-reporting graduates who did not find relevant employment, ACI was able to inflate its placement rates.

Second, ACI falsely claimed that graduates found work in their field of study by falsifying graduates' employer, position, or employment status on Employment Verification Forms (EVFs) that ACI submitted to its accreditor. For example, many EVFs indicated that graduates were self-employed freelancers working in their field of study, when in fact those graduates were working part-time or unemployed. At other times, ACI fabricated job titles to make it appear that graduates were working in positions relevant to their field of study when they were not. ACI also claimed graduates were working with purely fictitious employers, or with companies where the graduates did not work, and improperly hired ACI's own recent graduates, reporting them as being employed in-field.[9]

Depositions of ACI employees confirm that ACI purposefully manipulated documents to publish higher rates and maintain ACI's accreditation. For example, the Manager of Career Services and Externships at ACI's Cambridge campus, Marcea Taylor-Nicholson, admitted that she fabricated student completion records and EVFs, and understood that she would be fired if the records did not satisfy the school's accreditor (ACCET).[10] In fact, Taylor-Nicholson testified that she and ACI employees even falsified documents during the accreditor's site visits to the school:

---

[5] *Massachusetts v. The Career Institute*, LLC, No. 2013-CV-4128H at ¶ 20 (Mass. Supp. July 1, 2016) ("Consent Judgment")Consent Judgment.

[6] "Cohort" refers to the group of students that enrolled during a particular time period for a particular campus and program, (for example, the 2011 Medical Assisting Program at the Braintree campus). Each cohort corresponds to a particular published rate (*e.g.*, the rate that would students who enrolled in Medical Assisting in 2011 at the Braintree campus would have seen).

[7] Consent Judgment at ¶ 26-29, 31.

[8] Consent Judgment at ¶ 31(e).

[9] "ACI was the single largest employer of its own graduates, having reportedly hired more than 50 of them." Aprahamian Aff., No. 2013-CV-4128H at ¶ 9 (Mass. Supp. July 24, 2015).

[10] Taylor-Nicholson Dep. 48:6-8, 49:10-12, March 31, 2015.

A. When the site visit was actually happening, the forms were being altered and stuff still. They were in a back room secretly.
Q. While ACCET was there?
A. While ACCET was there. That's what we would do. We'd get up, we'd leave the office, run to the back room, "This is what they said, this is what I need," because they would give us a few minutes to get together what they asked for and I'd go in. It was almost like a stock market, "All right. Get this together. Look at this file."[11]

Significantly, ACI used this manipulated and fabricated data to calculate job placement rates that ACI published in program disclosures it provided to every prospective student.[12] Each incoming student had to sign one of these disclosures certifying that they had received that information. In addition to the disclosure forms that each enrolling student signed, ACI also published the falsified placement rates on its website, for prospective students; ACI continued publishing these rates until its final day of operation.[13]

In fact, ACI specifically admitted to misrepresenting placement rates that it provided to fifteen cohorts of incoming students.[14] The MA AGO recalculated ACI's job placement rates and found that the actual rates were at least 25% lower than the rates ACI disseminated to the fifteen cohorts. Specifically, the MA AGO used ACI's accreditor submissions and internal documents to determine which students were counted as placed, and which students appear to have graduated but were omitted from the job placement calculations. MA AGO then reviewed the EVFs of those students who had been listed as placed, and contacted students and employers to confirm what ACI had claimed on the EVFs. It also obtained employment records and/or affidavits to verify reported placements. Finally, working from a more accurate number of students who graduated and/or found employment, the MA AGO was able to re-calculate placement rates.

Using documents provided by the MA AGO, the Borrower Defense Unit validated these recalculations. The MA AGO provided information detailing their recalculation for each of the cohorts, and we used this information to recalculate the rates. Additionally, for two of the larger cohorts that ACI admitted had falsified placement rates, we reviewed all of the underlying data, including 28.1 forms, tracking spreadsheets, EVFs, interview notes, affidavits, and employer records. For all cohorts, our recalculations of placement rates showed substantial discrepancies between the actual and the published rates, consistent with the findings of the MA AGO.

---

[11] *Id.* at 167:19-168:5.
[12] ACI's disclosure form for the 2010 Digital Media Program at its Framingham campus falsely stated that "there were no completers in the period January – December 2010", and therefore did not provide a placement rate; the MA AGO discovered that there were two students who graduated in that time, and that neither of them had ever worked in their field of study. Therefore, the actual placement rate was 0%.
[13] https://web.archive.org/web/20130108043123/http://www.aci.edu/disclosures/.
[14] "Cohort" refers to the group of students that enrolled during a particular time period for a particular campus and program, (for example, the 2011 Medical Assisting Program at the Braintree campus). Each cohort corresponds to a particular published rate (*e.g.*, the rate that students who enrolled in Medical Assisting in 2011 at the Braintree campus would have seen).

3

Following the Consent Judgment, the MA AGO continued its work, and identified an additional nine cohorts of students that ACI induced to enroll based on falsified job placement rates;[15] all nine additional cohorts had discrepancies of at least 17% between the published and recalculated rates, with six of them being inaccurate by 20% or more.[16] Although these cohorts are not specifically covered by ACI's admissions in the Consent Judgment, the MA AGO identified them using the same method of recalculating placement rates used to identify the cohorts included in the admissions. The Borrower Defense Unit also validated these recalculations.

## B. Misrepresentations That Specified Employers Had Hired ACI Graduates

ACI and its owners also admitted that they provided prospective students with lists of employers who had hired previous graduates from the school, when, in fact, "many of the businesses listed on the flyers had not hired any of the School's graduates."[17] Flyers published for the various programs offered at ACI each prominently featured the school's name and logo, followed by the heading "EMPLOYERS THAT HAVE HIRED OUR [program name] GRADUATES," and then a list of employers. There were a total of 425 employers included on these lists. The MA AGO issued a number of civil investigative demands as part of its investigation, including a request for "documents sufficient to identify the employer and title for each ACI graduate who obtained employment."[18] According to a sworn affidavit, MA AGO staff searched all of the over 527,000 pages of records produced by ACI for any record of a student being employed by one of these 425 purported employers.[19] None of the employers appeared to have employed any ACI graduates.[20] There were, however, 69 graduates whom ACI listed as "employed" but did not have any record specifying an employer. Even assuming that the each of these graduates worked at a different one of the listed employers, that leaves over 350 (82%) that had never hired an ACI graduate.[21]

Based on documents provided by the MA AGO, ACI widely disseminated these flyers to prospective ACI students. They were considered "Admissions documents" and saved in ACI's "Admissions folder."[22] Prospective students enrolling as early as February of 2010 reported being given one of these lists during the admissions process.[23] A number of other students, across campuses and programs, reported having received the flyer during the admissions process and factoring it into

---

[15] The Consent Judgment acknowledged that the list of cohorts contained in the admissions was not intended to be a complete list of cohorts which were misrepresented. Consent Judgment at ¶ 32 ("Exhibit #1 reflects only the Cohorts for which the Commonwealth has made specific findings to date that the completion and/or placement data reported was significantly overstated. Nothing contained in the Consent Judgment should be construed as stating or implying that the School's completion and placement data for Cohorts that are not contained in Exhibit #1 was accurately represented to Students and prospective students.")

[16] If all evidence was viewed in the light most favorable to ACI, eight of these nine additional cohorts had discrepancies of at least 10% between the published and recalculated rates.

[17] Consent Judgment at ¶ 28.

[18] See Aprahamian Aff., No. 2013-CV-4128H at ¶ 5 (Mass. Supp. July 24, 2015).

[19] See Id. at ¶ 12.

[20] Id. at ¶ 13. Four of the employers were referenced in some way in an email, completion tracker, or employment verification form. Id. at ¶ 13(a)-(d). However, for each of these four, other information in the EVF indicated that the student was employed elsewhere, or no EVF verifying the employment could be located. Id.

[21] See Aprahamian Aff., No. 2013-CV-4128H at ¶ 15 (Mass. Supp. July 24, 2015); Commonwealth's Opp. To Motion for Protective Order, No. 2013-CV-4128H at 3 n.4 (Mass. Supp. July 24, 2015).

[22] Id.

[23] See, e.g., Memorandum of Interview with Patrick Laflamme.

their decision to enroll.[24] Several students even provided MA AGO with copies of their enrollment materials, which included copies of the flyers for their program.[25] Furthermore, an email from ACI's Marketing Director on January 16th, 2012, stated that they were printing copies of the flyers "to hang outside every classroom in MA."[26] In short, evidence shows that ACI provided the deceptive flyers to prospective students throughout its campuses and programs, and used them broadly to market the school.

### C. Employment of Instructors Not Authorized to Teach Under Massachusetts State Law

Under Massachusetts law, instructors at schools such as ACI must be approved by the Division of Professional Licensure (DPL).[27] Nevertheless, ACI admitted allowing "individuals who were not approved to teach by the DPL to be instructors, including recent School graduates, current Students with little or no experience in the field of study, and individuals who had no teaching experience."[28] DPL's predecessor investigated one student's complaints about ACI and found that, of the six instructors that student identified as teaching her classes, four were "not approved by OPS to provide instruction", and a fifth was approved by OPS, but not to teach the courses she was teaching.[29] A comparison of ACI's list of employees with DPL's list of approved instructors shows that 19% of ACI's roster of teachers was never approved to teach.

However, that 19% figure is not the full measure of ACI's use of unapproved instructors because not everyone who taught classes at ACI appeared on payroll records as an instructor. ACI also used temporary employment agencies to provide instructors for their courses.[30] With the exception of a handful who were later hired permanently, these temporary workers never appeared in ACI's employment records. As an example, RDH Temps, Inc., which specialized in providing dental assistants for short term assignments, placed more than twenty dental assistants in assignments *as instructors* with ACI, for periods ranging from one day to seventeen weeks. None of these instructors were approved by DPL to provide instruction when they began their assignments.[31]

Additionally, ACI utilized former students to provide classroom instruction, both as occasional substitutes and on an ongoing basis. Multiple former students stated that they were taught by recent

---

[24] *See* Memorandum of Interview with Angela Salmon-Collins (enrolled in Medical Assisting at the Braintree campus); Memorandum of Interview with Lynda Stockwell (enrolled in Medical Assisting Billing and Coding at Braintree); Memorandum of Interview with David Kee (enrolled in Digital Gaming Design at the Woburn campus).
[25] *See* AGO0000891, AGO0000718.
[26] *See* TCI00583457.
[27] Massachusetts law requires that, "Prior to employment a school… obtain the [DPL's] approval of all candidates for teaching positions," and that schools "submit to [DPL] an application for approval of each teacher." 603 CMR 3.15.
[28] Consent Judgment at ¶ 46.
[29] Office of Proprietary Schools, Preliminary Findings Student Complaint #081011 (ACIHUD001583-001587).
[30] ACI's December 11, 2012 letter to ACCET, Escobales Deposition Exhibit 1, ACCET0004034-0004036.
[31] RDH's Employment Agreement states that "the Employee is desirous of seeking temporary placement as a dentist, dental hygienist, dental assistant or dental receptionist and the Employer can provide such placement"; no provision is made for employment as an instructor in either the Employee Agreement, the Staffing Services Agreement between RDH and its clients, or the Facility Questionnaire RDH has clients fill out to determine what skills are necessary for temporary placements.

ACI graduates, or that they themselves taught at ACI subsequent to their graduation.[32] One student testified that during the course of a program that lasted less than eleven months, three of his instructors were recent ACI graduates.[33] Another former student testified that between April and September of 2012, she was the primary teacher for one of the Dental Assisting program sections, despite no actual experience in the field.

The MA AGO has provided a list of more than a dozen former or current ACI students who were identified as teaching classes, without DPL approval or the experience required for such approval.[34] This list of former or current ACI students is separate from the list of instructors that ACI admits were hired as teachers without proper approval.

### D. Other Misrepresentations by ACI

ACI, as well as its owners and employees, also admitted to making numerous other misrepresentations. The most egregious, widely-disseminated misrepresentations include:

- Routinely falsifying the number of students that *completed* ACI programs within a reasonable period after enrollment and widely disseminating these falsified completion rates to prospective students in the same disclosures that contained misleading job placement rates.

- Promising students lifetime career services, "but provid[ing] no more than links to listings on Craigslist or other employment hiring websites."[35]

- Creating "a false and misleading sense of urgency in prospective students, pressuring them to enroll immediately to ensure their place in the class even though the School had open and rolling enrollment."[36]

MA AGO has provided copies of marketing materials, deposition testimony and other evidence that confirms that ACI made these misrepresentations.

### III. The Borrower Defense Regulation Supports Eligibility and Full Relief for ACI Borrowers Under Massachusetts State Law

The Higher Education Act directs the Secretary, "[n]otwithstanding any other provision of State or Federal law," to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a [Direct] loan, except that in no event may a borrower recover from the Secretary, in any action arising from or relating to a [Direct] loan…,

---

[32] See Deposition of John Burrows at 23:8-23, 75:8-15; Deposition of Mary Ann Escobales at 20:11-21:16, 22:8-24:7, 67:17-68:19; Deposition of Kevin Ronald Haverty at 9:21-10:8, 12:1-13:5; Memorandum of Interview with Patrick LaFlamme; Memorandum of Interview with Melissa Jimenez; Memorandum of Interview with Benny Arce; Memorandum of Interview with April Leshore.
[33] Deposition of John Burrows at 23:8-23, 75:8-15.
[34] ACI Unapproved Instructors MASTER CHART updated 2015 08 13.
[35] Consent Judgment at ¶ 36. Also, the MA AGO conducted dozens of interviews in which students commented on the lack or complete absence of career services assistance. See, e.g., Interview Memoranda of Benny Arce, Julie Rifai, and Richard Burgess.
[36] Consent Judgment at ¶ 35.

an amount in excess of the amount such borrower has repaid on such loan."[37] The current borrower defense regulation states that "the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."[38]

For the reasons set forth below, borrowers who attended ACI campuses in Massachusetts have a valid claim under the Massachusetts Consumer Protection Act (MCPA),[39] and are therefore eligible for borrower defense. It is appropriate to grant relief without individual applications in this case because the MA AGO has identified all eligible borrowers and the Department has all necessary evidence to show that these borrowers were subject to ACI's substantial and pervasive misrepresentations. Given the widespread dissemination of ACI's extensive misrepresentations and the lack of value conferred by ACI, these borrowers should be granted full loan discharges and refunds of amounts already paid. The number of eligible borrowers is approximately 3,850.[40]

Although claims under the MCPA are subject to a four-year statute of limitations,[41] "this limitations period is subject to tolling until the plaintiff knew or should have known of the alleged injury."[42] The earliest that any ACI borrowers reasonably could have discovered ACI's misrepresentations and omissions would have been in November of 2013, when the MA AGO announced its complaint against ACI.[43] Since the four-year period would not run until November of 2017, all ACI borrowers fall within the statute of limitations.

### A. The Misrepresentations and Omissions Described Above State a Claim Under the MCPA

The MCPA, as interpreted by Massachusetts state courts, contains an expansive definition of "unfair or deceptive acts or practices."[44] No proof of intent or knowledge is required to find a violation of the MCPA.[45] In fact, a "practice is 'deceptive' if it could reasonably be found to have caused a person to act differently from the way he otherwise would have acted."[46] The Department has already determined that misleading or false job placement rates reasonably influence the enrollment decision of prospective students. Similarly, substantially false lists of employers that have previously employed ACI graduates would reasonably influence a prospective student to attend ACI when they would not

---

[37] 20 USC § 1087e(h).
[38] 34 C.F.R. § 685.206(c)(1).
[39] M.G.L. c. 93A.
[40] The total number of ACI borrowers who attended Massachusetts campuses is approximately 4,500. Approximately 650 have already received closed school discharges, which reduces the number of borrowers eligible for BD relief to about 3,850.
[41] M.G.L. c. 260, § 5A.
[42] *Lambert v. Fleet Nat. Bank*, 865 N.E.2d 1091, 1097 (Mass. 2007).
[43] Press Release, Massachusetts Attorney General's Office, American Career Institute Sued for Falsifying Student Documents, Failing to Provide Service (Nov. 21, 2013), *available at* http://www.mass.gov/ago/news-and-updates/press-releases/2013/2013-11-21-aci-complaint-regs.html.
[44] M.G.L. c. 93A, § 2(a).
[45] *See, e.g., Drakopoulos v. U.S. Bank Nat'l Ass'n*, 465 Mass. 775, 786 n.15 (2013) ("A successful G.L. c. 93A action based on deceptive acts or practices does not require proof . . . that the defendant intended to deceive . . . or even knowledge on the part of the defendant that the representation was false." (internal citation omitted)).
[46] *Lowell Gas Co. v. Attorney Gen.*, 377 Mass. 37, 51 (1979).

otherwise. The same is true of substantially misrepresented completion rates, false promises that lifetime career services would be provided, and statements that led prospective students to believe that they had to enroll immediately or miss the opportunity to do so. Therefore, all such representations constitute actionable claims under the MCPA.

In addition, the MCPA covers any failure to provide information "the disclosure of which may have influenced a person not to enter into a transaction."[47] Accordingly, the omission of material information – such as the fact that a substantial number of ACI's teachers were not authorized to teach – also violates the MCPA.[48] The fact that 19% of the instructors on ACI's payroll were teaching in violation of Massachusetts law, and that a significant number of classes were taught by temporary employees with no teaching experience and/or recent graduates with no relevant work experience, certainly would reasonably influence ACI students not to enroll.

### B. Granting Relief to ACI Borrowers Without Individual Applications is Appropriate and Consistent with the MCPA

The circumstances here warrant granting borrower defense relief, without an application, to every borrower who attended ACI's Massachusetts campuses. There is no need for an application from each of these borrowers because the evidence provided by the MA AGO has already established that those borrowers have a cause of action against the school under state law, and because ACI's misrepresentations were both substantial and pervasive. This approach is consistent with Massachusetts law, which does not require proof of individual reliance and provides for relief for groups of consumers harmed by violations of the MCPA.

Massachusetts courts have explicitly stated that a showing of individual reliance on a representation is not required under the MCPA: "the plaintiffs need not prove individual physical harm in order to recover for the defendants' deception. Nor need the plaintiffs show that each individual consumer relied on the defendants' false promise."[49] There need only be a "causal connection between the seller's deception and the buyer's loss."[50]

Here, the loss to ACI borrowers was clearly connected to ACI's misrepresentations and omissions, which were both substantial and widespread. Prior to enrollment, each ACI student was required to sign a program disclosure provided by ACI. As detailed above, many of these disclosures contain misrepresentations as to completion rates and job placement rates across a wide range of programs. Additionally, borrowers across ACI's campuses and programs received flyers containing falsified lists of employers who purportedly hired ACI graduates. ACI distributed these with other admissions documents starting immediately after the school opened, and later posted these deceptive

---

[47] *Grossman v. Waltham Chem. Co.*, 14 Mass. App. Ct. 932, 933 (1982) ("[F]ailure to disclose any fact, the disclosure of which may have influenced a person not to enter into a transaction, is a violation of c. 93A."). *See also Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 700-04 (1975) (failure to disclose that engine was defective at time of sale constituted a violation of the MCPA).
[48] *Schwartz v. Rose*, 418 Mass. 41, 46 (1994). *See also Commonwealth v. AmCan Enter., Inc.*, 5 Mass. L. Rptr. 53, *3 (1996) ("[A] solicitation package is deceptive if it contains material ... omissions which are likely to mislead the recipients."), *aff'd*, 47 Mass. App. Ct. 330 (1999).
[49] *Aspinall v. Philip Morris Companies, Inc.*, 442 Mass. 381, 397 (2004), *citing Nei v. Burley*, 388 Mass. 307, 313, 446 N.E.2d 674 (1983).
[50] M.G.L. c. 93A, § 9(b).

lists outside of *every* classroom. Similarly, ACI's failure to inform students about its severe lack of state-qualified teachers extended to *every* prospective student.

Under the MCPA, individuals who have been harmed are not required to bring suit on their own behalf to obtain relief. The MCPA allows individual consumers to bring class action cases and to obtain relief for any other "similarly injured and situated persons."[51] The MCPA also authorizes the Attorney General to seek relief on behalf of Massachusetts citizens.[52] The MA AGO is authorized to obtain "such orders or judgments as may be necessary to restore any person who has suffered any ascertainable loss of any moneys or property, real or personal..."[53] Therefore, providing relief to students without individual applications is consistent with state law.[54]

### C. Full Relief Should Be Provided to ACI Borrowers

Under the MCPA, plaintiffs are entitled to recovery "in the amount of actual damages... [i]n addition, the court shall award such other equitable relief... as it deems to be necessary and proper."[55] Actual damages include "all losses which were the foreseeable consequences of the defendant's unfair or deceptive act or practice."[56] It may also include out of pocket damages.[57] A court may treble the damages if the act or practice was a knowing or willful violation of the law.[58]

In calculating actual damages under the MCPA, Massachusetts courts have used a benefit of the bargain approach, comparing the amount paid against how something would have been valued absent the misrepresentation.[59] Where valuing the actual product delivered may be impracticable, however, the courts have recognized that the benefit of the bargain rule should not "operat[e] to defeat a just recovery where misrepresentation has caused real damage but where values cannot easily be proved."[60] To address this, the benefit of the bargain rule may be modified, so that "[w]here the proof is so vague as to cast virtually no light upon the value of the property had it conformed to the representations, damages will be awarded equal to the loss sustained."[61]

---

[51] M.G.L. c. 93A, § 9(b).

[52] M.G.L. c. 93A, § 2. In fact, the MCPA originally did not permit any private causes of action, allowing only the AGO to enforce the law. *See, e.g., Feeney v. Dell, Inc.*, 454 Mass. 192, 201 (2009) ("When originally enacted in 1967, G.L. c. 93A contained no provision for private remedies; only the Attorney General was empowered to bring enforcement proceedings.").

[52] M.G.L. c. 93A, § 2.

[53] M.G.L. c. 93A, § 2.

[54] Moreover, although not required, in this instance, the MA AGO has submitted an application on behalf of all borrowers that attended ACI's campuses in Massachusetts.

[55] M.G.L. c. 93A § 9(3). *See also Schwartz v. Rose*, 418 Mass. 41, 47-48 (1994); *Drakopoulos v. U.S. Bank Nat'l Ass'n*, 465 Mass. 775, 787 n.16 (2013).

[56] *Rivera v. Commerce Ins. Co.*, 84 Mass. App. Ct. 146, 149, 993 N.E.2d 1208, 1210 (2013); *see also DiMarzo v. Amer. Mut. Ins. Co.*, 389 Mass. 85, 101 (1983) (successful Chapter 93A plaintiff is "entitled to recover for all losses which were the foreseeable consequences of the defendant's unfair or deceptive act or practice").

[57] *See Blue Hill Chiropractic Grp., Inc. v. Encompass Ins. Co.*, No. SUCV200502075, 2011 WL 3672049, at *11 (Mass. Super. May 5, 2011) ("Out of pocket damages compensate the party for the actual loss it suffered as a result of the fraud.")

[58] M.G.L. c. 93A § 9(3).

[59] *Aspinall*, 442 Mass. at 399.

[60] *Rice v. Price*, 340 Mass. 502, 510, 164 N.E.2d 891, 896 (1960).

[61] *Id.*(citing Prosser, Torts (2d ed.) (ellipses and brackets omitted)).

In the case of students deceived into enrolling at ACI, actual damages under Massachusetts law would include, at a minimum, the amount paid by the student to attend the school.[62] The proof of the value of ACI's product, if any, is "vague" at best – indeed, what evidence the Department possesses indicates the programs had minimal or no value – so that full relief is appropriate. The facts described above with respect to ACI's practices and product resemble those for Corinthian Colleges, where the Department determined that borrowers should receive full relief. This determination was based in substantial part on the lack of value attendant to a Corinthian education, as evidenced by factors mirrored at ACI:

- Repeated misleading statements to students, regulators and accreditors;
- Misrepresentations regarding completion rates;
- Elaborate job placement fraud;
- Many student accounts testifying as to the lack of value provided by ACI; and
- Many student accounts stating that their affiliation with the school was an impediment rather than an asset as they sought employment.

Moreover, like Corinthian Colleges, the ACI programs at issue were career training programs. The inherent value of such programs lies in their ability to place students, so that placement rate advertising plays a significant role in establishing their value. An understanding that the value of the programs was not what it was purported to be can also be inferred from ACI employees' efforts to manipulate job placement rates.

ACI's misconduct was as flagrant as, if not worse than, Corinthian's. Documents provided by the MA AGO, including depositions with former ACI employees, portray a culture where falsifying information was routine. ACI employees, as well as top company executives, admitted that many students never attended class, and that unsuccessful students were simply erased from records documenting completion and job placement rates. Moreover, the school had a track record of providing demonstrably sub-standard educational services, including by hiring dozens of teachers who were not authorized to teach.

Given ACI's record of misconduct and poor results, the Department has determined that there is extremely limited proof of any value that ACI provided to its students, and what evidence there is indicates that the value provided by ACI was minimal.[63] In light of the above, it is appropriate to award eligible borrowers full relief.[64]

---

[62] As discussed above, damages under the MCPA may also include other expenses incurred as a result of the contract and, where a violation is knowing or willful, punitive damages in an amount two to the three times the actual damages. However, 455(h) of the HEA limits borrower defense relief to the amount of the loan.

[63] We also note that in the Consent Judgment, ACI admitted to a failure to provide lifetime placement services as promised. While we have not independently verified this admission, such a failure would constitute a breach of ACI's contractual promises with its students and would establish a borrower defense under 34 C.F.R. § 685.206(c).

[64] Under the MCPA, a court may also award such equitable relief "as it deems to be necessary and proper," M.G.L. 93A §9(3), and courts sometimes apply the equitable approach of rescission of contract in these cases. It appears the result of such an approach in this case would also yield full relief for affected borrowers. Rescission seeks to put both parties in the position they would have been absent the contract. *See, e.g., Ann & Hope, Inc.*, 42 Mass. App. Ct. at 230 (upholding an award of damages in part because "it returned to each party the consideration it provided under the contract to the greatest extent possible"). Sometimes it may be impossible for a product to be returned by a plaintiff, but "the value of the property not restored may be considered in determining the plaintiffs' damages." *Id.* In this case, given the evidence indicating a

I accept the above recommendation. For all borrowers that attended an ACI campus in Massachusetts, I direct the granting of borrower defense relief as set out in this memorandum.

1/13/17
Date

Ted Mitchell
Under Secretary
U.S. Department of Education

CONCUR:

1/13/17
Date

John K. DiPaolo
Office of General Counsel

---

lack of value of ACI's educational program, as described above, rescission would also properly yield recovery by ACI students of all they had paid the school.