UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| DIANA VARA, AMANDA WILSON, NOEMY SANTIAGO, KENNYA CABRERA, and INDRANI MANOO, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ELISABETH P. DEVOS, in her official capacity as Secretary of the United States Department of Education, and THE UNITED STATES DEPARTMENT OF EDUCATION, | ) ) ) ) ) ) |
| Defendants. | ) ) |

Civil No. 19-12175-LTS

---

MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION (DOC. NO. 11) AND PLAINTIFFS' MOTION FOR JUDGMENT
(DOC. NO. 38)
June 25, 2020

SOROKIN, J.

In this putative class action arising under the Higher Education Act ("HEA"), 20 U.S.C. §

1070 et seq., the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., and the

Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, plaintiffs challenge action taken by the

Department of Education ("Education") and its secretary, Elisabeth P. DeVos, concerning

thousands of federal student loans taken out to pay for the cost of attendance at Everest Institute

("Everest"), a for-profit postsecondary school that was operated by Corinthian Colleges, Inc.

("Corinthian").  Plaintiffs are former Everest students who seek to set aside what they

characterize as Education's constructive denial of an application for student loan discharge that

1

the Massachusetts Attorney General's Office ("AGO") submitted on their behalf in 2015.

Plaintiffs contend that Education's failure to render a reasoned decision on the merits of the

AGO's application was "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law" and "without observance of procedure required by law" in violation of the

APA, 5 U.S.C. § 706(2).  Further, plaintiffs argue that the AGO's application, which included

extensive factual and legal findings and invoked Education's borrower defense regulation, 34

C.F.R. § 685.206(c) (eff. until Oct. 16, 2018), entitled plaintiffs to full relief from their federal

student loan obligations.

On November 13, 2019, Named Plaintiffs Diana Vara and Amanda Wilson moved to

certify this lawsuit as a class action, Doc. No. 11, a motion that was later supplemented after

Named Plaintiffs Noemy Santiago, Kennya Cabrera, and Indrani Manoo entered the case, Doc.

No. 29.  On January 22, 2020, the parties stipulated to a factual record to govern this dispute.

Doc. No. 33.  Subsequently, plaintiffs moved for judgment on the record, Doc. No. 38, and

defendants opposed both plaintiffs' motion for class certification, Doc. No. 39, as well as their

motion for judgment, Doc. No. 49.  The two pending motions are now ripe for resolution.

I.      BACKGROUND

Before turning to the resolution of the pending motions, the Court reviews the text,

application, and recent revision of the governing regulatory regime, the procedural history of this

case and its prior related case, as well as the factual record as it concerns both Corinthian and the

AGO's application seeking borrower defense relief on behalf of borrowers who took out loans to

pay for the cost of attendance at Everest Massachusetts locations.  The Court first reviews the

governing law.

A.  Federal Student Loans and the Borrower Defense Regulatory Scheme

Under Title IV of the HEA, the Secretary of Education is authorized "to assist in making available the benefits of postsecondary education to eligible students" through financial-assistance programs.  20 U.S.C. §§ 1070(a), 1071(a)(1).  To that end, the HEA directs the Secretary of Education to "carry out programs to achieve [this] purpose[]," id. § 1070(b), including the William D. Ford Federal Direct Loan Program ("Direct Loan Program"), through which borrowers secure direct loans from the federal government, id. § 1087a, as well as the Federal Family Education Loan Program ("FFEL Program"), which allows Education to reinsure guaranteed loans made to students by financial institutions, id. § 1078.

1.  The 1995 Borrower Defense Regulatory Scheme

Education's regulations, promulgated pursuant to its statutory authority under the HEA, establish that "a borrower is obligated to repay the full amount of a Direct Loan . . . unless the borrower is relieved of the obligation to repay as provided [by the HEA or Education's regulations]."  34 C.F.R. § 685.207.  In the HEA, Congress mandated:

> Notwithstanding any other provision of State or Federal law, the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part, except that in no event may a borrower recover from the Secretary, in any action arising from or relating to a loan made under this part, an amount in excess of the amount such borrower has repaid on such loan.

20 U.S.C. § 1087e(h).  Pursuant to this statutory command, Education promulgated its borrower defense regulation, codifying the mechanism by which "[a] Direct Loan borrower may request that the Secretary exercise [her] long-standing authority to relieve the borrower of his or her obligation to repay a loan on the basis of an act or omission of the borrower's school."  Federal Direct Student Loan Program, Notice of Proposed Rulemaking, 59 Fed. Reg. 42,646, 42,649 (Aug. 18, 1994).  In its original iteration—which was effective from June 28, 1995 until October

3

16, 2018 and governs the federal student loans at issue in this case—the regulation read in

pertinent part:

> (c) Borrower defenses.
>
>> (1) In any proceeding to collect on a Direct Loan, the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law. These proceedings include, but are not limited to, the following:
>>
>> (i) Tax refund offset proceedings under 34 CFR 30.33.
>> (ii) Wage garnishment proceedings under section 488A of the Act.
>> (iii) Salary offset proceedings for Federal employees under 34 CFR part 31.
>> (iv) Credit bureau reporting proceedings under 31 U.S.C. 3711(f).
>>
>> (2) If the borrower's defense against repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay. The Secretary affords the borrower such further relief as the Secretary determines is appropriate under the circumstances.

34 C.F.R. § 685.206(c) (eff. until Oct. 16, 2018).

> a. <u>The Secretary is Required to Adjudicate Borrower Defenses to Repayment</u>

As a threshold matter, the HEA and the 1995 borrower defense regulation require the

Secretary to adjudicate borrower defense claims.  This duty to adjudicate emanates from the text

of the HEA, which establishes that borrowers have the right to raise "defense[s] to repayment" of

their federal student loans and unequivocally directs the Secretary to define the contours of such

defenses—that is, to clarify which "acts or omissions of an institution of higher education" will

give rise to a defense that Education must recognize.  20 U.S.C. § 1070e(h).  In passing this

provision, Congress ensured that a defense to repayment would be available to borrowers,

irrespective of how Education ultimately defined the scope and nature of such a defense.  And by

selecting the word "defense," Congress chose a word associated with adjudication, a significant

4

textual consideration.  See Black's Law Dictionary 511 (10th ed. 2014) (defining "defense" as "a basis for avoiding liability on a negotiable instrument").

At the same time, Congress delegated to the Secretary—along with other duties necessary to administer the federal student loan programs that Congress created in the HEA—the task of identifying the specific "acts or omissions" which would constitute a defense.  Courts have recognized that where, as here, Congress has delegated to an agency the task of administrating federal programs, that agency undertakes a non-discretionary duty to adjudicate claims or applications that are essential to the administration of those programs.  Cf.  Nigmadzhanov v. Mueller, 550 F. Supp. 2d 540, 546 (S.D.N.Y. 2008) ("The secretary cannot be charged with immigration administration and simultaneously have no duty to administrate.  Such a result is irrational."); Rodriguez v. Nielsen, No. 16-CV-7092 (MKB), 2018 WL 4783977, at *10 (E.D.N.Y. Sept. 30, 2018) (collecting cases in which courts have held that "immigration authorities have a non-discretionary duty to adjudicate applications").  So too here.

Moreover, Education and courts have confirmed that the agency is bound to adjudicate borrower defenses to repayment.  Indeed, when Education issued its first interpretation of the 1995 borrower defense regulation, the agency explained circumstances in which "[t]he Secretary will acknowledge a Direct Loan borrower's cause of action under State law as a defense to repayment of a loan" during the course of an adjudication.  60 Fed. Reg. 37,768, 37,769 (July 21, 1995) (emphasis added).  Since then, courts have confirmed that an adjudication necessarily follows a borrower's assertion of the defense.  See Commonwealth v. United States Dep't of Educ., 340 F. Supp. 3d 7, 10 (D.D.C. 2018) (observing that, under the regulatory scheme, the agency will continue collection on a student's debt "until this defense is asserted and the Department adjudicates the borrower's application").  Moreover, the agency has confirmed in

this litigation that borrower defense applications are "adjudicat[ed] in the regular course."  Doc.

No. 33 ¶ 16.  Thus, under the HEA, the 1995 borrower defense regulation, and the agency's

interpretations, the Secretary has a duty to adjudicate applications or claims for borrower defense

relief.

          b.   The Secretary Must Adjudicate Affirmative Borrower Defense Applications

The borrower defense regulatory scheme also provides that the Secretary must adjudicate

affirmative borrower defense applications—that is, requests for borrower defense relief that are

asserted before a borrower has defaulted on their federal student loan and is a party to a related

post-default collection proceeding.

The text of the borrower defense regulation makes clear that additional regulations more

specifically govern some, but not all, of the "proceedings" in which a borrower may assert a

defense to repayment.  For example, before the Secretary may collect debt owed to Education

through a tax refund offset proceeding, she is required to notify the debtor of her intent to collect

and must allow the debtor sixty-five days to request a review by Education of "the existence,

amount, enforceability, or past-due status of the debt."  34 C.F.R. § 30.33.  As a part of that

review, a borrower must include an "explanation of the reasons the debtor believes that the

notice the debtor received . . . inaccurately states any facts or conclusions relating to the debt,"

and, in this explanation, may assert a defense to repayment pursuant to the borrower defense

regulation.  34 C.F.R. § 30.24(b)(2).

However, the plain text of the borrower defense regulation also explains that the

"proceedings" in which a borrower may assert a defense to repayment "are not limited to" those

that are specifically enumerated in subsections (i) through (iv).  34 C.F.R. § 685.206(c)(1)

(providing that a borrower may assert a defense to repayment in tax refund proceedings, wage

garnishment proceedings, federal employee salary offset proceedings, and credit bureau reporting proceedings).  In fact, numerous sources—in addition to the regulation's clear indication that the listed "proceedings" are not exhaustive—confirm that borrowers who are not facing such proceedings and, indeed, not in default at all may nonetheless assert and obtain an adjudication of their borrower defense.  From 1995 on, the agency's interpretations, contracts, and adjudications confirmed that the rights conferred by the borrower defense regulatory scheme had two critical features: (1) a borrower's ability to assert a defense to repayment was not limited to post-default collection proceedings such as those specifically enumerated in 34 C.F.R. § 685.206(c)(1); and (2) Education was bound to adjudicate affirmative, pre-default applications for borrower defense relief by issuing reasoned decisions that discussed the merits of such applications.

The agency's published interpretations, as well as its contractual agreements, confirm that the borrower defense regulation encompassed the right to assert a defense to repayment at any time during repayment of a loan.  Education's 1995 interpretation—published "to ensure that program participants and the public generally understand the Secretary's intent in issuing" the borrower defense regulation—provides that Direct Loan borrowers "may present [their] arguments to . . . the Department during the collection process," not just during debt collection proceedings.  60 Fed. Reg. 37,768, 37,770 (July 21, 1995).  Since then, Education has repeatedly "explained [that] the Direct Loan borrower defense regulations were intended to . . .  allow[] borrowers to assert both claims and defenses to repayment, without regard as to whether such claims or defenses could only be brought in the context of debt collection proceedings."  81 Fed. Reg. 75,926, 75,956 (Nov. 1, 2016) (noting that this interpretation was first "explained by the Department in 1995" shortly after the borrower defense regulation was initially promulgated).

Just last year, the agency reiterated this interpretation, acknowledging that "throughout the history of the existing borrower defense repayment regulation, [Education] has approved . . . affirmative borrower defense to repayment requests." 84 Fed. Reg. 49,788, 49,796 (Sept. 23, 2019). Moreover, the promissory notes governing both the Direct Loan Program and the FFEL Program have long included the following statement under the heading "Discharge (having your loan forgiven)":

> In some cases, you may assert, as a defense against collection of your loan, that the school did something wrong or failed to do something that it should have done. You can make such a defense against repayment only if the school's act or omission directly relates to your loan or to the educational services that the loan was intended to pay for, and if what the school did or did not do would give rise to a legal cause of action against the school under applicable state law.

Williams v. DeVos, Civil Case No. 16-11949-LTS, Doc. No. 43-13 at 7 (reproducing a Direct Loan Master Promissory Note dated October 6, 2010).[1] Education has confirmed that "[l]oans made before July 1, 2017 are governed by the contractual rights expressed in the existing Direct Loan promissory notes." 81 Fed. Reg. 75,926, 75,936 (Nov. 1, 2016). The "defense against collection" described in the master promissory note is not reserved for those borrowers in debt collection proceedings; by its plain terms, a borrower is empowered to assert such a defense as an affirmative claim to preclude "collection" of the loan.

Education's long-standing practice conforms to the regulatory guidance and contract documents. The agency adjudicated applications that affirmatively invoked borrower defenses to repayment, including those submitted on behalf of groups of borrowers. For example, in 2001 and 2003, Education's Office of the General Counsel wrote detailed memoranda in response to two "requests that [Education] recognize [a group of borrowers'] defense to repayment of their

---

[1] The parties agree that the Court may take judicial notice of any documents filed in the Williams case. Doc. No. 33 at 2 n.1.

Direct Loans pursuant to 34 C.F.R. § 685.206(c)." Calvillo Manriquez v. Devos, Civil Case No. 3:17-cv-07210-SK, Doc. No. 35-8 at 73-82, 86-99.[2]  In response to one of these requests—which was made on behalf of 58 borrowers[3] who "claim[ed] that they should not have to pay any remaining balance on their Direct student loan accounts," id. at 87—Education's Office of the General Counsel wrote that "Direct Loan regulations provide that a borrower may avoid repayment on a Direct Loan to the extent that he or she 'asserts [] a [valid] defense against repayment,'" id. at 86 (quoting 34 C.F.R. 685.206(c)).  The memorandum then explicated a "three-part test" that the agency used to determine whether it "will . . . recognize such claims":

> [I]n order to establish a defense to repayment, these 58 students must prove three elements: (1) that [the school] engaged in wrongful conduct that gives rise to a legal cause of action under State law (in this case North Dakota law); (2) that [the school]'s actions were directly related to the receipt or distribution of their Direct Loans or the provision of educational services paid for with those loans; and (3) that they were in fact injured as a result of [the school]'s action, and that those injuries can be measured as a specific damage amount.

Id. at 86-87 (emphasis added); see also id. at 74.  In its legal analysis, the memorandum used mandatory language to describe its consideration of the borrowers' claim. See, e.g., id. at 89 (concluding that Education "must evaluate these 58 students' claims under North Dakota law")

---

[2] The Court takes judicial notice of these memoranda pursuant to Fed. R. Evid. 201(b).  See Cardoso v. City of Brockton, No. CIV.A. 12-10892-DJC, 2014 WL 6698618, at *3 (D. Mass. Aug. 11, 2014) ("'Federal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.'" (quoting E.I. Du Pont de Nemours & Co. v. Cullen, 791 F.2d 5, 7 (1st Cir. 1986)); Torrens v. Lockheed Martin Servs. Grp., Inc., 396 F.3d 468, 473 (1st Cir. 2005) (taking judicial notice of a letter sent by the Acting Navy Secretary to the Governor of Puerto Rico because the letter was relevant "as a legally significant event"); Cty. of Tooele v. U.S. Dep't of Agric., 210 F.3d 382 n.3 (9th Cir. 2000); Opoka v. I.N.S., 94 F.3d 392, 394 (7th Cir. 1996).  Here, the Secretary directed the Court to Calvillo Manriquez, which has direct relation to the claims and arguments presently before the Court.  See Doc. No. 49 at 15.
[3] This group included both students and "parents who obtained PLUS loans for their children." Id. at 86 n.2.

(emphasis added).[4]  Ultimately, after analyzing the three decisive factors and acknowledging that

the memorandum's "conclusions rest[ed] in large part on inferences drawn from other cases

involving [the same college] but not these individuals," Education's Office of the General

Counsel "conclude[d] that all 58 students" had "adequately established" that their "claims should

be recognized as a defense to collection of their Direct loans."  Id. at 93.  Education also

explained that in order "[t]o quantify the students' damages, [the agency] ha[d] to determine the

amount of damages they could recover from [the school] under state law."  Id. at 92.  After

looking to North Dakota state law, which "permits a person defrauded by any advertisement or

circular issued by a postsecondary educational institution to recover three times the amount of

the actual damages," the agency determined that the students' "loan obligations are fully offset

by their damages against [the school]."  Id. at 92-93 (citing North Dakota Century Code §15-

20.4-09).  Finally, in addition to both memoranda, Education furnished the borrowers'

representative with responses that provided notice of Education's determination.  See id. at 83.

Education's practice of adjudicating affirmative applications continued well after 2003.

For example, in 2016, the AGO "sent an application to the Department requesting that all

Massachusetts borrowers who attended [American Career Institute ("ACI")] receive a full

discharge of their federal loans under the borrower defense regulation without individual

application."  Doc. No. 33-11 at 1; Commonwealth, Civil Case No. 12-12777-LTS, Doc. No. 16-

---

[4] This mandatory language was mirrored over a decade later in Education's First Report of the
Special Master for Borrower Defense to the Under Secretary, which noted that, under
Education's 1995 Notice of Interpretation, 60 Fed. Reg. 37768 (July 21, 1995), "the Department
will acknowledge a Direct Loan borrower's cause of action under state law as a defense to
repayment of a loan only if the cause of action directly relates to the loan or to the school's
provision of educational services for which the loan was provided."  U.S. Dep't of Educ., First
Report of the Special Master for Borrower Defense to the Under Secretary 4 (Sept. 3, 2015),
https://perma.cc/8RMB-5VBJ ("First Special Master Report") (emphasis added).

2 at 9 ("Pursuant to 34 C.F.R. 685.206, the Commonwealth requests and applies for Borrower

Defense Discharges, including refunds for all amounts paid to date, for [all] students who

attended ACI in Massachusetts between 2010 and the School's closure on January 9, 2013.").

On January 4, 2017, Education adjudicated the AGO's application, determining that the agency

should "provid[e] full borrower defense relief to all borrowers who attended ACI's

Massachusetts campuses." Id. According to its recommendation, which was authored by Under

Secretary of Education Ted Mitchell and approved by the General Counsel of the agency,

Education came to this conclusion by applying "the current borrower defense regulation."[5]

Notably, Education's adjudication of the AGO's ACI application mirrored the agency's

earlier memoranda considering defense to repayment applications submitted on behalf of

multiple borrowers.  First, Education concluded that "borrowers who attended ACI campuses in

Massachusetts ha[d] a valid claim under the Massachusetts Consumer Protection Act (MCPA)[6]

and [were] therefore eligible for a borrower defense." Id. at 7.  Second, Education canvassed

ACI's "numerous," "egregious, [and] widely-disseminated misrepresentations" that related to its

provision of educational services that were paid for with federal student loans. Id. at 2-6.  Then,

Education concluded that "the loss to ACI borrowers was clearly connected to ACI's

misrepresentations and omissions." Id. at 8.  Given these conclusions, Education "direct[ed] the

granting of borrower defense relief" as to "approximately 3,850" eligible borrowers. Id. at 7, 11.

Then, Education applied Massachusetts state law to determine the appropriate amount of relief:

---

[5] As indicated above, the 1995 version of the borrower defense regulation was effective until
October 16, 2018.
[6] The agency applied Massachusetts courts' explicit statements "that a showing of individual
reliance on a representation is not required under the MCPA." Id. at 8 (emphasis in original).
Thus, the agency concluded that "providing relief to students without individual applications is
consistent with state law." Id. at 9.

full loan discharges.  Id. at 10 (noting that "actual damages under Massachusetts law would include, at a minimum, the amount paid by the student to attend the school").

In sum, the texts of the HEA and the 1995 borrower defense regulation, as well as Education's contemporaneous interpretations, contracts, and adjudicatory practices, demonstrate that the agency must adjudicate affirmative applications for borrower defense relief through the issuance of reasoned decisions applying established legal frameworks.

2.   Corinthian's Collapse and the New Borrower Defense Regulatory Scheme

In 2015, Corinthian, a publicly traded company that operated postsecondary schools across the country, closed its schools and filed for bankruptcy.  Doc. No. 33 ¶¶ 1, 5. Corinthian's demise followed "numerous investigations for misconduct," id. ¶ 5, including a multi-year investigation led by Education that resulted in a $26,665,000 fine for falsification of job placement rates at Corinthian campuses in California, see Letter from Robin Minor, U.S. Dep't of Educ., to Jack Massimino, Corinthian Colleges, Inc., (Apr. 14, 2015), https://perma.cc/J6AQ-38PY.

After Corinthian's collapse, Education received a "flood of borrower defense claims submitted by Corinthian students stemming from the school's misconduct."  81 Fed. Reg. 39,330, 39,330 (June 16, 2016); see also Doc. No. 33 ¶ 6 ("Immediately after Corinthian collapsed, Education received about a thousand borrower defense claims.").  In 2015, Education announced the appointment of a Special Master for Borrower Defense, a position that was designed "to provide students who attended Corinthian Colleges the debt relief they are entitled to."  Press Release, U.S. Dep't of Educ., Education Department Appoints Special Master to Inform Debt Relief Process (June 25, 2015), https://perma.cc/RP5Q-9F9S.  In September 2015, Special Master Joseph A. Smith, Jr., issued his first report, pledging to

12

> [f]urther engage State Attorneys General and other enforcement agencies to
> discuss pending or past investigations they may have pursued against career
> colleges; evidence of wrongdoing emerging from those investigations that may be
> relevant to the Department's borrower defense process; and their own state
> statutes and case law as it relates to wrongdoing relevant for borrower defense
> claims.

First Special Master Report at 10-11.  He also stated his intent to "create processes by which the

State Attorneys General can submit evidence developed through their investigatory findings, so

that wherever possible, like claims can be treated together and alike."  Id. at 11.

Shortly thereafter, in 2016, Education also promulgated a new borrower defense

regulation in order to "clarify and streamline the borrower defense process to protect borrowers

and improve the Department's ability to hold schools accountable for actions and omissions that

result in loan discharges."  81 Fed. Reg. 75,926, 75,926 (Nov. 1, 2016).  The new regulation,

which ultimately took effect in October 2018, enumerated procedures for individual and group

borrower defense applications.  34 C.F.R. §§ 685.222(e), 685.222(f).  As to group borrower

defense applications, the new regulation provides that "the Secretary may initiate a process to

determine whether a group of borrowers, identified by the Secretary, has a borrower defense."

Id. §685.222(f)(1).  The new regulation also specifies the procedures that govern such group

applications, providing that "[a] hearing official resolves [a] borrower defense [group

application] through a fact-finding process," which then results in a "written decision,"

regardless of whether the application is approved or denied.  Id. § 685.222(g)(1).

B.  The AGO's Litigation Against Corinthian and its Defense to Repayment Application

In 2011, the AGO initiated an investigation of Corinthian after receiving numerous

consumer complaints of misconduct at its two Everest campuses in Massachusetts, Doc. No. 33-

5 at 4, locations which offered "courses in medical administration, medical insurance billing and

coding, dentistry, and massage therapy," Williams, 2018 WL 5281741, at *1.  Pursuant to this

13

investigation, the AGO reviewed hundreds of surveys from former students, conducted extensive employment verifications, interviewed more than one hundred former Everest employees and students, evidence which, in the AGO's view, "demonstrat[ed] widespread and systemic illegal behavior." Id. Ultimately, on April 3, 2014, the AGO sued Corinthian on behalf of the Commonwealth in Massachusetts Superior Court, alleging that since at least 2009, Corinthian had "deceived and misled the public and prospective students in order to aggressively enroll students at its Massachusetts campuses with the goal of increasing tuition and fee revenues, and consequently profits, for the company and its shareholders." Doc. No. 33-1 ¶ 2 (reproducing Complaint, Massachusetts v. Corinthian Colls., Inc., No. 14-1093 (Mass. Super. Ct. Apr. 3, 2014)). The AGO, though suing in the name of the Commonwealth of Massachusetts, sought full restitution for current and former students of Corinthian in Massachusetts. Doc. No. 33-1 at 47 (praying that the Court "[o]rder Corinthian to make full and complete restitution to current and former students at Everest MA schools, including but not limited to the repayment to students of all tuition monies acquired by Corinthian as a result of its unfair or deceptive acts or practice"). The AGO eventually prevailed on a summary judgment motion against Corinthian and, in August 2016, the Massachusetts Superior Court ordered restitution to the Commonwealth for the benefit of the borrowers in the amount of $67,333,091. Doc. No. 33-3 ¶ 15.

While its litigation was ongoing in Massachusetts Superior Court, on November 30, 2015, the AGO submitted to Education a document entitled "Group Discharge of Federal Loans to Corinthian Students" in which the AGO explained that it sought "the immediate discharge of all federal loans taken out by student borrowers who attended Corinthian Colleges, Inc.'s Everest

Institute campuses in Brighton and Chelsea, Massachusetts, between 2007 and 2015." Doc. No.

33-4 at 1.[7]

The DTR Application, which was over 2,700 pages long, contained three particularly

notable sections. First, the DTR Application included a 60-page memorandum detailing the

evidence it had "compiled in the course of [its] investigation." Doc. No. 33-5 at 5. This

evidence, according to the AGO, demonstrated that Corinthian had "engaged in patterns and

practices of unfair and deceptive conduct in violation of Massachusetts law," thus "providing

Everest MA students with defenses to repayment of their student loans." Id. As the Court noted

in Williams, this memorandum canvassed evidence that

> Corinthian [had] misrepresented its in-field placement rates at Everest, which
> Corinthian advertised as "often in excess of 70%," when actual in-field placement
> rates were as low as 20 to 40 percent depending on the program. The document
> also described Corinthian's misrepresentation of the quality of career services and
> quality and type of classroom instruction at Everest. For example, in promotional
> material, Corinthian promised "programs specifically designed to provide hands-
> on training" but, in reality, most training at Everest was "self-taught instruction
> from workbooks." And, although Corinthian promised "experienced instructors"
> with "industry-specific expertise," instructors were "unqualified, uninformed, and
> unconcerned with teaching." "Many instructors were from temp agencies and
> some never taught in a classroom before." In addition, Corinthian advertised its
> "professional-level standards for conduct and behavior" and "inspirational
> classroom discussions," but students instead found the school environment to be
> "a free-for-all," "unprofessional," and "neglectful." Students reported "serious
> problems of drug use and violence" at Everest. The document cited these

---

[7] In Williams, the Court referred to this document as a "Defense to Repayment ("DTR")
Submission," explaining that the Court "refer[red] to Attorney General Healey's writing using
the name she gave the document in her amicus brief before the Court." See Williams, 2018 WL
5281741, at *4 n.7. In fact, Attorney General Healey's amicus brief in Williams referred to her
writing as a "DTR Application." See generally Williams, Civil Case No. 16-11949-LTS, Doc.
No. 29. In addition, the first sentence of the cover letter to the AGO's writing makes clear that
the writing is "an application to the U.S. Department of Education . . . seeking the immediate
discharge of all federal loans taken out by student borrowers who attended Corinthian Colleges,
Inc.'s Everest Institute campuses in Brighton and Chelsea, Massachusetts, between 2007 and
2015[.]" Doc. No. 33-4 at 1 (emphasis added); accord id. ("We have compiled our findings here
as an application for group loan discharge.") (emphasis added). Accordingly, the Court will
henceforth refer to the AGO's writing as a "DTR Application."

practices and others as establishing violations of the Massachusetts Consumer
Protection Act.

Williams, 2018 WL 5281741, at *5 (internal citations omitted).

Second, the DTR Application included an exhibit that "contained documents, totaling
189 pages, concerning over 30 individual former Corinthian students in Massachusetts."  Doc.
No. 33 ¶ 12.  Labeled Exhibit 3 to the DTR Application, these forms included, "as to each
student, dates of enrollment, contact and identifying information (including Social Security
numbers), a list of deceptive practices of Everest with checkmarks next to those practices that
influenced the specific student's decision to attend, and the student's signature," as well as
"signed authorization[s] for Attorney General Healey to access information regarding the status
of the student's loan(s) and to act on the student's behalf."  Williams, 2018 WL 5281741, at *4.
The DTR Application additionally "requested that Education review the individual proffers in
Exhibit 3 . . . and promptly discharge the applicants' federal student loans."  Id. (internal
alterations omitted).

Third, the DTR Application included an exhibit that "contained the name, addresses,
phone numbers, e-mail addresses, enrollment status, date of enrollment, date of graduation,
campus and program(s) attended of 7,241 students."  Doc. No. 33 ¶ 13.  In the DTR
Application's introductory memorandum, the AGO requested "that the Department provide a
swift, wholesale, and automatic discharge (including providing refunds on loan payments
previously made and removal of any negative credit report entries) for each of Corinthian's
Everest MA students, including the [approximately] 7,200 students shown on Exhibit 4."  Doc.
No. 33-5 at 6 (emphasis added).  The AGO clarified that its application on behalf of all 7,241
students was motivated by its view that individual borrowers would struggle to "investigate
cohort placement rates or aggregate witness statements," as well as its fear that "[n]avigating

16

defense to repayment applications and gathering associated required documentation can also present significant hurdles, particularly in the case of a closed school like Corinthian." Id. at 6 n.5.  To that end, the AGO's request sought to initiate a process that would "assist borrowers in asserting their <u>individual</u> defense to repayment." Id. (emphasis added).

On January 8, 2016, Education provided its only response to the DTR Application.  Doc. No. 33 ¶ 14; <u>Williams</u>, 2018 WL 5281741, at *6 ("The Court ordered the Secretary to file 'any responses to [Attorney General Healey's] letter by Defendant.' She filed only the January 8, 2016 letter.") (citations omitted).  In its response, entitled "Re: Everest-Massachusetts Borrower Defense Claims," Education acknowledged receipt of "the summary of evidence and applicable law included with [the DTR Application]," as well as "all appendices and exhibits" that the AGO attached to its Application.  Doc. No. 33-7 at 4.  Additionally, Education explained that it had "reviewed the documents sent to [the agency] by [the AGO] with care and believe[d] that some evidence referred to in those documents was not included in the submission." Id.  Accordingly, Education requested "additional evidence [that] may be critical to [the agency's] assessment of student claims for debt relief," including additional data to support the AGO's conclusions about Corinthian's recalculation of job placement rates, as well as corroborating documentation regarding Corinthian's alleged misrepresentations about the transferability of credits and the expected salary of graduates. Id. at 4-5.  In its response, Education did not seek individual attestation forms, social security numbers, or dates of birth for the 7,241 students listed on Exhibit 4, nor did it convey to the AGO that the absence of such information would be a barrier to those students successfully asserting borrower defenses to repayment.  <u>Williams</u>, 2018 WL

5281741, at *14 (noting that "Education never identified the lack of [this] information as a deficiency requiring cure").

On January 29, 2016, the AGO submitted to Education supplemental materials in support of the DTR Application.  See Williams, Civil Case No. 16-11949-LTS, Doc. No. 29-1 ¶ 4 (Declaration of Assistant Attorney General Jennifer Snow).  Education did not respond further to the DTR Application.  Williams, 2018 WL 5281741, at *6 n.11.  According to David Michael Page, an attorney advisor in Education's Borrower Defense Unit, the forms contained in Exhibit 3 to the AGO's DTR Application, which concerned 30 individual students, were, at some point thereafter, "forwarded to the [Federal Student Aid] personnel responsible for Borrower Defense Intake, for adjudication in the regular course."  Doc. No. 33 ¶ 16.  However, on December 15, 2017, "a duly authorized representative of Education testified that 'Education did not consider the list of 7,200 names provided in Exhibit 4 to constitute individualized applications for Borrower Defense discharge and did not consider students listed in Exhibit 4 as having applied for Borrower Defense discharge.'"  Id. ¶ 17 (quoting Williams, Civil Case No. 16-11949-LTS, ECF No. 50-1 (Second Decl. of Chad Keller)).  Education has since confirmed that "the collection procedures on unpaid federal student loans continue for former Massachusetts Everest students who have not personally applied for Borrower Defenses or other types of student loan discharges."  Id. ¶ 19.

C.      The *Williams* Lawsuit

In September 2016, Darnell Williams and Yessenia Taveras, two former students at Corinthian schools in Massachusetts, filed a lawsuit in this Court alleging that Education had improperly certified their student loan debts as legally enforceable for purposes of referral to the U.S. Department of the Treasury's Treasury Offset Program ("TOP").  Williams, 2018 WL

18

5281741, at *1.  Williams and Taveras, who each obtained nearly $10,000 in federal student

loans to attend Corinthian schools, defaulted on their student loans in the fall of 2014.  Id. at *1-

*2.  Subsequently, in 2015, Education sent both Williams plaintiffs notices of its intent to refer

their debts to TOP for collection by offset.  Id. at *2.  Ultimately, in 2016, Education seized both

Williams plaintiffs' tax refunds.  Id. at *6.

      The Williams plaintiffs argued that the certification of their debts to TOP, and the

subsequent seizure of their tax refunds, violated the APA because, "at the time the Secretary

certified their debts, she had in her possession an application for the discharge of [their] loans"

which the Secretary was required to consider before reaching her certification decision.

Williams, Civil Case No. 16-11949-LTS, Doc. No. 68 at 2.  Critically, both of the Williams

plaintiffs were listed in Exhibit 4 of the DTR Application, which Education received on

November 30, 2015, over a week before the Secretary certified the Williams plaintiffs' debt for

collection by offset on December 9, 2015.  Id. at *4, *6.

      In January 2017, the Secretary moved to dismiss the Williams case for lack of

jurisdiction, a motion that the Court allowed only insofar as the Williams plaintiffs sought

injunctive relief or relief on behalf of other non-parties.  Id. at *1. After the Massachusetts

Attorney General filed an amicus brief and the Secretary filed a complete administrative record,

the parties cross-moved for judgment on the record.  Id.

### 1.   The Court's Order on Motions for Judgment in *Williams*

      On October 24, 2018, the Court resolved the parties' cross-motions, primarily

considering two central questions: (1) whether the Williams plaintiffs were required to exhaust

available administrative remedies as a prerequisite to bringing suit, id. at *9-*12, and (2) whether

the Secretary's decision to certify the Williams plaintiffs' loans without first considering the

DTR Application was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of the APA, id. at *13 (quoting 5 U.S.C. § 706(2)).

First, as to exhaustion, the Court held that the Williams plaintiffs were "entitled to advance their APA action to have the agency's decision reviewed on the basis of the administrative record without first exhausting available administrative remedies." Id. at *10. Alternatively, the Court determined that, even if the plaintiffs had been required to exhaust administrative remedies, that exhaustion requirement was satisfied by (1) the DTR Application, "which invoked the administrative remedy of Education's review process such that Education was required to adjudicate the request," id. (referencing the Secretary's regulations that govern debtor "request[s] for review" that must be adjudicated before the Secretary refers tax refund offsets to Treasury, see 34 C.F.R. §§ 30.24, 30.33); and (2) the Secretary's "decision to certify the plaintiffs' debts for collection through offset," as the Secretary's decision necessarily "'squarely addressed' . . . the plaintiffs' borrower defense," which was the precise issue that would have been adjudicated in any request for review filed by the plaintiffs, id. (quoting Mazariegos-Paiz v. Holder, 734 F.3d 57, 63 (1st Cir. 2013)).

Second, as to the merits of the Williams plaintiffs' APA claim, the Court held that

the Secretary acted arbitrarily and capriciously by (1) ignoring or refusing to consider the DTR [Application] prior to certifying the plaintiffs' loans for tax refund offsets; (2) failing to determine whether Williams and Taveras, in light of the administrative record and the DTR [Application], had established valid borrower defenses as defined in Education's regulations; and (3) failing to issue a reasoned decision on either of these points.

Id. at *14.  In reaching this holding, the Court rejected several arguments that the Secretary raised in support of her contention that "the DTR [Application] was not a borrower defense

application on behalf of Williams and Taveras and therefore was insufficient to stop certification of their debts." Id. at *13.

First, the Court rejected the Secretary's argument that the AGO could not have submitted a valid borrower defense application because the applicable regulation, 34 C.F.R. § 685.206(c), "makes no provision for a *third party* to assert the borrower defense or for defenses to be submitted on behalf of a group of borrowers." Williams, Civil Case No. 16-11949-LTS, Doc. No. 81 at 13 (emphasis in original). In fact, the Court noted, the Secretary "cited no statute or regulation that explicitly prohibits an attorney general from asserting a borrower defense request on behalf of her citizens." Williams, 2018 WL 5281741, at *11. Moreover, the Court observed that the AGO is charged with a "common law duty to represent the public interest," id. (quoting Sec'y of Admin. & Fin. v. Attorney Gen., 326 N.E.2d 334, 338 (Mass. 1975)), a duty the AGO had previously exercised by filing an earlier group application for discharge that Education had adjudicated and approved, id. at *12 (referencing the AGO's 2016 application submitted on behalf of former ACI students, see generally supra section I.A.1). The Court also noted that, in its January 8, 2016 response to the DTR Application, "Education did not advance the position that the law (or anything else) required an individual request from each borrower." Id.

Second, the Court rejected the Secretary's claim that Education could withhold consideration of the DTR Application because it did not "establish[] that the plaintiffs relied upon or were personally harmed by Corinthian's illegal conduct." Id. at *13. Indeed, the Court emphasized that "no language in the borrower defense regulation or any related regulation requires detrimental reliance in order for a borrower to state a claim sufficient for administrative consideration." Id. Further, the Court noted that irrespective of the evidence required to make out a "successful borrower defense claim, the Secretary [is] required to review," and, if

21

necessary, "deny [such a] claim," because "the Secretary's own regulations allow a borrower to assert a state law claim against the borrower's school as a borrower defense in a tax refund offset proceeding." Id. (citing 34 C.F.R. § 685.206(c)(1)(i)).  Thus, the Court reasoned, the Secretary could not refuse to review the DTR Application and certify the plaintiffs' debt for offset without first considering the merits of the borrower defense claim that had been submitted on their behalf.  Id.

Finally, the Court rejected the Secretary's argument that the DTR Application "was not a borrower defense application on the plaintiffs' behalf because it did not provide certain information required for consideration," such as the plaintiffs' social security numbers.  Id. at *14; cf. Williams, Civil Case No. 16-11949-LTS, Doc. No. 81 at 16-17 (Education's memorandum in support of its motion for judgment relying on a screenshot of the Federal Student Aid website—not Education's regulations, interpretations, or past adjudications—as evidence of the "minimum" requirements for a borrower defense claim).  Rather, the Court held that, "where, as here, the DTR [Application] contained ample identifying and contact information for the plaintiffs, and Education never identified the lack of certain information as a deficiency requiring cure, Education's failure to provide notice and an explanation of its decision [to certify the plaintiffs' debt for offset] is the very definition of arbitrary and capricious agency action."  Id. at *14.

Ultimately, the Court "determine[d] that the DTR [Application] invoked a borrower defense proceeding on behalf of the people listed on Exhibit 4, including Williams and Taveras," and, given the rights afforded by the borrower defense regulation, 34 C.F.R. § 685.206(c)(1)(i), and the agency's duty to "consider[] any evidence presented by [a] debtor" and "determine[] that the debt is past-due and legally enforceable" before certifying the debt for offset, 31 C.F.R. §

285.2(d)(ii)(C), held that "the Secretary's certification [of the plaintiffs' debt for offset], without

consideration of Attorney General Healey's DTR [Application], was arbitrary and capricious."

Id. at *15.  The Court then granted the Williams plaintiffs relief by, inter alia, (1) vacating the

Secretary's "certifications for offset as to Williams and Taveras," (2) declaring that the DTR

Application "required the Secretary to render a decision on the merits of [the Williams

plaintiffs'] borrower defenses," (3) remanding the "matter to the Secretary for redetermination of

her certification decision, including consideration of the borrower defense asserted by [the DTR

Application] on behalf of Williams and Taveras," and (4) ordering "the Secretary to report on the

status and timing of her decision in 60 days."  Id.

       2.     Subsequent Litigation in *Williams*

Education and the Secretary did not appeal the Court's judgment on the parties' cross-

motions for judgment.  See Williams, 2019 WL 7592345, at *2 ("Defendants did not appeal from

the judgment").  Rather, on December 12, 2018, Education sent letters to the two Williams

plaintiffs notifying them that, pursuant to the Court's October 24, 2018 Order, the DTR

Application "will be considered to initiate a borrower defense application submitted on your

behalf."  Williams, Civil Case No. 16-11949-LTS, Doc. No. 101-1.  However, Education also

informed the plaintiffs of its view that it would not "be able to process [their] borrower defense

application" until Education received "additional documentation," including a separate

individual application form for a borrower defense to loan repayment from each plaintiff.  Id.

Thereafter, on February 5, 2018, the Court convened a status conference at which

> counsel for the Secretary informed the Court that she had no information about
> the expected timing of the Secretary's decision on the plaintiffs' applications for
> borrower defense . . . In-house counsel for the Department of Education, who
> appeared by phone, stated that the Department has begun its review of the
> plaintiffs' borrower defense applications and expects that, without further
> submissions in response to the December 12, 2018, letters to the plaintiffs, the

> applications will be denied. However, counsel further informed the Court the
> Secretary might exercise her discretion to discharge the plaintiffs' debts without
> considering the merits of the applications for borrower defense, provided that
> such a discharge would moot this case.

Williams, Civil Case No. 16-11949-LTS, Doc. No. 108 at 2.  The Williams plaintiffs, who were

"unmoved by the Secretary's willingness to discharge the debts on a discretionary basis,"

informed the Court that "they did not intend to submit additional information, such as the

information requested by the Secretary's [December 12, 2018] letter," and further requested that

the Court order the Secretary to render a decision on the merits of their borrower defense

application.  Id. at 2-3.  After further discussion, the Court ordered the Secretary to render a

decision on the merits of the plaintiffs' applications for borrower defense, including the claims

asserted by the DTR Application, within 30 days.  Id. at 3. The Court's Order left to the

Secretary how she might resolve the applications, but she was required to resolve them.

However, Education ultimately did not render a decision on the merits of the borrower

defense application submitted on the Williams plaintiffs' behalf.  Instead, on February 26, 2019,

the parties reported to the Court that they had reached a settlement in principle and jointly

requested that the Court stay its February 6, 2018 Order requiring Education to render a merits

decision within 30 days.  Williams, Civil Case No. 16-11949-LTS, Doc. No. 112.  That same

day, the Court entered the stay requested by the parties.  The Court also received a motion by the

Commonwealth of Massachusetts to compel the Secretary's compliance with the Court's

October 24, 2018 Order, or, in the alternative, to intervene in the Williams case.  Williams, Civil

Case No. 16-11949-LTS, Doc. No. 115.  On May 7, 2018, the Williams parties stipulated to

dismissal of the action with prejudice, and the following day, the Court vacated its February 6,

2018 Order.[8]  Williams, Civil Case No. 16-11949-LTS, Doc. No. 134.  At that time, the Commonwealth's motion to compel compliance or intervene remained under advisement.  Id.

On August 8, 2019, the Court denied the Commonwealth's motion.  Williams, Civil Case No. 16-11949-LTS, Doc. No. 144.  The Commonwealth's motion principally alleged that the Court's October 24, 2018 Order "require[ed] the Secretary to treat [the DTR Application] as having invoked a borrower defense proceeding as to all of the [approximately] 7,200 students listed on its Exhibit 4."  Id. at 2.  The Commonwealth also alleged that "the Secretary has adopted a different interpretation of the [October 24, 2018 Order], which it argue[d] is incorrect: that [the Order] required her to treat the DTR [Application] as having invoked a borrower defense proceeding only as the two plaintiffs in this action."  Id.  In denying the Commonwealth's motion, the Court noted that "[t]he express terms of the [October 24, 2018 Order] did not grant express relief to anyone other than the named plaintiffs, and the Court had previously dismissed the plaintiffs' claim for non-class declaratory relief benefiting a larger group of persons."  Id. at 3.  The Court also observed that permissive intervention was not warranted because, amongst other reasons: (1) Education had not appealed the October 24, 2018 Order; and (2) the Commonwealth was free to file a new lawsuit that could squarely address the relief sought by its motion to intervene and would permit the Secretary, if she wished, to appeal the merits of the Court's decision, rather than (possibly) just the Commonwealth's motion to intervene.  Id. at 3-4.  Finally, the Court remarked that "a prospective plaintiff could 'notify the clerk by notation on the local civil category sheet' that the new pleading is related to [the Williams] case."  Id. at 4 (quoting L.R. 40.1(g)).

---

[8] As the Court noted at a status conference in the instant matter, the Court did not vacate or otherwise disturb its October 24, 2018 Order.  See Doc. No. 20 at 6.

D.  <u>The Instant Lawsuit</u>

On October 22, 2018, plaintiffs filed this lawsuit and, on the civil cover sheet accompanying their pleadings, indicated its relation to the <u>Williams</u> case.[9]  Doc. No. 1-1.  In this putative class action, plaintiffs "ask the Court to rule that the Secretary is violating the [APA] by failing to render a reasoned decision on the Borrower Defense that the Attorney General submitted on behalf of 7,241 students in 2015."  Doc. No. 24 ¶ 7.  Further, they seek an order setting aside the Secretary's "determin[ation] that [the DTR Application] is insufficient, in and of itself or in combination with all other information available to the Department, to establish a borrower defense for any and all individuals who took out a federal student loan in connection with Everest Massachusetts."  <u>Id.</u> ¶ 8.  Finally, they urge the Court to declare that "[t]he only non-arbitrary action that Defendants may take, in light of all the evidence in front of them, is to cancel the loans of all members of the proposed class, and return any money already collected towards these invalid loans."  <u>Id.</u> ¶ 9.

The named plaintiffs, who bring suit on behalf of themselves and "all individuals who borrowed a federal student loan to pay the cost of attendance for the 7,241 students identified in Exhibit 4 to the [DTR Application] who have not yet had their federal student loans completely cancelled and/or have not yet received a refund of sums already collected," Doc. No. 11 at 1, are all former Everest students who were specifically named in Exhibit 4 to the DTR Application. Doc. No. 24 ¶¶ 13-17.

Named Plaintiff Kennya Cabrera took out a $3,500 FFELP loan to attend Everest's Chelsea, Massachusetts location and has since made $3,034.70 in payments on the loan.  Doc.

---

[9] On the same day, the Commonwealth filed a parallel "related" lawsuit.  <u>See</u> <u>Commonwealth v. U.S. Dep't of Educ.</u>, Civil Case No. 19-12177, Doc. No. 1-1.  No party has suggested or contended that the cases are not related under the Local Rule.

No. 35 ¶ 18 (Declaration of Education Loan Analyst Cristin Bulman).  Cabrera's loans are not in default and the remaining principal on her loan is $626.31.  Id. ¶ 20.  Additionally, on May 10, 2016, Cabrera filed an individual borrower defense application and Education has "ceased all collection activity on her loans."  Id. ¶ 19.

Named Plaintiff Indrani Manoo took out $9,500 in federal student loans to attend Everest. Doc. No. 36 ¶¶ 15-17.  Manoo has made $1,698.56 in payments on the loans but, as of January 23, 2020, still owes Education $13,540.11 ($11,044.39 in principal and $2,495.72 in interest). Id. ¶ 20.  Manoo has also filed, in various formats, three individual borrower defense applications, Doc. No. 36-4, and Education has "ceased all collection activity on [Manoo's] loans," Doc. No. 36 ¶ 19.

Named Plaintiff Noemy Santiago took out two federal student loans to attend Everest's Brighton, Massachusetts location.  Doc. No. 34 ¶ 15.  As of January 16, 2020, the total amount owed on Santiago's FFELP Loans balance is $13,715.97 ($8,969.91 in principal and $4,746.06 in interest).  Id. ¶ 19.  On January 22, 2020, Education sent Santiago the following communication:

> On or about November 30, 2015, the U.S. Department of Education's (ED) Federal Student Aid received a submission from Massachusetts Attorney General regarding the actions of Corinthian College, which it has previously investigated. Pursuant to a decision by the U.S. District Court rendered in Williams v. DeVos, Case No. 16-11949 (D. Mass.), issued on October 24, 2018, this submission will be considered to initiate a borrower defense application submitted on your behalf. As a result of this submission your student loan account has been put into stopped collection status and decertified from Treasury Offset program on January 21, 2020. This will continue while the U.S. Department of Education's review of your borrower defense application is completed.

Doc. No. 38-1 at 1.[10]   In this communication, Education also stated in a footnote that "[t]he

Secretary of Education reserves all legal rights to challenge the Court's decision."  Id.  And, just

as it did in its pre-settlement letters to the Williams plaintiffs, Williams, Civil Case No. 16-

11949-LTS, Doc. No. 101-1, Education communicated to Santiago that it would not "be able to

process [her] borrower defense application" until Education received "additional

documentation," including a separate individual application form for a borrower defense to loan

repayment, Doc. No. 38-1 at 1.  Nothing in the record indicates that Santiago has since submitted

such "additional documentation."

　　　Named Plaintiff Diana Vara took out $9,500 in federal student loans to pay for the cost of

attendance at Everest's Chelsea location.  Doc. No. 31 ¶ 17.  On July 2, 2016, Vara's loans

entered default, at which point her loan balances totaled $10,279.96 ($9,839.06 in principal and

$440.90 in interest).  Id. ¶¶ 18-19.  Beginning on June 1, 2017 through June 11, 2019, Education

collected $8,790.03 in administrative wage garnishment payments toward Vara's federal student

loans and, on April 25, 2019, collected $1,111.00 through the TOP.  Id. ¶¶ 21-22.  On May 7,

2019, Vara filed an individual borrower defense application, at which point "Education ceased

all collection activity on her loans."  Id. ¶ 23.  After the instant litigation commenced, on January

7, 2020, Education "refunded to Vara all the payments she has ever made on her student loans"

and, on January 8, 2020 "wrote off the balance of all of Vara's student loans."  Id. ¶¶ 25-26.

However, Education did not render any decision on either Vara's individual borrower defense

application or the DTR Application.  Doc. No. 24 ¶ 16.[11]

---

[10] At oral argument, counsel for Education represented that the filing of the Amended Complaint including Santiago as a Named Plaintiff triggered the sending of this letter.

[11] Nowhere in Education's affidavit describing Vara's federal student loan history does Education state that Vara's loans were ultimately "discharged" pursuant to the borrower defense process; rather, Education's loan analyst merely states that Vara "is no longer indebted to the

Named Plaintiff Amanda Wilson likewise borrowed thousands of dollars of federal student loans to attend Everest's Chelsea location.  Doc. No. 32 ¶ 17.  Wilson's loans entered default on October 20, 2018, and, six days later, when her loans were assigned for collection, her outstanding balance was $9,448.78 ($8,589.95 in principal and $585.83 in interest).  Id. ¶ 18.  On March 6, 2019, Education collected $3,101.00 through the TOP; however, when Wilson filed an individual borrower defense application on May 24, 2019, "Education ceased all collection activity and initiated a refund of the $3,101.00 TOP payment."  Id. ¶¶ 21-22.  Just as it did with Vara, in January 2020, Education "initiated a refund of all payments Wilson made during the life of [her] loan" and "wrote off the balance of all of Wilson's student loans."  Id. ¶¶ 23-24.  And just like Vara, Education did not render any decision on either Wilson's individual borrower defense application or the DTR Application.  Doc. No. 24 ¶ 17.

## II.   MOTION FOR CLASS CERTIFICATION

The Court now turns to plaintiffs' motion for class certification, Doc. No. 11, which was supplemented after additional named plaintiffs entered the case, Doc. No. 29.  Plaintiffs seek certification of the following class:

> [A]ll individuals who borrowed a federal student loan to pay the cost of attendance for the 7,241 students identified in Exhibit 4 to the Massachusetts Attorney General's Office borrower defense submission who have not yet had

---

United States for any student loans," suggesting that Education's decision to "refund" Vara's loan payments and "write off the balance" of her loans was made pursuant to a grant of authority unrelated to the borrower discharge process.  See, e.g., 20 U.S.C. § 1082(a)(6) (providing that, in the performance of her duties with respect to FFELP loans, the Secretary may "compromise, waive, or release any right, title, claim, lien, or demand, however acquired"); 20 U.S.C. § 1087a(b)(2) (explaining that Direct loans have "the same terms, conditions, and benefits as [FFELP loans]"); 34 C.F.R. § 30.70(e) (providing that "the Secretary may compromise a debt in any amount, or suspend or terminate collection of a debt in any amount, if the debt arises under" FFELP or the Direct loan program); 81 Fed. Reg. 39330, 39368 (June 16, 2016) (explaining that "[t]he HEA has, since 1965, authorized the Secretary to compromise—without dollar limitation—debts arising from title IV, HEA student loans.").

their federal student loans completely cancelled and/or have not yet received a
refund of sums already collected.

Doc. No. 11 at 1.  The Court now considers the motion to certify this class, as well as

defendants' opposition, Doc. No. 39, and plaintiffs' reply, Doc. No. 42.

    A.    <u>Legal Standard</u>

"To obtain class certification, the plaintiff must establish the four elements of Rule 23(a)

and one of several elements of Rule 23(b)."  <u>Smilow v. Southwestern Bell Mobile Sys., Inc.</u>, 323

F.3d 32, 38 (1st Cir. 2003) (citing <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 614 (1997)).

Rule 23(a) permits class certification only if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there
> are questions of law or fact common to the class; (3) the claims or defenses of the
> representative parties are typical of the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Here, plaintiffs rely on Rule 23(b)(2), Doc. No. 11 at 15, which permits class certification

when "the party opposing the class has acted or refused to act on grounds that apply generally to

the class, so that final injunctive relief or corresponding declaratory relief is appropriate

respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

    B.    <u>Discussion</u>

Defendants raise two sets of arguments in opposition to class certification.  First,

defendants argue that plaintiffs' motion fails to meet the commonality and typicality

requirements of Rule 23(a).[12]  Second, defendants argue that plaintiffs' requested relief would

---

[12] Defendants do not contend that the other two prerequisites of Rule 23(a) are unmet.  Thus, the
Court focuses its inquiry on commonality and typicality.

not be "appropriate respecting the class as a whole" and that "final injunctive relief" is

unavailable to them.  Fed. R. Civ. P. 23(b).  The Court now addresses these arguments in turn.

       1.  <u>Rule 23(a): Commonality and Typicality</u>

Under Rule 23(a), "commonality" necessitates "questions of law or fact common to the

class."  Fed. R. Civ. P. 23(a)(2).  "A question is common if it is 'capable of classwide

resolution—which means that determination of its truth or falsity will resolve an issue that is

central to the validity of each one of the claims in one stroke.'"  <u>Parent/Prof'l Advocacy League</u>

<u>v. City of Springfield, Massachusetts</u>, 934 F.3d 13, 28 (1st Cir. 2019) (quoting <u>Wal-Mart Stores,</u>

<u>Inc. v. Dukes</u>, 564 U.S. 338, 350 (2011)).  "In other words, the commonality requirement is met

where the questions that go to the heart of the elements of the cause of action will each be

answered either 'yes' or 'no' for the entire class and the answers will not vary by individual class

member."  <u>Raposo v. Garelick Farms, LLC</u>, 293 F.R.D. 52, 55 (D. Mass. 2013) (internal

quotations and citation omitted).  Under Rule 23(a), what really "matters to class certification . . .

is not the raising of common 'questions'" as much as "the capacity of a classwide proceeding to

generate common <u>answers</u> apt to drive the resolution of the litigation."  <u>Wal-Mart</u>, 564 U.S. at

350 (alteration in original) (emphasis in original) (quoting Richard A. Nagarenda, <u>Class</u>

<u>Certification in the Age of Aggregate Proof</u>, 84 N.Y.U. L. Rev. 97, 132 (2009)).  "Those

common answers," the First Circuit recently explained, "typically come in the form of 'a

particular and sufficiently well-defined set of allegedly illegal policies [or] practices" that work

similar harm on the class plaintiffs."  Parent/Prof'l Advocacy League, 934 F.3d at 28 (quoting

Parsons v. Ryan, 754 F.3d 657, 679 (9th Cir. 2014)).

"To establish commonality under Rule 23(a)(2), one common question is enough."

Savino v. Souza, No. CV 20-10617-WGY, 2020 WL 1703844, at *6 (D. Mass. Apr. 8, 2020).

Here, plaintiffs propose several common questions of law and fact, including:

> (1) whether the AGO's submission represents a valid borrower defense
> application on behalf of all former Everest Massachusetts students named therein;
> (2) whether the Secretary constructively denied that application without making a
> reasoned decision, in violation of the Administrative Procedure Act; and (3) given
> Everest's numerous, undisputed violations of state law, whether any decision that
> fails to grant full relief to Plaintiffs and proposed class members is arbitrary and
> capricious.

Doc. No. 42 at 2; Doc. No. 28 ¶ 155(b).

The typicality requirement of Rule 23(a), on the other hand, "requires that the claims of

the representative plaintiff be typical of the claims of the class."  Vargas v. Spirit Delivery &

Distribution Servs., Inc., 245 F. Supp. 3d 268, 287 (D. Mass. 2017).  "The typicality requirement

is met 'when the representative plaintiffs' injuries arise from the same events or course of

conduct as do the injuries of the class and when plaintiffs' claims and those of the class are based

on the same legal theory.'"  Id. (quoting In re Credit Suisse–AOL Sec. Litig, 253 F.R.D. 17, 23

(D. Mass. 2008)).  Critically, courts note that the typicality requirement "does not mean that the

representative plaintiffs' claims must be identical to those of proposed class members, rather the

question is whether the putative class representatives can fairly and adequately pursue the

interests of the proposed class members without being sidetracked by their own particular

concerns." Id. (internal alterations and quotation marks omitted).

      a.   Dissimilarities Amongst Proposed Class Members Are Immaterial

"Though commonality and typicality are distinct elements under Rule 23(a), the

Supreme Court has repeatedly recognized that they 'tend to merge.'" Savino, 2020 WL

1703844, at *6 (quoting Wal-Mart, 564 U.S. at 349 n.5).  In this case, defendants marshal the

same argument to attack both requirements: that "there are material dissimilarities between the

claims of the five individual Plaintiffs and between each individual Plaintiff and the proposed

class as a whole." Doc. No. 39 at 11.

Defendants point to two sets of "material dissimilarities" that, in their view, prevent

class-wide consideration of plaintiffs' claims.  First, they observe that some proposed class

members—including some of the named plaintiffs—have "filed individual Borrower Defense

applications . . . while others [in the proposed class] have never filed an [individual]

application," Doc. No. 39 at 11.  Further, they note that "the [proposed] class is composed not

only of borrowers who are not in default on their loans and have filed Borrower Defense

applications . . . but also borrowers who are not in default and have never filed Borrower

Defense applications, borrowers who are in default and have filed Borrower Defense

applications, and borrowers who are in default and have never filed Borrower Defense

applications." Id. at 13.  Second, and relatedly, defendants argue that some of the relief that

plaintiffs seek—full discharge of their student loan obligations—cannot be considered as a class

because, in their telling, "entitlement to relief under the borrower discharge regulation hinges on

individualized facts" such that borrower defense discharges "cannot be determined en masse."

Id.

In fact, these dissimilarities have no bearing on class certification.  First, the question whether a given class member filed an individual borrower defense application in addition to the DTR Application is entirely unrelated to whether the DTR Application, in and of itself, constituted a valid borrower defense application on behalf of all class members that must be adjudicated and entitles all class members to relief.  Even if some proposed class members have pending individual applications that separately entitle them to relief, this additional entitlement in no way vitiates any entitlement that they may enjoy with respect to the DTR Application.  If, by raising this objection, the Secretary means to say that the existence of one pending application submitted on an individual's behalf precludes relief emanating from a separate application also filed on that individual's behalf, nothing in the borrower defense regulatory scheme suggests this limitation on a borrower's ability to seek and receive discharge of their loan obligations.[13]  And the Secretary submits no authority or reasoned argument in support of such a limitation.[14]

In any event, though Education claims that those proposed class members who submitted individual applications are differently situated because their "applications [are] in the process of being adjudicated by [Education]," id., nothing in the affidavits supporting its motions establish that Education is, in fact, adjudicating such individual borrower defense applications, see, e.g.,

---

[13] This reasoning applies with equal force to Education's attempt to distinguish proposed class members "who have filed [an individual] Borrower Defense application and been denied discharge."  Id.  Even if such proposed class members exist, the mere fact that one application was insufficient to establish an individual's entitlement to relief in no way answers the question whether the DTR Application—which may include more robust evidence—entitles that same individual to relief.  Cf. Doc. No. 33-6 at 6 n.5 (explaining that the DTR Application seeks discharge on behalf of all 7,241 students because individuals may struggle to "investigate cohort placement rates or aggregate witness statements" and acknowledging that "[n]avigating defense to repayment applications and gathering associated required documentation can also present significant hurdles").

[14] Whether a ruling on one application, favorable or unfavorable, might have significance to other pending applications on behalf of a borrower has not been argued by the Secretary and is not presented by the facts before the Court.

Doc. No. 36 ¶ 19 (stating that Manoo filed three individual applications with Education in 2016, 2017, and 2019, respectively, but not providing any information about whether they are "being adjudicated"); Doc. No. 35 ¶ 19 (stating that Cabrera filed an individual application with Education in 2016, but not similarly providing no information about whether that application is "being adjudicated"); cf. L.R. 7.1 ("Affidavits and other documents setting forth or evidencing facts on which the motion is based shall be filed with the motion.") (emphasis added).

That some proposed class members are in default on their loans while others are not is also immaterial to class-wide resolution of plaintiffs' claims. As explained above, see supra section I.A.1 (collecting numerous sources), since its promulgation, the borrower defense regulation has encompassed the right to assert a defense to repayment at any time during repayment of a loan, including before a borrower is in default. Indeed, Named Plaintiffs Manoo and Santiago are not in default on their loans, yet Education deems them to have valid borrower defense applications pending before the agency, undoubtedly for this very reason. See Doc. No. 36 ¶ 19; Doc. No. 34 ¶ 20. Clearly, then, default is unrelated to the submission and consideration of borrower defense applications; thus, it is immaterial to the resolution of whether the DTR Application was a valid borrower defense application, whether that application has been denied in violation of the APA, and whether that application entitles all proposed class members to relief. Of course, if the law were otherwise—that only persons in default could obtain a borrower defense discharge of their entire loan obligation—Education's regulatory scheme would stand for an incongruous and perverse proposition: A student who is defrauded by a predatory for-profit college but who nonetheless, through grit and sacrifice, manages to avoid default enjoys no legal right to a borrower defense, while an otherwise similarly-situated student

who forgoes the difficult sacrifice of the first student and defaults on their loan nonetheless enjoys a right to a borrower defense.

Finally, Education's assertion that entitlement to borrower defense relief "hinges on individualized facts," like an individual's "reliance" on a "school's actions," such that relief "cannot be determined en masse" is simply inaccurate as a matter of law.  Doc. No. 39 at 13. Defendants concede that the 1995 borrower defense regulation "appl[ies] to this case," Commonwealth, Civil Case No. 19-12177-LTS, Doc. No. 18 at 15; see Doc. No. 49 at 11 n.2 (incorporating this argument by reference), and, in its Answer to plaintiffs' Second Amended Complaint, Doc. No. 37 ¶ 33, admit that "[s]tate law provides the standard for borrower defense for all federal student loans at issue in this lawsuit," Doc. No. 28 ¶ 33 (citing "34 C.F.R. § 685.206(c) (eff. until Oct. 16, 2018)").  Reliance is not an element under the relevant Massachusetts law.  Aspinall v. Philip Morris Cos., 813 N.E.2d 476, 492 (Mass. 2004) (finding "deceptive advertising . . . a per se injury on consumers").  Thus, the individual's "reliance" is not relevant to whether a borrower is entitled to relief.

Moreover, defendants have, throughout the history of the 1995 borrower defense regulation, adjudicated affirmative group borrower defense to repayment applications, recognizing this very point.  See, e.g., Calvillo Manriquez, Civil Case No. 3:17-cv-07210-SK, Doc. No. 35-8 at 93 (granting an application for group discharge submitted on behalf of 58 borrowers based on "inferences drawn from other cases involving [the same college] but not these individuals").  And, when Education previously adjudicated a group application involving a Massachusetts institution, the agency specifically noted that "a showing of individual reliance on a representation is not required under" Massachusetts law.  Doc. No. 33-11 at 8 (emphasis in original).  Of course, Massachusetts law imposes no such requirement.  Given this backdrop, the

36

individual circumstances of class members plainly cannot preclude review of plaintiffs' common claim that the DTR Application, in and of itself, entitled all proposed class members to relief from their loan obligations.

Ultimately, then, plaintiffs' common questions are "resolvable irrespective of the distinctions identified by Defendants" and "no possibility exists that an individual claim or factual difference will 'consume the merits' of this class action." Reid v. Donelan, 297 F.R.D. 185, 191 (D. Mass.), enforcement granted, 64 F. Supp. 3d 271 (D. Mass. 2014) (quoting Durmic v. J.P. Morgan Chase Bank, 10–cv–10380–RGS, 2010 WL 5141359, at *4 (D. Mass. Dec. 10, 2010)).

### 2. Vara's and Wilson's Claims Are Not Moot

Defendants level an additional attack on plaintiffs' fitness to maintain this class action: They argue that Vara and Wilson "cannot as individuals meet the jurisdictional requirement of Article III of the Constitution" because their claims are now moot. Doc. No. 39 at 12. This is so, according to defendants, because Education "has discharged their loans, refunded all payments made on the student loans, and they are no longer indebted to the United States." Id. at 11. Vara and Wilson, for their part, argue that their claims are not moot because Education's failure to adjudicate the merits of their individual borrower defense applications or the DTR Application renders them ineligible for relief from the IRS, which, as of January 15, 2020, "will not assert that taxpayers who receive a . . . borrower defense discharge must recognize gross income resulting from the discharge of [their] federal loans." I.R.S. Rev. Proc. 2020-11, § 2.05(1). Given their ineligibility for IRS relief, Vara and Wilson say, their loan discharges may

be treated as gross income, thus impacting their tax liabilities and giving them a stake in the outcome of this case.  Doc. No. 42 at 4-5.[15]

Defendants are correct that Article III, §2 of the U.S. Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies," thus preventing federal courts from "decid[ing] questions that cannot affect the rights of litigants in the case before them."  Chafin v. Chafin, 568 U.S. 165, 172 (2013) (quoting North Carolina v. Rice, 404 U.S. 244, 246 (1971)).  However, the

---

[15] Nearly four months after Vara and Wilson raised this argument in their reply brief, Doc. No. 42, defendants countered in a post-argument letter that "Vara and Wilson will [not] face adverse tax consequences because . . . [s]uch write-offs are not taxable."  No. 56 at 3.  This is so, defendants say, because such write-offs "are not identifiable events under the Internal Revenue Service regulations."  Doc. No. 56 at 3 (citing 26 C.F.R. § 1.6050P-1(b)(2)(i)).  Defendants' argument misunderstands the cited regulation, which sets out requirements, "[s]olely for purposes of the reporting," for when certain applicable entities—including federal agencies like Education and certain financial entities—must file a Form 1099-C upon the discharge of an indebtedness.  26 C.F.R. § 1.6050P-1(a)(1).  That a "write-off" is not an "identifiable event" under the regulation—and thus does not trigger a duty on the part of federal agencies and financial entities to file a Form 1099-C—has no bearing on whether the "write-off" must be reported as gross income.  Indeed, as a 2019 IRS Guidance for individuals makes clear, "[e]ven if [an individual] didn't receive a Form 1099-C, [they] must report canceled debt as gross income on [their] tax return unless [certain] exceptions or exclusions . . . appl[y]."  U.S. Dep't of Treasury, Pub. No. 4681, Canceled Debts, Foreclosures, Repossessions, and Abandonments (for Individuals) 3 (Feb. 7, 2020), https://www.irs.gov/pub/irs-pdf/p4681.pdf.  In the section of the Guidance that specifically explains the tax consequences of student loan debt cancellations, the IRS further states:

> Generally, if [an individual is] responsible for making loan payments, and the loan is canceled or repaid by someone else, [the individual] must include the amount that was canceled or paid on [their] behalf in [their] gross income for tax purposes. However, in certain circumstances, [an individual] may be able to exclude amounts from gross income as a result of: (1) Student loan cancellation due to meeting certain work requirements, (2) Student loan cancellation due to death or permanent and total disability, or (3) Student loan repayment assistance.

Id. at 4.  The January 15, 2020 IRS Guidance cited by Vara and Wilson provides for additional new exceptions to the general rule, including when student loans are discharged "based on the Closed School or Defense to Repayment discharge process."  I.R.S. Rev. Proc. 2020-11.  The "write off" of Vara and Wilson's loans does not fall into any of the specific "exceptions or exclusions" identified in IRS guidance documents.

Supreme Court has cautioned against reflexive findings of mootness, holding that a case is moot only if "it is impossible for a court to grant any effectual relief whatever," id., a "demanding standard" that courts must apply critically, Mission Prod. Holdings, Inc. v. Tempnology, LLC, 139 S. Ct. 1652, 1660 (2019).  Indeed, "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."  Chafin, 568 U.S. at 172 (quoting Knox v. Serv. Emps. Int'l Union, Local 1000, 567 U.S. 298, 307 (2012)).

Here, that "demanding standard" is not met.  Vara and Wilson undoubtedly have an interest in minimizing their tax liabilities and, due to Education's failure to render a decision on their borrower defense applications, may not avail themselves of a benefit now provided by the IRS.  I.R.S. Rev. Proc. 2020-11 (explaining that the IRS will extend relief only "where the Federal loans are discharged by [Education] under the Closed School or Defense to Repayment discharge process, or where the private loans are discharged based on a settlement of a legal cause of action against nonprofit or other for-profit schools and certain private lenders.").  While the Secretary may have refunded Vara and Wilson's payments and discharged their loans, the plain text of the January 15, 2020 IRS Guidance limits relief to borrowers whose loans were discharged pursuant to the enumerated discharge processes.  As such, the relief that the proposed class seeks—including a "declar[ation] that the Defendants' failure to issue a decision on the merits of the [DTR Application] is unlawful" and an order compelling Education to issue such a decision—would redress ongoing harm to Vara and Wilson.  Accordingly, neither Vara's nor Wilson's claims are moot.[16]

---

[16] One additional matter bears discussion.  On January 6, 2020, the Court convened a status conference to discuss a schedule for fair and expeditious resolution of the instant dispute.  Doc. No. 23.  At that conference, defendants' counsel indicated that this dispute "may be moot before [the Court has] to decide it."  Id. at 30.  On that very same day, Education wrote off the balance of all of Vara and Wilson's student loans (without issuing a decision as to their borrower defense

3. <u>Rule 23(b)</u>

Defendants also raise two objections to class certification under Rule 23(b).  First, they

argue that plaintiffs are not entitled to "final injunctive relief or corresponding declaratory

relief," Fed. R. Civ. P. 23(b)(2), because the HEA's so-called "anti-injunction provision," 20

U.S.C. § 1082(a)(2), forecloses such relief.  Second, defendants argue that, even if plaintiffs are

entitled to such relief, the proposed class is not amenable to a uniform remedy, thus rendering

class certification inappropriate.  <u>See</u> Fed. R. Civ. P. 23(b)(2) (dictating that relief must be

"appropriate with respect to the class as a whole").

a. <u>The HEA Does Not Preclude Class Certification</u>

Defendants argue that they are immune from suit seeking injunctive relief because the

HEA provides that "no attachment, injunction, garnishment, or other similar process, . . . shall be

issued against the Secretary or property under the Secretary's control." 20 U.S.C. § 1082(a)(2).

Given this so-called "anti-injunction provision," defendants argue that plaintiffs are categorically

---

claims), <u>see</u> Doc. No. 31 ¶ 26; Doc. No. 32 ¶ 24; and, one day earlier, it refunded to Vara and
Wilson all the payments they had ever made on their student loans, Doc. No. 31 ¶ 25; Doc. No.
32 ¶ 23.  At this point, Vara and Wilson were the only named plaintiffs in this putative class
action.  <u>See</u> Doc. No. 24 (adding Santiago as a named plaintiff on January 13, 2020); Doc. No.
28 (adding Manoo and Cabrera as named plaintiffs on January 16, 2020).  On January 29, 2020,
nearly three weeks after the Court's status conference, defendants filed their opposition to this
motion for class certification, arguing, in part, that Vara's and Wilson's claims were moot in
light of the refunds and discharges that Education issued.  Because Vara's and Wilson's claims
are not moot, the Court need not consider whether Education engaged in the "nefarious" practice
of "pick[ing] off plaintiffs to evade judicial review."  <u>Kaplan v. Fulton St. Brewery, LLC</u>, No.
CV 17-10227-JGD, 2018 WL 2187369, at *9 (D. Mass. May 11, 2018) (quotation marks
omitted); <u>see also</u> <u>Bais Yaakov of Spring Valley v. ACT, Inc.</u>, 798 F.3d 46, 48 (1st Cir. 2015)
(rejecting defendant's "nifty stratagem for defeating motions for class certification: offer only the
named plaintiff full payment for its individual claims, and then move to dismiss the suit as moot
before the court has a chance to consider whether the plaintiff should be allowed to represent the
putative class").

barred from seeking "final injunctive relief or corresponding declaratory relief" and thus cannot maintain this class action against the Secretary. Fed. R. Civ. P. 23(b)(2).

This is not so. As to plaintiffs' APA claim, "[s]ection 702 of the APA waives sovereign immunity when a plaintiff," as here, "seeks non-monetary relief from a decision of a federal agency." Tortorella v. United States, 486 F. Supp. 2d 159, 163 (D. Mass. 2007). The HEA's "anti-injunction provision" does not, as defendants argue, categorically disturb the APA's general waiver of sovereign immunity. As the First Circuit has held, "no-injunction language" like the HEA's "anti-injunction provision" merely

> protects [Education] from interference with its internal workings by judicial orders attaching agency funds, etc., but does not provide blanket immunity from every type of injunction. In particular, it should not be interpreted as a bar to judicial review of agency actions that exceed agency authority where the remedies would not interfere with internal agency operations.

Ulstein Mar., Ltd. v. United States, 833 F.2d 1052, 1057 (1st Cir. 1987). Moreover, federal district and circuit courts across the country have "concluded the APA grants federal courts subject matter jurisdiction over cases seeking declaratory and injunctive relief for injuries caused by the Secretary's decisions made under the HEA." Adams v. Duncan, 179 F. Supp. 3d 632, 640 (S.D.W. Va. 2016) (collecting numerous cases).[17] Indeed, the HEA posed no impediment at all to recent class actions that challenged the Secretary's actions with respect to borrower defense

---

[17] In their merits briefing, defendants point to one out-of-circuit case that recently determined that the HEA's "limited waiver of sovereign immunity does not allow declaratory relief that functions as injunctive relief by another name." Carr v. DeVos, 369 F. Supp. 3d 554, 560 (S.D.N.Y. 2019). The Court is unpersuaded, at the very least, that the Carr Court's reasoning prevents review of plaintiffs' APA claim. The Carr Court specifically "stresse[d] that [the HEA's anti-injunction provision] will not, on its own, bar Plaintiffs (or other student borrowers) from raising a similar challenge to a final [Education] decision under the APA." Carr, 369 F. Supp. 3d at 562; see also Student Loan Mktg. Ass'n v. Riley, 907 F. Supp. 464, 474 (D.D.C. 1995), aff'd and remanded, 104 F.3d 397 (D.C. Cir. 1997), on reh'g (Mar. 11, 1997) (noting that many courts "have held that the anti-injunction clause of § 1082(a)(2) does not preclude relief for APA claims.").

claims and sought injunctive and declaratory relief.  See, e.g., Sweet v. DeVos, No. C 19-03674

WHA, 2019 WL 5595171, at *3 (N.D. Cal. Oct. 30, 2019) (certifying a class under Rule 23(b)(2)

that sought "injunctive relief compelling the Department to begin deciding borrower defense

claims again"); Calvillo Manriquez v. DeVos, No. 17-CV-07210-SK, 2018 WL 5316175, at *1

(N.D. Cal. Oct. 15, 2018) (certifying a class under Rule 23(b)(2) that "sought, among other

forms of relief, full relief for all students who had attended the Corinthian schools during the

designated time period").

Plaintiffs' claim under the DJA, which seeks a declaration that plaintiffs "have

successfully established a defense to the repayment of all federal student loans associated with

Everest Massachusetts," Doc. No. 28 ¶ 172, is similarly unaffected by the HEA's "anti-

injunction provision."  Multiple circuit courts have held that the HEA does not prevent the

issuance of declarations concerning the Secretary's prospective compliance with and application

of statutes and regulations.  See, e.g., Thomas v. Bennett, 856 F.2d 1165, 1168 (8th Cir. 1988)

(holding that the HEA did not thwart the court's consideration of plaintiff's prayer for a

declaration that a proposed tax refund offset would be improper because the applicable statute of

limitations had run); Bartels v. Riley, No. 98-8885 (11th Cir. June 29, 1999) (holding that the

HEA did not thwart a class from seeking a declaration that certain of the Secretary's wage

garnishment procedures violated due process).  Accordingly, the HEA cannot prevent class-wide

review of plaintiffs' claim for declaratory relief.[18]

---

[18] Defendants urge the Court to adopt the rule of American Ass'n of Cosmetology Sch. v. Riley,
170 F.3d 1250 (9th Cir. 1999), which held that the HEA's anti-injunction provision bars
declaratory relief that "would have the same coercive effect as an injunction."  Id. at 1255.  The
Court is unpersuaded.  Such a categorical rule would bar "judicial review of agency actions that
exceed agency authority" and would thus directly conflict with First Circuit precedent regarding
the scope of anti-injunction provisions.  Ulstein, 833 F.2d at 1057.

b.   The Proposed Class is Amenable to a Uniform Remedy

Rule 23(b)(2) allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  As the Supreme Court has held, "[t]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Wal-Mart, 564 U.S. at 360 (internal quotations and citations omitted).  In their opposition, defendants contend that "[t]here is no uniform remedy that would address the needs of all 7,241 members of the proposed class."  Doc. No. 39 at 17.

Not so.  In fact, this is a "quintessential Rule 23(b)(2) case," Nat'l Ass'n of Deaf v. Massachusetts Inst. of Tech., No. 3:15-CV-30024-KAR, 2020 WL 1495903, at *2 (D. Mass. Mar. 27, 2020); here, "a party charges that another has engaged in unlawful behavior toward a defined group," Reid, 297 F.R.D. at 193—that is, all borrowers who took out loans on behalf of individuals listed in Exhibit 4.  Moreover, the remedies sought by plaintiffs—including a declaration that the all such borrowers have established a defense to repayment of their federal student loans, as well as an order compelling Education to issue a reasoned decision as to the DTR Application, Doc. No. 28 at 30—would benefit all proposed class members by ameliorating a common harm inflicted by the agency's action with respect to the DTR Application.  See McDonald v. Heckler, 612 F. Supp. 293, 300 (D. Mass. 1985) (concluding that a "class action is properly brought pursuant to Rule 23(b)(2)" where plaintiffs seek "declaratory and injunctive relief with respect to the entire class concerning the policies of the Secretary which have been applied to each class member").  Thus, plaintiffs have satisfied the strictures of Rule 23(b)(2).

C.  Conclusion

For the foregoing reasons, plaintiffs' motion for class certification is ALLOWED.  The

following class is CERTIFIED:

> All individuals who borrowed a federal student loan to pay the cost of attendance
> for the 7,241 students identified in Exhibit 4 to the DTR Application who have
> not yet had their federal student loans completely discharged due to a successful
> borrower defense claim, have not yet received a refund of sums already collected,
> and have not yet received a favorable decision as to a borrower defense
> application.[19]

Named Plaintiffs Kennya Cabrera, Indrani Manoo, Noemy Santiago, Diana Vara, and

Amanda Wilson are hereby APPOINTED as class representatives.  Plaintiffs' counsel

from the Harvard Legal Services Center's Project on Predatory Student Lending are

hereby APPOINTED as class counsel.

III.  MOTION FOR JUDGMENT

Now before the Court is plaintiffs' motion for judgment.  Doc. No. 38.  First, plaintiffs

argue that the DTR Application "is a valid borrower defense application" on behalf of all

borrowers who took out loans for students on Exhibit 4.  Id. at 2.  Second, plaintiffs submit that

Education "must render a reasoned decision" with respect to the borrower defenses invoked by

the DTR Application.  Id.  Finally, plaintiffs argue that any decision failing to grant full relief to

---

[19] The Court certifies this slightly redefined class, cf. Doc. No. 11 at 1, in order to overtly
recognize an additional grievance that plaintiffs raise throughout their Second Amended
Complaint and motion for class certification: that they have been harmed, in multiple ways, by
defendants' failure to render a decision as to their borrower defenses.  See Doc. No. 28 ¶ 7
("Named Plaintiffs, on behalf of themselves and all of their classmates, ask the Court to rule that
the Secretary is violating the Administrative Procedure Act by failing to render a reasoned
decision on the Borrower Defense that the Attorney General submitted on behalf of 7,241
students in 2015."); see also Manning v. Bos. Med. Ctr. Corp., 725 F.3d 34, 60 (1st Cir. 2013)
(holding that "the district court has many tools at its disposal to address concerns regarding the
appropriate contours of the putative class, including redefining the class during the certification
process").

the class—that is, complete loan cancellations, the return of any money paid on relevant loans, and a favorable borrower defense determination for all borrowers in the class—would be arbitrary, capricious, and contrary to law.  Id.  Defendants have opposed the motion on multiple grounds.  First, defendants argue that "judicial review under the [APA] is unavailable because the Secretary's decision to not initiate a process to determine whether a particular group of borrowers has a borrower defense is committed to her discretion as a matter of law."  Doc. No. 49 at 2.  Second, defendants argue that "the APA did not require a formal, reasoned decision here."  Id.  Third, defendants contend that the Court is not authorized to grant plaintiffs the relief that that they seek.  Id.  The motion for judgment is now ripe for resolution.

A.    Legal Standard

In the administrative law context, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious."  Boston Redevelopment Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016).  An agency has acted arbitrarily and capriciously if it has "relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise."  Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997).  An agency action may only be upheld "on the basis articulated by the agency itself."  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983) (internal citations omitted).  Courts considering a claim under the APA's arbitrary and capricious standard must "carefully review[]" the record to "satisfy[] themselves that the agency has made a reasoned decision[.]"  Marsh v. Oregon Nat.

Res. Council, 490 U.S. 360, 378 (1989).  "While this is a highly deferential standard of review, it is not a rubber stamp."  Penobscot Air Servs., Ltd. v. F.A.A., 164 F.3d 713, 720 (1st Cir. 1999) (quoting Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n, 59 F.3d 284, 290 (1st Cir.1995)).  Although "the ultimate standard of review is a narrow one," the court must undertake "a thorough, probing, in-depth review," necessitating a "searching and careful" inquiry into the record.  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415–16 (1971).

B.     The Court May Review the Challenged Action

As a threshold matter, defendants argue that this Court may not review plaintiffs' "claim that Defendants erred by not initiating a process to determine whether the seven thousand borrowers listed in the DTR [Application] had a borrower defense claim."  Doc. No. 49 at 11.  This is so, defendants argue, because "[s]uch action is committed to Defendants' discretion as a matter of law, and there is no law for the Court to apply in evaluating Defendants' action."  Id.  Plaintiffs, for their part, contend that "[t]his Court is empowered to review the Department's denial of the DTR [Application]."  Commonwealth, Civil Case No. 19-12177-LTS, Doc. No. 27 at 38; Doc. No. 50 at 2 (incorporating this argument by reference).

The Court first notes that there is a "strong presumption" favoring judicial review of administrative action.  Mach Mining, LLC v. EEOC, 575 U.S. 480, 486 (2015); accord Block v. Cmty. Nutrition Inst., 467 U.S. 340, 349 (1984).  The APA "generally provides a vehicle for reviewing agency decisions that are alleged to violate federal law."  Union of Concerned Scientists v. Wheeler, 954 F.3d 11, 17 (1st Cir. 2020).  Supreme Court cases have repeatedly "established that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress."  Bowen

v. Mich. Acad. of Family Physicians, 476 U.S. 667, 670 (1986) (internal alteration and quotation marks omitted).

"Notwithstanding that strong presumption, agency actions can evade judicial review under the APA if they are 'committed to agency discretion by law.'" Union of Concerned Scientists, 954 F.3d at 17 (quoting 5 U.S.C. § 701(a)(2)).[20]  This exception applies only in the "rare circumstances" where the relevant law "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Lincoln v. Grover Vigil, 508 U.S. 182, 191 (1993) (quoting Heckler v. Chaney, 470 U.S. 821, 830 (1985)).  Recently, the Supreme Court emphasized that the § 701(a)(2) exception to the presumption of reviewability is "quite narrow[]." Dep't of Commerce v. New York, 139 S. Ct. 2551, 2568 (2019).[21]

Ultimately, the Court's inquiry into whether this "narrow" exception applies turns on whether there is "law to apply," Citizens to Preserve Overton Park, 401 U.S. at 410, that provides "judicially manageable standards" for judging the agency's exercise of discretion, Chaney, 470 U.S. at 830.  The First Circuit "ha[s] not clearly defined the outer limits of the types of 'law' that may furnish meaningful standards for deciding claims under § 706(2)(A)." Union of Concerned Scientists, 954 F.3d at 21; see also Cowels v. Fed. Bureau of Investigation, 936 F.3d 62, 67 (1st Cir. 2019), cert. denied, 140 S. Ct. 1118 (2020) (declining to decide whether an FBI manual was sufficient to provide law to apply).  However, the First Circuit has echoed other

---

[20] Defendants do not rely on the APA's other exception to judicial review, 5 U.S.C. § 701(a)(1), which provides that review of an agency action is unavailable where "statutes preclude judicial review."

[21] The Supreme Court also stressed that it has "generally limited [this] exception to certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion, such as a decision not to institute enforcement proceedings or a decision by an intelligence agency to terminate an employee in the interest of national security." Id. (internal citations and quotation marks omitted).

courts in holding that "[a]gencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departures." Distrigas of Massachusetts Corp. v. F.E.R.C., 737 F.2d 1208, 1219 (1st Cir. 1984). Indeed, the First Circuit recently reiterated the longstanding principle that "an agency is expected to apply the same basic rules to all similarly situated supplicants,'" Thompson v. Barr, No. 18-1823, 2020 WL 2570167, at *6 (1st Cir. May 21, 2020) (quotation marks omitted), echoing its earlier observation that "[a]n agency cannot merely flit serendipitously from case to case, like a bee buzzing from flower to flower, making up the rules as it goes along," Henry v. I.N.S., 74 F.3d 1, 6 (1st Cir. 1996).

These legal principles necessarily inform the proper scope of judicial review. As a unanimous Supreme Court held:

> Though [an] agency's discretion [may be] unfettered at the outset, if it announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy . . . could constitute action that must be overturned as arbitrary, capricious, or an abuse of discretion.

I.N.S. v. Yueh–Shaio Yang, 519 U.S. 26, 32 (1996) (internal alteration omitted); see also Morton v. Ruiz, 415 U.S. 199, 235 (1974) (holding that "where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures . . . even where the internal procedures are possibly more rigorous than otherwise would be required."); Serv. v. Dulles, 354 U.S. 363, 388 (1957) (explaining that an agency is bound to adhere to the more "rigorous substantive and procedural standards" enumerated in its own regulations). Given these teachings, federal circuit courts throughout the country look not only "to the statutory text" when determining whether there is "law to apply," but also consider "the agency's regulations, and informal agency guidance that govern the agency's challenged action," Salazar v. King, 822 F.3d 61, 76 (2d Cir. 2016), as well as agency's practice when applying the relevant regulatory scheme, see ASSE

48

Int'l, Inc. v. Kerry, 803 F.3d 1059, 1069 (9th Cir. 2015) ("Even where statutory language grants an agency unfettered discretion, its decision may nonetheless be reviewed if regulations or agency practice provide a meaningful standard by which this court may review its exercise of discretion."); Doe v. United States, 100 F.3d 1576, 1583 (Fed. Cir. 1996) (holding that Treasury regulations and an agency handbook offered "guidance or constraint" sufficient to guide judicial review of federal agency's discretionary determination); Padula v. Webster, 822 F.2d 97, 100 (D.C. Cir. 1987) ("Judicially manageable standards may be found in formal and informal policy statements and regulations as well as in statutes . . .").

In this case, upon review of the HEA, the 1995 borrower defense regulations, Education's published interpretations of that regulation in the Federal Register, and Education's practice of adjudicating borrower defenses, the Court concludes that there is sufficient law to apply to permit judicial review of plaintiffs' claims.  As noted above, see supra section I.A.1, the HEA itself ensures that a defense to repayment is available to federal student loan borrowers.  As defendants concede, in enacting the HEA, "Congress required the Secretary to promulgate borrower defense regulations."  Commonwealth, Civil Case No. 19-12177-LTS, Doc. No. 18 at 15.  Pursuant to the HEA's command, 20 U.S.C. § 1087e(h), Education promulgated a regulation that established borrowers' right to "assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c)(1) (eff. until Oct. 16, 2018).  This regulatory scheme established Education's duty to adjudicate borrower defense claims, including those affirmatively asserted before a borrower was in default.

Moreover, throughout the existence of that regulation, the agency used mandatory language to indicate the circumstances under which it "will acknowledge" a "right to relief."

49

First Special Master Report at 3-4 (quoting 60 Fed. Reg. 37768, 37769 (July 21, 1995)); see also

Hewitt v. Helms, 459 U.S. 460, 471 (1983) (describing the use of words like "will" and "must"

in administrative guidelines as "language of an unmistakably mandatory character"); Salazar,

822 F.3d at 77 (holding that "mandatory, non-discretionary language creates boundaries and

requirements for agency action").  The agency consistently interpreted its regulation to

encompass borrower defense claims asserted at any time during the loan collection process, an

interpretation that was codified in the master promissory note governing all federal student loans.

See supra section I.A.1.  Additionally, Education's practice—memorialized in multiple

memoranda authored by the agency's Office of the General Counsel—demonstrates that the

agency was bound to adjudicate affirmative borrower defense applications by analyzing relevant

state law to determine whether applicants had established a right to relief, as well as to determine

the appropriate remedy.  See, e.g., Calvillo Manriquez v. Devos, Civil Case No. 3:17-cv-07210-

SK, Doc. No. 35-8 at 89 (concluding that Education "must evaluate these 58 students' claims

under North Dakota law") (emphasis added); id. at 92 ("To quantify [these borrowers'] damages,

we have to determine the amount of damages they could recover from [the fraudulent for-profit

college] under state law.") (emphasis added); Doc. No. 33-11 at 6-10 (applying Massachusetts

state law to determine whether borrowers had established a right to relief and to determine the

appropriate remedy).

 Notwithstanding these numerous sources of law, defendants now argue that the borrower

defense regulation "does not contain any criteria or guidelines to apply in making the

determination that a borrower successfully asserted a defense to repayment." Commonwealth,

Civil Case No. 19-12177-LTS, Doc. No. 18 at 15; Doc. No. 49 at 11 (incorporating this

argument by reference).  Remarkably, this position is directly rebutted by defendants' own

admissions in this litigation.  In their Answer to plaintiffs' Second Amended Complaint, Doc.
No. 37 ¶ 33 defendants "admitted" that "[s]tate law provides the standard for borrower defense
for all federal student loans at issue in this lawsuit," Doc. No. 28 ¶ 33 (citing "34 C.F.R. §
685.206(c) (eff. until Oct. 16, 2018)") (emphasis added)).  Defendants reiterated this position in
their brief in the Commonwealth's related case.  Commonwealth, Civil Case No. 19-12177-LTS,
Doc. No. 32 at 4 (stating that "state law provides the basis upon which Defendants evaluate a
borrower defense claim").

These admissions establish the law to apply to the decision under review.  Nothing more
is required, but there is more.  Back in 2015, Education's own Special Master stated in his First
Report: "Under [the borrower defense] regulations, the Department looks to the law of the state
where the action took place to determine whether to accept the borrower defense," and further
explained that a "cause of action under state law against the school [] establishes an equivalent
right to relief from the obligation to repay a Direct Loan."  First Special Master Report at 3-4.
Thus, defendants have consistently recognized that a specific legal standard—that is, one
supplied by state law—governs the agency's consideration of borrower defense applications.

In these circumstances, where the Court may look to the statutory and regulatory text, the
agency's published interpretations, contractual language drafted by and binding the agency, as
well as its "settled course of adjudication," Yueh–Shaio Yang, 519 U.S. at 32, the Court
concludes that there is "law to apply," Citizens to Preserve Overton Park, 401 U.S. at 410, that
provides "judicially manageable standards" for judging the agency's actions with respect to the
DTR Application, Chaney, 470 U.S. at 830.  Accordingly, the Court now turns to plaintiffs'
claims under the APA and the DJA.

C.        Defendants Must Render Reasoned Decisions on Borrower Defense Applications

The Court must now consider plaintiffs' argument that defendants are generally obligated to render reasoned decisions in response to applications for borrower defense relief, irrespective of whether those applications are ultimately successful.  Doc. No. 38 at 15-17.  Defendants contend that an application for borrower defense relief creates no such obligation, arguing instead that "text of the [borrower defense] regulation itself does not require the Secretary to issue a statement of reasons" if an application is denied or is otherwise unsuccessful.  Doc. No. 32 at 12.

Courts have repeatedly held that "[a] fundamental requirement of administrative law is that an agency set forth its reasons for decision[s]," maintaining that "an agency's failure to do so constitutes arbitrary and capricious agency action."  Tourus Records, Inc. v. Drug Enf't Admin., 259 F.3d 731, 737 (D.C. Cir. 2001) (internal quotation marks omitted).  This fundamental requirement is codified in section 6(d) of the APA, 5 U.S.C. § 555, which requires that "[p]rompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding . . . accompanied by a brief statement of the grounds for denial."  5 U.S.C. § 555(e).  "This requirement not only ensures the agency's careful consideration of such requests, but also gives parties the opportunity to apprise the agency of any errors it may have made and, if the agency persists in its decision, facilitates judicial review."  Tourus Records, Inc., 259 F.3d at 737.  As Judge Henry Friendly observed in a seminal work on the subject, "the core requirement is that the agency explain 'why it chose to do what it did.'"  Id. (quoting Henry J. Friendly, Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders, 1969 Duke L.J. 199, 222).  Ultimately, "conclusory statements will not do; an 'agency's statement must be one of

reasoning.'" Amerijet Int'l, Inc. v. Pistole, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quoting Butte

Cnty., Cal. v. Hogen, 613 F.3d 190, 194 (D.C. Cir. 2010)) (emphasis in original).

By its plain terms, section 6(d) applies to "any agency proceeding."  5 U.S.C. § 555(e).

The APA provides that "agency proceedings" include rule makings, adjudications, and licensing

proceedings.  5 U.S.C. §§ 551(5), (7), (9), (12).  As the Court has already observed, see supra

section I.A.1, the governing regulatory scheme creates a duty to adjudicate borrower defense

applications, and both the agency and reviewing courts treat Education's consideration of

borrower defense applications—including those submitted on behalf of borrowers who have not

yet defaulted on their loans—as "adjudications."  Indeed, throughout the briefs submitted in the

instant case, defendants repeatedly refer to the agency's consideration of borrower defense

claims as "adjudications."  See Commonwealth, Civil Case No. 19-12177, Doc. No. 18 at 12

(stating that it placed certain borrowers' applications submitted by the AGO "in the queue for

adjudication") (emphasis added); Doc. No. 32 at 15 (same).  Thus, there can be no doubt that

Education, upon receipt of borrower defense applications, undertakes the obligation to "articulate

[] satisfactory explanation[s]" for the agency's actions.  State Farm, 463 U.S. at 43.  Such

explanations must be fashioned in order to "facilitate judicial review" under the APA's familiar

arbitrary and capricious standard.  Tourus Records, Inc., 259 F.3d at 737.

D.    The AGO Validly Sought Individual Relief for All Exhibit 4 Borrowers

In light of the APA's demands detailed above, plaintiffs argue that the DTR Application

validly sought relief on behalf of all Exhibit 4 borrowers, and, as such, obligated the agency to

render a reasoned, non-arbitrary decision as to whether each borrower was entitled to borrower

defense relief.  Defendants, however, contend that the DTR Application did not trigger any of the

APA's constraints on agency adjudications.  See Doc. No. 49 at 12 (arguing that "the AGO did

not have the authority to create such obligation[s] for the Defendants simply by asking for something.").  In defendants' view, the DTR Application only requested that the agency initiate a "group discharge process," a request that could not have precipitated the agency's ordinary duties because "such [a] process did not exist for group submissions" under the governing regulation.  Id. at 13.

The parties do not dispute that the AGO presented its DTR Application, at least in part, as "an application for group loan discharge."  Doc. No. 33-4 at 1.  The Court rejects defendants' claim that a group discharge process did not exist and thus could not be requested by the AGO. In fact, this claim is contradicted by overwhelming record evidence, which demonstrates that the agency repeatedly exercised its discretion to initiate group discharge processes upon receipt of group applications.  See, e.g., Doc. No. 33-11 (granting a request for group discharge submitted by the AGO); Calvillo Manriquez v. Devos, Civil Case No. 3:17-cv-07210-SK, Doc. No. 35-8 at 89 (considering and granting a borrower defense application submitted on behalf of 58 borrowers).  However, defendants are correct insofar as they argue that nothing in the 1995 borrower defense regulation nor the agency's adjudicatory practice required the agency to adjudicate en masse or in group form an application submitted on behalf of multiple borrowers. Put another way, while the agency's practice clearly indicates that it engaged in group discharge adjudications, nothing in the text of the HEA, the 1995 borrower defense regulation, nor in the agency's interpretations or memoranda indicate that the agency considered itself bound to adjudicate as a group an application requesting borrower defense relief on behalf of multiple similarly situated persons.  Rather, the agency was free to either adjudicate such a group application in one fell swoop or adjudicate constituent individual applications one at a time.  As noted above, though, the agency was not free to simply ignore such an application.

In any event, the DTR Application sought more than the initiation of a group discharge process, a point this Court resolved in <u>Williams</u>.  <u>See</u> 2018 WL 5281741, at *14.  There, the Court held that "the language of the DTR submission itself requested the application of the borrower defense on behalf of <u>all</u> persons listed on Exhibit 4."  <u>Id.</u> at *12 (emphasis added).  Indeed, the AGO requested "that the Department provide a swift, wholesale, and automatic discharge (including providing refunds on loan payments previously made and removal of any negative credit report entries) for <u>each</u> of Corinthian's Everest MA students, including the [approximately] 7,200 students shown on Exhibit 4."  Doc. No. 33-5 at 6 (emphasis added).  The AGO specifically requested that Education view the DTR Application as initiating a process that would "assist borrowers in asserting their <u>individual</u> defense to repayment."  Doc. No. 33-5 at 6 n.5 (emphasis added).  Moreover, the AGO provided each "student's name, dates of enrollment, contact information, and programs attended" to facilitate the provision of such individual relief. <u>Williams</u>, 2018 WL 5281741, at *4.

Defendants, as they did throughout the <u>Williams</u> litigation, maintain that the DTR Application did not validly seek individual relief on behalf of all Exhibit 4 borrowers.[22]  Once again, defendants' arguments fail.

---

[22] Much ink has been spilled discussing the import of the Court's decision in <u>Williams</u>.  To the extent that defendants contend that the Court in <u>Williams</u> (1) only ordered relief as to the two plaintiffs in the lawsuit, <u>id.</u> at *15; and (2) only resolved whether the Secretary's decision to certify the two plaintiffs' debts to TOP without first considering the DTR Application was arbitrary and capricious, <u>id.</u>, those observations are plainly correct.  Necessarily, then, plaintiffs' contention that defendants have "refused to comply with the [Court's] judgment," Doc. No. 38 at 3, is inaccurate.  However, to the extent defendants wish to characterize the Court's reasoning in <u>Williams</u> as to whether the DTR Application "invoked a borrower defense proceeding on behalf of the people listed on Exhibit 4," <u>id.</u>, as "dicta," Doc. No. 49 at 13, such nomenclature in no way disproves the Court's logic.  <u>Cf.</u> <u>Traglio v. Harris</u>, 104 F.2d 439, 441 (9th Cir. 1939) ("The force of these statements, when so deliberately made on the precise point, may not be destroyed by calling it 'dicta.'").

First, defendants' contention that only individual borrowers themselves may present borrower defense claims to Education, Williams, Civil Case No. 16-11949, Doc. 81 at 14, is plainly incorrect.  Lawyers routinely represent clients before administrative agencies and present claims on their clients' behalf.  See George M. Cohen, The Laws of Agency Lawyering, 84 Fordham L. Rev. 1963, 1963 (2016) ("A significant part of lawyering in the regulatory state involves lawyers appearing and practicing before federal administrative agencies on behalf of clients."); see also Calvillo Manriquez v. Devos, Civil Case No. 3:17-cv-07210-SK, Doc. No. 35-8 at 98 (reproducing a letter from a private lawyer indicating his representation of a number of students who attended a for-profit college and seeking borrower defense relief on their behalf).  As the Court noted in Williams, "[t]he Attorney General is a lawyer, licensed to 'seek the lawful objectives of [those whom she represents] through reasonably available means permitted by law,' including through recourse to administrative proceedings."  Williams, 2018 WL 5281741, at *11 (quoting Mass. R. Prof'l Conduct 1.2).  Defendants offer no source of law that vitiates the AGO's competence to appear as a lawyer in proceedings before Education, including adjudications of borrower defense claims.  They offer no law, regulation, or practice either precluding lawyers from representing borrowers in asserting a borrower defense or requiring the borrowers to proceed pro se before the agency.  In fact, the notice that Education sends to borrowers whose debts the agency intends to refer to TOP, unsurprisingly, states otherwise.  See id. at *2 (observing that Education's notices informed the Williams plaintiffs that they may "have a lawyer represent them in exercising their rights" during debt collection proceedings).

Next, defendants protest that, even if the AGO may generally represent Massachusetts citizens in federal administrative proceedings—a point that defendants tacitly conceded when

they adjudicated applications submitted by the AGO on behalf of borrowers included in Exhibit 3 of the DTR Application, id. at *11 n.19—the Attorney General's representation of Exhibit 4 borrowers is defective because her submission lacked signed attestation forms indicating that all of the persons listed on Exhibit 4 consented to her representation or authorized the request for relief.  Williams, Civil Case No. 16-11949, Doc. 81 at 15.  This argument fundamentally misunderstands that the scope of the AGO's authority and its capacious role in protecting the public interest.  Numerous sources of statutory and common law support the AGO's "routine[] and presumptive[] represent[ation]" of Massachusetts citizens in legal proceedings without their specific written consent.  Williams, 2018 WL 5281741, at *11 (collecting authorities and noting that "Attorney General Healey stands in very different shoes than a private lawyer seeking relief on behalf of a class of individuals").  Given the AGO's additional statutory charge to enforce Massachusetts' consumer protection laws, Mass. Gen. Laws ch. 93A, §§ 2, 4, the AGO was authorized to assert borrower defense claims on behalf of Massachusetts citizens and is not at all akin to a private lawyer who seeks to represent a class or group of borrowers.  Indeed, in the DTR Application, the AGO sought specific relief for individual borrowers, just as the AGO did in its lawsuit against Corinthian in Massachusetts Superior Court.  See Doc. No. 33-1 at 47 (seeking, amongst other relief, "full and complete restitution to current and former students at Everest MA schools").

Finally, defendants continue to argue that the DTR Application did not validly seek individual relief on behalf of all Exhibit 4 borrowers because the Application lacked certain personally identifying information, like social security numbers and birth dates, for each student listed on Exhibit 4.  Williams, Civil Case No. 16-11949-LTS, Doc. No. 81 at 16-17.  However, contrary to Education's representations, nothing in the HEA, the 1995 borrower defense

regulation, or the agency's adjudicatory practice suggests that the inclusion of such information

was required for a borrower defense application to validly seek relief.  Indeed, even the 2015

Federal Student Aid website cited by defendants did not, as they claim, state that "student[s]

must include, 'at a minimum,'" such information; rather, it merely stated that "submission

materials . . . should include" certain listed information, id. at 17 (emphasis added), much of

which was, in fact, appended to the DTR Application in Exhibit 4, Williams, 2018 WL 5281741,

at *4 (noting that Exhibit 4 included each "student's name, dates of enrollment, contact

information, and programs attended," in addition to the AGO's 60-page memorandum

chronicling Corinthian's fraudulent practices).  Cf. Lambert v. Austin Ind., 544 F.3d 1192, 1196

(11th Cir. 2008) (noting that the word "should" indicates "permissive, rather than mandatory

language") (citing Black's Law Dictionary 1379 (6th ed. 1990) (noting that "should" means

"usually no more than an obligation of propriety or expediency . . . it does not ordinarily express

certainty as 'will' sometimes does."); Atla–Medine v. Crompton Corp., No. 00 CIV 5901(HB),

2001 WL 1382592, at *5 (S.D.N.Y. Nov. 7, 2001) (finding that a statement that parties "should

negotiate the terms and conditions" was not a promise because "'should' is permissive, not

mandatory.")).  Moreover, as the Court noted in Williams, "Education never identified the [DTR

Application's] lack of [social security numbers and birth dates] as a deficiency requiring cure."

2018 WL 5281741, at *14.  To the extent that social security numbers or birth dates are

necessary at any stage of borrower defense process—a proposition that is not supported by any

evidence presently before the Court—such information most certainly is not required for a

borrower defense application to validly seek relief on behalf of an individual borrower or for the agency to adjudicate that application in the ordinary course.[23]

Thus, as this Court determined in <u>Williams</u>, the DTR Application "invoked a borrower defense proceeding on behalf of the people listed on Exhibit 4," <u>Williams</u>, 2018 WL 5281741, at *15, an invocation that triggered Education's duty to render reasoned, non-arbitrary decisions as to each borrower who took out loans on behalf of students listed in Exhibit 4.[24]  While Education was not required to adjudicate the DTR Application in a single group adjudication, it was required to adjudicate the individual claim advanced on behalf of each Exhibit 4 borrower.

E.     Defendants Constructively Denied the DTR Application

Next, plaintiffs aver that the Secretary constructively denied the DTR Application's request for individual borrower defense relief.  Doc. No. 38 at 11.  Specifically, plaintiffs note that, notwithstanding the events of the <u>Williams</u> litigation, defendants have continued "to collect on the loans of former students of Everest Massachusetts, including by seizing the tax refunds

---

[23] The Court does not understand defendants to contend that the DTR Application could not constitute an application on behalf of borrowers associated with Exhibit 4 students merely because none of those borrowers signed a piece of paper requesting the relief.  This is, of course, a different contention than the argument defendants did advance: that borrowers who took out loans on behalf of Exhibit 4 students are not entitled to relief because each borrower has not made a showing of individual reliance.  That contention has been addressed in the text.  <u>See</u> <u>supra</u> section II.B.  In any event, the contention that an application does not validly seek borrower defense relief without a signed statement from the borrower saying they want the relief is without merit.  Neither the HEA nor the 1995 borrower defense regulation impose such a requirement.  And, at least in the context of an application made by the Commonwealth's Attorney General with her plenary authority to advance claims on behalf of individuals, <u>see</u> <u>Williams</u>, 2018 WL 5281741, at *11, defendants have identified no reason or purpose supporting such a requirement.  If this was the basis for denial, that is arbitrary and capricious.

[24] Previously, defendants also argued that the DTR Application could not constitute a valid invocation of the borrower defense on behalf of all class members because the AGO's submission did not include individualized evidence of detrimental reliance as to each borrower.  <u>Williams</u>, Civil Case No. 16-11949, Doc. 81 at 18.  Now, defendants concede that the absence of such evidence "would not justify a failure to consider a discharge request."  <u>Commonwealth</u>, Civil Case No. 19-12177, Doc. No. 32 at 4 n.2 (quoting <u>Williams</u>, 2018 WL 5281741, at *12).

and garnishing the wages of individuals specifically named by the Attorney General as qualifying for loan cancellation." Doc. No. 28 ¶ 5.

In the administrative law context, it is black letter law that "inaction may represent effectively final agency action that the agency has not frankly acknowledged." Sierra Club v. Thomas, 828 F.2d 783, 793 (D.C. Cir. 1987). As the D.C. Circuit has held, "when administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief." Id. (quoting Environmental Defense Fund, Inc. v. Hardin, 428 F.2d 1093, 1099 (D.C. Cir. 1970)); see also Her Majesty the Queen in Right of Ontario v. U.S. E.P.A., 912 F.2d 1525, 1531 (D.C. Cir. 1990) (holding that "the absence of a formal statement of the agency's position . . . is not dispositive" as to whether a final agency action is subject to review); All. To Save Mattaponi v. U.S. Army Corps of Engineers, 515 F. Supp. 2d 1, 10 (D.D.C. 2007) (reviewing under section 706(2) an agency's failure to exercise its discretion to veto a permit where "the agency 'did' nothing").

Here, the agency's inaction amounts to a constructive denial of the DTR Application's request for relief on behalf of all Exhibit 4 borrowers. After the Court's October 24, 2018 Order in Williams, Education notified the Williams plaintiffs that the DTR Application would "be considered to initiate a borrower defense application submitted on [their] behalf" and informed the plaintiffs that Education would not "be able to process [their] borrower defense application" until Education received "additional documentation," including a separate application form for borrower defense relief issued by Education. Williams, Civil Case No. 16-11949-LTS, Doc. No. 101-1. After Named Plaintiff Santiago entered this case, Education similarly notified her that the DTR Application "will be considered to initiate a borrower defense application submitted on

[her] behalf" and that she will not receive borrower defense relief unless she submits an additional application form.  Doc. No. 38-1 at 1.  Education's apparent, but unstated, position in these communications—that the DTR Application, in and of itself, is insufficient to establish a right to borrower defense relief for all borrowers who took out loans for students listed in Exhibit 4—comports with the position taken by the agency's in-house counsel during the Williams litigation.  See Williams, Civil Case No. 16-11949-LTS, Doc. No. 108 at 2 (noting that, on February 5, 2018, Education's counsel informed the Court that, while the agency was contemplating providing relief to the Williams plaintiffs on a discretionary basis, it would deny the relief sought by the DTR Application unless it was supplemented with individual application forms).  Now, more than a year since the agency made that representation in open court, "the collection procedures on unpaid federal student loans continue for former Massachusetts Everest students who have not personally applied for Borrower Defenses or other types of student loan discharges."  Doc. No. 33 ¶ 18.  Moreover, in a post-argument letter, defendants contend that "[m]ere presence on the Exhibit 4 list does not preclude certification or collection activity because . . . the list lacks birthdates and social security numbers."  Doc. No. 56 at 2.  While the agency has not "frankly acknowledged" its denial of the DTR Application for individual borrower defense relief, in these circumstances, defendants' continued refusal to grant the plaintiffs individual relief based on the DTR Application "has precisely the same impact on the rights of the parties as denial of relief."  Sierra Club, 828 F.2d at 793.

Plaintiffs argue that this constructive denial was arbitrary, capricious, and contrary to law, in violation of the APA.  Doc. No. 38 at 10.  This is so, plaintiffs say, because defendants have not—as they are obligated to do—rendered a reasoned decision on the merits of the DTR Application's request for relief for all Exhibit 4 borrowers.  Id. at 15-17.  Defendants, for their

part, argue that the APA's strictures do not apply because the DTR Application was not a part of an "agency proceeding."  Doc. No. 49 at 11.

Not so.  As the Court explained above, the agency's consideration of the DTR Application, like its consideration of other affirmative borrower defense claims, was an "adjudication" within the meaning of the APA.  See supra section III.C.  Nonetheless, Education attempts to evade the APA's procedural requirements by recasting a familiar form of agency action as an alien proceeding, suggesting that the DTR Application—which, on its face, is a written application that invokes an adjudicatory process on behalf of certain borrowers—may disappear undetected.  Cf. Doc. No. 49 at 12 (arguing that the DTR Application "does not squarely fit in the APA definition of 'adjudication'").  This runs counter to the letter and spirit of the APA.  State Farm, 463 U.S. at 48 (holding that the Supreme Court has "frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner").  Accordingly, the Court concludes that defendants' failure to render a reasoned decision justifying its denial of the DTR Application is arbitrary, capricious, and contrary to law.

> F.     All Class Members Have Established a Right to Full Relief

In light of the above conclusion—that the agency's constructive denial of the DTR Application's request on behalf of all Exhibit 4 borrowers violated the APA, at least due to the agency's failure to render a reasoned decision—the Court is now tasked with determining the appropriate remedy.  On this front, defendants contend that, even if their actions violated the APA, the only acceptable path forward is an order remanding this matter back to the agency for reconsideration.  Doc. No. 49 at 13-14.

There can be no dispute that "the proper way to handle an agency error in the ordinary circumstance is to remand to the agency for additional investigation or explanation."  Boliero v.

<u>Holder</u>, 731 F.3d 32, 38 (1st Cir. 2013) (describing the "ordinary remand rule").  The Supreme

Court has long held that, in the ordinary course, "if the record before the agency does not support

the [challenged] agency action, [or] if the agency has not considered all relevant factors . . . the

proper course, except in rare circumstances, is to remand to the agency for additional

investigation or explanation."  <u>Fla. Power & Light Co. v. Lorion</u>, 470 U.S. 729, 744 (1985).

However, it is also well established that courts are "not strictly bound to [the] ordinary remand

rule when it is clear that remand would be futile."  <u>Singh v. Holder</u>, 558 F. App'x 76, 81 (2d Cir.

2014); <u>accord</u> <u>Watson v. Geren</u>, 569 F.3d 115, 134–35 (2d Cir. 2009) (holding that where "the

record contains no basis in fact for denial of [an] application," remand to the agency is futile).

The Supreme Court has noted that its precedents do not "require that [courts] convert judicial

review of agency action into a ping-pong game" and has further held that there is no need to

remand a matter to an agency when such a procedure "would be an idle and useless formality."

<u>N. L. R. B. v. Wyman-Gordon Co.</u>, 394 U.S. 759, 766 n.6 (1969).  The D.C. Circuit has

reiterated this principle, repeatedly holding that a remand is unnecessary where "only one

conclusion would be supportable."  <u>Donovan ex rel. Anderson v. Stafford Const. Co.</u>, 732 F.2d

954, 961 (D.C. Cir. 1984); <u>George Hyman Const. Co. v. Brooks</u>, 963 F.2d 1532, 1539 (D.C. Cir.

1992) (holding "that a remand would be futile on certain matters as only one disposition is

possible as a matter of law").

 In this case, the precise legal questions at issue—whether plaintiffs have established their

right to borrower defense relief and whether plaintiffs are entitled as a matter of law to full loan

discharges—are directly and unequivocally answered by the record evidence.  As to the first

legal question, the parties do not—and cannot—dispute that "[s]tate law governs the right to

relief under the [1995] borrower defense rule."  <u>California v. U.S. Dep't of Educ.</u>, No. 17-CV-

07106-SK, 2018 WL 10345668, at *10 (N.D. Cal. June 27, 2018).  Indeed, the Secretary has

<u>admitted</u> as much in her Answer to which she is bound.  Doc. No. 37 ¶ 33.

Here, the overwhelming, uncontradicted evidence demonstrates that plaintiffs have

satisfied the 1995 borrower regulation's requirement to establish a cause of action under

Massachusetts state law.  In 2016, the AGO secured a judgment against Corinthian in

Massachusetts Superior Court.  Doc. No. 33 ¶ 3.  In that judgment, the Massachusetts Superior

Court wrote that it had allowed the AGO's "summary judgment motion as to [Corinthian's]

liability for [the AGO's] claims," Doc. No. 33-3 at 1, including the AGO's allegation that

Corinthian "violated M.G.L. c. 93A by misleading prospective students about the school's job

placement rates, transferability of credits, and other issues," Doc. No. 33-2.[25]  The Superior

Court then made findings as to damages, noting that "[r]estitution is authorized in cases where

defendants are found to have liability for unfair or deceptive acts or practices in violation of c.

93A, section 4."  Doc. No. 33-3 ¶ 5.  Additionally, the Superior Court wrote that its restitution

calculation was based on a "complete list of all students enrolled at Corinthian during the

relevant time period," which was July 1, 2007 through June 30, 2014.  <u>Id.</u> ¶¶ 9-10.  The Superior

Court also noted that its "restitution calculation makes no distinction between graduates as to

whom the record on summary judgment contains statements that such students relied on

defendants' misrepresentations and graduates as to whom the record contains no such

---

[25] The Massachusetts Superior Court's judgment made clear that it had scrutinized the AGO's submissions and findings of fact.  <u>Compare</u> <u>Calvillo Manriquez</u>, Doc. No. 35-8 at 91 (observing that Education could not rely solely on a default judgment because "there [was] no way to determine whether the court in fact scrutinized the complaint, or simply relied on [the college's] failure to answer"), <u>with</u> Doc. No. 33-3 (acknowledging in its Entry of Judgment that the Superior Court had "considered the Commonwealth's . . . statement of undisputed facts, together with the affidavits and exhibits submitted by the Commonwealth in support of [its summary judgment] motion," and had held a hearing to consider the Commonwealth's request for damages).

statements."[26] Id. ¶ 12.  Given this conclusive state court judgment, as well as the copious

factual findings included in the DTR Application, see Williams, 2018 WL 5281741, at *5, the

Court concludes that plaintiffs have established their right to borrower defense relief.

Accordingly, remand is inappropriate as to this legal question—that is, whether the borrowers

are entitled to relief.  Other courts have reached similar conclusions about the mandatory nature

of this entitlement.  See Calvillo Manriquez, 345 F. Supp. 3d at 1100; California, 2018 WL

10345668, at *10.

        This does not end the matter.  There remains a second legal question: whether plaintiffs

are entitled to full loan discharges under the 1995 borrower defense regulation as a matter of law.

Urging the Court to answer this question in the negative, defendants point to two recent decisions

issued by district courts in the Northern District of California.  There, the courts determined that,

while a successful borrower defense claim necessarily triggers a "mandatory right to some

relief," as well as a "mandatory right to be notified about the amount of the relief," the borrower

defense regulation "do[es] not provide a mandatory right to a full discharge."  Calvillo

Manriquez, 345 F. Supp. 3d at 1100; California, 2018 WL 10345668, at *10 (holding that "the

regulation at issue gives the Secretary discretion to determine the amount of relief, not tethered

to state law").

        Calvillo Manriquez and California rendered rulings based only on the governing statutes

and regulations.  See Calvillo Manriquez, 345 F. Supp. 3d at 1101 (determining that there is a

"mandatory right to some relief but not a full discharge[] under the [relevant] section of the

Higher Education Act and its [implementing] regulations"); California, 2018 WL 10345668, at

---

[26] As previously noted, Massachusetts law does not require a showing of individual reliance.  See
supra section II.B; Doc. No. 33-11 at 8.

*10 (looking only to the text of the 1995 borrower defense regulation in determining that states

did not have standing to pursue their claim based on Education's alleged failure to enforce state

unfair competition law).  This Court, on the other hand, has before it a more robust record

depicting a "settled course of adjudication" under the 1995 borrower defense regulatory scheme.

Yueh–Shaio Yang, 519 U.S. at 32.

Here, the agency's course of adjudication—that state law determines the measure of

relief for a successful borrower defense—is settled.  In the pre-2017 cases in which the agency

applied the 1995 borrower defense regulation, the measure of relief was uniformly determined by

reference to the state law that gave rise to the right to relief.  See, e.g., Calvillo Marquez, Doc.

No. 35-8 at 91 ("To quantify [these borrowers'] damages, we have to determine the amount of

damages they could recover from IBC under state law."); id. at 82 (same); Doc. No. 33-11

(framing its inquiry into the appropriate amount of relief by applying Massachusetts law).[27]

Critically, even the agency now admits that, in the years before 2017, "the Department [took] the

position internally that the amount of relief due to [borrower defense] applicants [was] dictated

by state law."  Policy Statement, U.S. Dep't of Educ., Tiered Relief Methodology to Adjudicate

Certain Borrower Defense Claims 9 (December 10, 2019),

http://ed.gov/sites/default/files/documents/borrower-defense-relief.pdf.  According to the agency,

"[t]his position was based on an extension of the application of state law in the adjudication of

[borrower defense] claims under the 1995 regulation to the determination of relief and reliance,"

---

[27] Remarkably, in its ACI memorandum, Doc. No. 33-11, the agency makes this observation
when determining the appropriate amount of relief: "The facts described above with respect to
ACI's practices and product resemble those for Corinthian Colleges, where the Department
determined that borrowers should receive full relief. This determination was based in substantial
part on the lack of value attendant to a Corinthian education."  Id. at 10.  The agency then
applied Massachusetts case law to determine that full relief was appropriate.

which adopted the interpretive method endorsed by "courts in consumer protection cases."  Id.

Education has pointed to no contemporaneous adjudications under the governing 1995 borrower

defense regulation in which the agency determined the measure of relief for a borrower defense

claim arising from a state law cause of action on a basis other than by reference to state law.[28]

Irrespective of whether the agency was required by statute or regulation to apply the 1995

borrower defense regulation in this manner, it may not irrationally shift the legal framework that,

in practice, governed like applications for relief.  As the First Circuit recently reiterated, "an

agency is expected to 'apply the same basic rules to all similarly situated supplicants.'"

Thompson, 2020 WL 2570167, at *6 (quoting Henry, 74 F.3d at 6).  Indeed, a "zigzag course is

not open to an agency when . . . the agency has failed to explain why it is changing direction."

Id. (quoting Davila-Bardales v. I.N.S., 27 F.3d 1, 5 (1st Cir. 1994)).

Here, defendants offer one post-hoc attempt to distinguish its contemporaneous

adjudication of the ACI matter: They note that ACI, unlike Corinthian, "actually required its

students to sign an acknowledgment that they had received the information containing the

misrepresentations."  Williams, Civil Case No. 16-11949, Doc. No. 81 at 18.  This attempt fails

for two reasons.  First, as the agency itself noted in the ACI memorandum, "individual reliance

on a representation is not required" for Massachusetts borrowers to either state a claim or receive

full relief under the 1995 borrower defense regulation.  Doc. No. 33-11 at 8 (emphasis in

original).  Second, this factual difference in no way explains or supports a departure in this case

from the settled legal rule that uniformly governed the measure of relief in borrower defense

adjudications.  As the First Circuit has long held, the law "prohibit[s] an agency from adopting

---

[28] The Court notes that Education was enjoined from utilizing a post-2017 methodology for
determining the measure of borrower defense relief.  Calvillo Manriquez, 345 F. Supp. at 1107.

significantly inconsistent policies that result in the creation of 'conflicting lines of precedent governing the identical situation.'" Davila-Bardales, 27 F.3d at 5 (quoting Shaw's Supermarkets, Inc. v. NLRB, 884 F.2d 34, 37 (1st Cir. 1989)).  Given this prohibition, as well as the clarity of the agency's pre-2017 adjudicatory practice, the Court need not remand this matter to the agency for redetermination.

Notwithstanding this undisputed evidence as to plaintiffs' entitlement to relief and their entitlement to full loan discharges, defendants argue that the Court may not issue declaratory relief in this case because doing so would "circumvent the ordinary remand rule."  Doc. No. 49 at 14.  However, the DJA allows "any court of the United States" to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," so long as the declaration is made "[i]n a case of actual controversy within [that court's] jurisdiction."  28 U.S.C. § 2201(a).  "Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants."  Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995); Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 534 (1st Cir. 1995) (noting that the DJA is "designed to enable litigants to clarify legal rights and obligations").  Ultimately, the Supreme Court has held that "the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power."  Pub. Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 243 (1952).

The parties do not dispute that the Secretary may, pursuant to the HEA, "sue . . . in any district court of the United States," including to "enforce" any "claim" arising from her administration of the federal student loan programs.  20 U.S.C. § 1082(a); see also United States

v. Mance, 2020 WL 1080438, at *1 (E.D.N.Y. Mar. 6, 2020) ("The United States of America . . .

commenced the instant action to recover the amounts owed by Defendant Shondell Mance on

Mance's defaulted student loan").   In their Answer to plaintiffs' Second Amended Complaint,

defendants also admit that "[i]n such a lawsuit, the individual borrower, as defendant, could raise

a borrower defense to [Education's] claim, based on school misconduct."   Doc. No. 37 ¶ 174;

Doc. No. 28 ¶ 174.   Further, defendants admit that "[t]his Court may exercise jurisdiction over

the affirmative defense to putative collection actions raised by the AGO in her borrower defense

submission and reiterated by the Plaintiff Class in this action."   Doc. No. 37 ¶ 175; Doc. No. 28 ¶

175.

        In these circumstances, the Court concludes that declaratory relief is appropriate.   The

parties dispute whether the DTR Application "in and of itself or in combination with all other

information available to [Education] . . . establish[es] a borrower defense for any and all

individuals who took out a federal student loan in connection with Everest Massachusetts."   Doc.

No. 28 ¶ 8.   The resolution of this dispute depends on whether plaintiffs can "assert," as the 1995

borrower defense regulation demands, "any act or omission of the school attended by the

student[s] that would give rise to a cause of action against the school under applicable State

law."   34 C.F.R. § 685.206(c)(1) (eff. until Oct. 16, 2018).   If plaintiffs have asserted such acts or

omissions, then they have necessarily "established an equivalent right to relief from the

obligation to repay a Direct Loan."   First Special Master Report at 4 (emphasis added and

alteration omitted).   As noted above, the parties also dispute whether they are entitled to full

relief as a matter of law.   Where, as here, the Court is faced with purely legal questions and

benefits from a robust evidentiary record, the Court is well-suited to declare the litigants' rights.

G.      Certifications of Legal Enforceability and Wage Garnishment Orders

In their Second Amended Complaint, plaintiffs also seek a declaration that "every certification of legal enforceability and every wage garnishment order issued by the Department, since November 26, 2015, against any individual listed on Exhibit 4 is unlawful."  Doc. No. 28 at 30.  The Court has not made such a declaration for two reasons.  First, in light of the declarations made by the Court, a declaration with respect to the certifications or wage garnishments might be moot.  Second, not all of the borrowers who took out loans associated with Exhibit 4 students have been subject to certifications or wage garnishments, thus raising significant class certification concerns.  See Fed. R. Civ. P. 23(b)(2) (dictating that relief must be "appropriate with respect to the class as a whole").

The Court does note, however, that Education has admitted in a binding Answer that "[s]tate law provides the standard for borrower defense for all federal student loans at issue in this lawsuit."  Doc. No. 37 ¶ 33.  Further, Education has admitted in a binding stipulation that a Massachusetts Superior Court entered judgment against Corinthian for violations of Massachusetts state law in a lawsuit that sought "full and complete restitution to current and former students at Everest MA schools."  Doc. No. 33 ¶ 4, Doc. No. 33-1 at 47.  Despite these unequivocal concessions, Education has acknowledged that "collection procedures on unpaid federal student loans," including certifications to TOP and wage garnishments, "continue for former Massachusetts Everest students who have not personally applied for Borrower Defenses or other types of student loan discharges."  Doc. No. 33 ¶ 19.   The agency has also argued that "[m]ere presence on the Exhibit 4 list does not preclude certification or collection activity."  Doc. No. 56 at 2.  Of course, a complete borrower defense to repayment vitiates Education's ability to certify a loan for tax refund offset or seek wage garnishment.  See 34 C.F.R. §

685.206(c) (eff. until Oct. 16, 2018).  And, as this Court has previously held, the agency is <u>bound</u> by statute and regulation to consider such a defense before a certification or wage garnishment decision is made.  <u>See</u> 31 U.S.C. § 3720A(b); 31 C.F.R. § 285.2(b)–(d).

IV.  <u>ORDER</u>

For the foregoing reasons, the Court concludes that: (1) the DTR Application was a valid borrower defense application on behalf of all individuals who took out federal student loans to pay for the cost of attendance for students listed in Exhibit 4, including those who took out Parent PLUS loans; (2) defendants constructively denied the DTR Application without rendering a reasoned decision, thus violating the APA's prohibition on arbitrary and capricious agency action; and (3) plaintiffs have established that they are entitled full loan discharges and a favorable borrower defense decision pursuant to 34 C.F.R. § 685.206(c)(1) (eff. until Oct. 16, 2018).  Accordingly, the Court hereby:

(1) ALLOWS the plaintiffs' Motion for Judgment, Doc. No. 38;

(2) DECLARES that the DTR Application was a valid borrower defense to repayment application submitted on behalf of all individuals who took out federal student loans to pay for the cost of attendance for students listed in Exhibit 4;

(3) SETS ASIDE the defendants' constructive denial of the DTR Application for borrower defense relief submitted on behalf of all individuals who took out federal student loans to pay for the cost of attendance for students listed in Exhibit 4;

(4) DECLARES that plaintiffs have established a right to borrower defense relief for all individuals who took out federal student loans to pay for the cost of attendance for students listed in Exhibit 4;

(5) DECLARES that plaintiffs are entitled to full loan discharges pursuant to the agency's settled course of adjudication;[29]

(6) REMANDS this matter to the Secretary to render a reasoned decision not inconsistent with this Order;

(7) ORDERS the Secretary to issue her reasoned decision within 60 days of the issuance of this Order or such further time allowed by the Court;[30]

---

[29] In a post-argument letter, defendants claim, without evidentiary support, that Education is unable to search its database for borrowers who took out loans for individuals in Exhibit 4 because the DTR Application does not contain birth dates and social security numbers for all such individuals. Doc. No. 56 at 2. The Court notes that within three days of Named Plaintiff Noemy Santiago entering this case—at which point the Amended Complaint and Santiago's Affidavit in support of class certification merely contained her name, dates of attendance at Everest Brighton, and information about which program she attended at Everest Brighton, see Doc. No. 24 ¶¶ 67-80, Doc. No. 29-3—an Education loan analyst produced Santiago's entire loan history, Doc. No. 34. The loan analyst's declaration states that her search of Education's various databases was based on "documents submitted by [Santiago] in this lawsuit." Id. ¶ 8. There is no indication in the loan analyst's declaration that birth dates or social security numbers are necessary to search loan records maintained by or available to the agency, nor is there any support for defendants' claim that Education's "database . . . is not organized by school." Doc. No. 56 at 2. (It is unclear which "database" defendants mean to reference in their post-argument letter. Indeed, as Education's loan analyst confirms in her declaration, electronic records are maintained in several databases, including the Common Origination and Disbursement (COD) system, the National Student Loan Database System, and the Debt Management Collection System. Doc. No. 34 ¶¶ 4-6.). To the extent that defendants require additional information about borrowers who took out loans for those listed in Exhibit 4 in order to effectuate the relief to which borrowers are entitled, that is a matter of implementation that the agency shall consider upon remand.

[30] The Court has carefully considered the time required for the Secretary to render a decision. Among other factors, the Court notes: (1) the AGO filed the DTR Application almost five years ago; (2) the Court rendered its decision in Williams well over a year and a half ago; and (3) defendants have demonstrated their ability to expeditiously compile relevant loan documents for individuals listed in Exhibit 4. See supra note 29. Defendants complain that plaintiffs' case is a plea for favoritism, a request to "jump ahead of all existing claimants without having followed the rules." Doc. No 49 at 2. The Court respectfully disagrees. The DTR Application was filed in 2015. Education never issued a reasoned decision in response to the DTR Application. The Court found in Williams that the DTR Application was a valid borrower defense application as to two borrowers listed in Exhibit 4 and ordered Education to adjudicate the individual borrower defense that the DTR Application presented on their behalf. Education did not appeal this judgment; instead, it persisted in its view that the law did not require it to render a reasoned

(8) RETAINS jurisdiction of this matter in the event of an appeal from or challenge to the

administrative decision ordered by paragraph 6.

The clerk shall issue a final judgment.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

decision or frankly acknowledge its constructive denial of the borrower defense that the DTR Application raised on behalf of all borrowers connected to Exhibit 4 students.  Another suit predictably followed.  The Court has now ruled.  With the five-year anniversary of the AGO's submission of the DTR Application approaching, the Court concludes that plaintiffs are not "jumping ahead" of anyone at all.